**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1148

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

GPA MIDSTREAM ASSOCIATION and AMERICAN PETROLEUM
INSTITUTE
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION and PIPELINE and
HAZARDOUS MATERIALS SAFETY ADMINISTRATION,
*Respondents*.

---

On Petition for Review of a Final Rule from the United States Department of
Transportation and Pipeline and Hazardous Materials Safety Administration

---

**INITIAL BRIEF OF PETITIONERS GPA MIDSTREAM
ASSOCIATION AND AMERICAN PETROLEUM INSTITUTE**

---

Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
*Counsel for Petitioners GPA
Midstream Association and American
Petroleum Institute*

Dated: October 21, 2022

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### A.     Parties and *Amici*

The parties before this Court are the Petitioners, the GPA Midstream Association ("GPA") and American Petroleum Institute ("API"), and the Respondents, the United States Department of Transportation and Pipeline and Hazardous Materials Safety Administration (collectively, the "Department").  There are no *amici* or intervenors.

### B.     Rulings Under Review

GPA and API (collectively "Petitioners") seek review of a final rule prescribed by the Department, entitled *Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards*, 87 Fed. Reg. 20,940 (Apr. 8, 2022) (the "Final Rule").

### C.     Related Cases

This case has not been before this Court previously, and there is no other previous or pending appeal before this Court arising out of the Final Rule.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners submit the following corporate disclosure statement.

GPA has served the U.S. energy industry since 1921.  GPA is composed of nearly 60 corporate members that are engaged in the gathering and processing of natural gas into merchantable pipeline gas, commonly referred to as "midstream

i

activities." Such processing includes the removal of impurities from the raw gas stream produced at the wellhead as well as the extraction for sale of natural gas liquid products ("NGLs") such as ethane, propane, butane, and natural gasoline or in the manufacture, transportation, or further processing of liquid products from natural gas. GPA membership accounts for more than 90 percent of the NGLs produced in the United States from natural gas processing. GPA has no parent companies, and no publicly held company has a 10 percent or greater ownership interest in GPA.

API represents all segments of America's natural gas and oil industry, which supports more than 11 million U.S. jobs and is backed by a growing grassroots movement of millions of Americans. Our nearly 600 members produce, process, and distribute the majority of the nation's energy, and participate in API Energy Excellence®, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting. API was formed in 1919 as a standards-setting organization and has developed more than 800 standards to enhance operational and environmental safety, efficiency, and sustainability. API has no parent company, and no publicly held company has a 10 percent or greater ownership in API.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY......................................................................................xi

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW .........................3

STATUTES AND REGULATIONS........................................................4

STATEMENT OF THE CASE................................................................5

    A.    Factual Background....................................................................5

        1.    The Department prescribes pipeline safety standards pursuant to authority provided in the Pipeline Safety Act..........5

        2.    The Department's safety standards for gathering lines are unique.....................................................................................6

        3.    The Department satisfied a prior congressional mandate by establishing regulations for gathering lines in the mid-2000s. ......................................................................................7

        4.    The Department's mid-2000s gathering line regulations were in effect when Congress passed the 2011 Act. .................9

    B.    Procedural History...............................................................10

        1.    In the 2011 Act, Congress gave the Department specific instructions about requiring the use of rupture-mitigation valves on transmission pipeline facilities. ................................10

        2.    In 2012, the Department obtained information about the use of rupture-mitigation valves on transmission lines. ...........12

        3.    In February 2020, the Department proposed regulations requiring the use of rupture-mitigation valves on certain pipelines. ................................................................................14

        4.    In April 2020, GPA and API commented that the proposed regulations would require the use of rupture-mitigation valve on gathering lines...........................................16

        5.    In mid-July 2020, the Department said for the first time that it intended to require rupture-mitigation valves on gathering lines. ........................................................................17

iii

6.  In late-July 2020, the Pipeline Advisory Committees questioned the appropriateness of requiring rupture-mitigation valves on gathering lines due to the lack of public notice. ............................................................18

7.  In April 2022, the Department nevertheless issued final regulations requiring the use of rupture-mitigation valves on certain gathering lines. .........................................22

SUMMARY OF ARGUMENT ................................................24

STANDING ..........................................................................25

STANDARD OF REVIEW ...................................................27

ARGUMENT ........................................................................28

I.  The Department Disregarded The Clear And Unambiguously Expressed Intent Of Congress. ...........................................28

A.  The Department Cannot Use the Rulemaking Authority in Section 60102(n)(1) to Require Rupture-Mitigation Valves on Gathering Lines. ................................................29

1.  The statutory text and structure confirm that "transmission pipeline facilities" are not "gathering pipelines facilities." ...........................................30

2.  The legislative history supports the conclusion that "transmission pipeline facilities" are not "gathering pipeline facilities." ...............................33

3.  The Department has recognized that "transmission pipeline facilities" are not "gathering pipeline facilities" in satisfying other rulemaking mandates. ................................34

4.  The Department has long recognized that transmission lines are not gathering lines in its own regulations .................36

5.  The Final Rule requires the use of rupture-mitigation valves on "gathering pipeline facilities" that are not "transmission pipeline facilities." .............................37

6.  The Department cannot use the rulemaking authority in Section 60102(n)(1) to require rupture-mitigation valves on "gathering pipeline facilities." .............................38

B.  The Department Cannot Use its General Rulemaking Authority in Section 60102(a) to Circumvent the Specific Rulemaking Requirements in Section 60102(n)(1). ................................39

iv

      1.     Section 60102(n)(1) is a specific rulemaking provision that limits the Department's discretion under the general rulemaking authority in Section 60102(a). .............................40

      2.     The specific-trumps-the-general canon applies in determining the extent of the Department's rulemaking authority under Section 60102(n)(1) and (a). ..........................42

      3.     The text of Section 60102(n)(1) confirms that the Department cannot use its general rulemaking authority in Section 60102(a) to require rupture-mitigation valves.........44

      4.     The Final Rule shows why Congress did not want the Department to use its general rulemaking authority in Section 60102(a) to require rupture-mitigation valves.............45

   C.     The Department Cannot Use the Hazardous Materials Transportation Safety Act or Mineral Leasing Act to Require Rupture-Mitigation Valves on Gathering Lines..................................46

II.    Even If The Department Had The Authority To Require The Use Of Rupture-Mitigation Valves On Gathering Pipeline Facilities, The Regulations In The Final Rule Are Unlawful For Other Reasons. ..............47

   A.     The Department did not Comply with the Risk Assessment Requirements........................................................................47

   B.     The Department did not Comply with the Pipeline Advisory Committee Requirements.....................................................50

   C.     The Department did not Comply with the Reasoned Decisionmaking Requirement.............................................52

   D.     The Department did not Adequately Support its Disparate Treatment of Gathering and Distribution Lines.................53

III.   The Rupture-Mitigation Valve Requirements For Gathering Lines In The Final Rule Must Be Vacated And Remanded To The Department For Further Proceedings. .......................................................55

CONCLUSION ....................................................................................57

## TABLE OF AUTHORITIES

**Page**

### Cases

*Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017) ...................32

*Air Alliance Houston v. EPA*, 906 F.3d 1049, 1053 (D.C. Cir. 2018)...............39, 43

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146
  (D.C. Cir. 1993) ................................................................................55

*American Petroleum Inst. v. EPA*, 706 F.3d 474 (D.C. Cir. 2013) ........................39

*American Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995) ........................40

*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998)........................................40

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).......................................28

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ...............................49

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)..........................................................................29

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1
  (D.C. Cir. 2015) ...........................................................................51-52

*Eagle Pharm., Inc. v. Azar*, 952 F.3d 323 (D.C. Cir. 2020) ...................................33

*Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984) .........53

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  45 F.4th 306 (D.C. Cir. 2022)..............................................................29

*Hall v. United States*, 566 U.S. 506, 516 (2012) ......................................................9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........27

*Lilliputian Sys., Inc. v. PHMSA*, 741 F.3d. 1309 (D.C. Cir. 2014) ........................53

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .............................................26

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001) ....................................... 28, 39-40

vi

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................... 47

*National Credit Union Admin. v. First Nat. Bank & Trust Co.*,
    522 U.S. 479 (1998) ................................................................. 27

*National Mining Ass'n v. U.S. Dept. of the Interior*, 105 F.3d 691
    (D.C. Cir. 1997) ....................................................................... 28

*New York Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) ...................... 28

*North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) .................................. 56

*Owner–Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188
    (D.C. Cir. 2007) ....................................................................... 48

*Public Citizen v. FMCSA*, 374 F.3d 1209 (D.C. Cir. 2004) .................................... 53

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ....................................................... 39, 42, 43

*Russello v. United States*, 464 U.S. 16 (1983) ......................................................... 32

*Sierra Club v. EPA*, 292 F. 3d 895 (D.C. Cir. 2002) ............................................... 25

*Southern Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882
    (D.C. Cir. 2006) ....................................................................... 26

*Tyler v. Cain*, 533 U.S. 656 (2001) ................................................................... 31-32

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ................................... 39

*WildEarth Guardians v. Chao*, 454 F. Supp. 3d 944 (D. Mont. 2020) .................. 47

**Statutes**

5 U.S.C. § 706(2) ................................................................................................. 27

49 U.S.C. § 5126(b)(1) ........................................................................................ 46

49 U.S.C. §§ 60101, *et seq.* ................................................................................... 5

49 U.S.C. § 60101(a) ........................................................................................... 30

49 U.S.C. § 60101(b) ................................................................................... 8, 31, 37

vii

49 U.S.C. § 60102(a) ........................................................................5, 40

49 U.S.C. § 60102(b) .......................... 10, 11, 47, 48, 50, 51, 52, 53

49 U.S.C. § 60102(f) ............................................................................31

49 U.S.C. § 60102(k) ...........................................................................31

49 U.S.C. § 60102(n) ...........................................10, 12, 29, 41, 45

49 U.S.C. § 60102(q) ...........................................................................31

49 U.S.C. § 60102(r) ............................................................................31

49 U.S.C. § 60102(t) ............................................................................31

49 U.S.C. § 60104 ................................................................................12

49 U.S.C. § 60110 ................................................................................31

49 U.S.C. § 60113 ................................................................................31

49 U.S.C. § 60115 ...........................................................................11, 12

49 U.S.C. § 60119(a)(3) .....................................................................27

Accountable Pipeline Safety and Partnership Act of 1996 Pub. L. No. 104-304, 110
   Stat. 3793 ...........................................................................................7

Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96-129, Title II, 93
   Stat. 989, 1003 ..................................................................................6

Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720 ...........6

Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289.....................7, 34

Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-
   90 (2012), 125 Stat. 1904......................................................................9

Pipeline Safety Reauthorization Act of 1988, Pub. L. No. 100-561,
   102 Stat. 2805 ................................................................................9, 34

Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020,
   Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020),
   134 Stat. 2210 ...................................................................................33

viii

Pub. L. 103-272, (1994), 108 Stat. 1301...................................................7

**Regulations**

49 C.F.R. § 1.96 (2021) ...............................................................5

49 C.F.R. §§ 191.15-191.17.......................................................... 38

49 C.F.R. §§ 191.23-191.29.......................................................... 38

49 C.F.R. § 192.3 ........................................................................36

49 C.F.R. § 195.2 ........................................................................36

49 C.F.R. Part 195, Subpart B .....................................................38

**Other Authorities**

**Other Authorities**

*Establishment of Minimum Standards*, 35 Fed. Reg. 13,248
  (Aug. 19, 1970)...............................................................6, 7, 36

*Gas Gathering Line Definition; Alternative Definition for Onshore Lines and New
  Safety Standards*, 71 Fed. Reg. 13,289 (Mar. 15, 2006) ................8, 37

*Part 190—Interim Minimum Federal Safety Standards for the Transportation of
  Natural and Other Gas by Pipeline*, 33 Fed. Reg. 16,500 (Nov. 13, 1968)........6

*Passage of Instrumented Internal Inspection Devices*, 59 Fed. Reg. 17,275 (Apr.
  12, 1994) .......................................................................35

*Pipeline Safety: Protecting Unusually Sensitive Areas from Rural Onshore
  Hazardous Liquid Gathering Lines*, 73 Fed. Reg. 31,634 (June 3, 2008) .....8, 37

*Pipeline Safety: Notice of Public Meetings on Improving Pipeline Leak Detection
  System Effectiveness and Understanding the Application of Automatic/Remote
  Control Valves*, 77 Fed. Reg. 6,857 (Feb. 9, 2012).....................12, 54

*Pipeline Safety: Public Comment on Leak and Valve Studies Mandated by the
  Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011*, 77 Fed.
  Reg. 19,414 (Mar. 30, 2012).......................................................13, 54

ix

*Pipeline Safety: Safety of Gas Transmission Pipelines: MAOP Reconfirmation, Expansion of Assessment Requirements, and Other Related Amendments*, 84 Fed. Reg. 52,180, 52,182 (Oct. 1, 2019) ...........................................................35

*Pipeline Safety: Meeting of the Gas and Liquid Pipeline Safety Advisory Committees*, 85 Fed. Reg. 37,496 (June 22, 2020)..............................................17

*Transportation of Liquids by Pipeline*, 46 Fed. Reg. 38,357 (July 27, 1981)...........7

*Transportation of Hazardous Liquids; Gathering Lines in Rural Areas*, 51 Fed. Reg. 15,005 (Apr. 22, 1986) ...............................................................................36

Review of Existing Federal and State Regulations for Gas and Hazardous Liquid Gathering Lines, ORNL/TM-2013/133 (Sept. 4, 2013) ......................................14

H.R. Rep. No. 90-1390 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3223 ...................7

S. Rep. No. 96-182 (1979), *reprinted in* 1979 U.S.C.C.A.N. 1971 ........................7

H.R. Rep. 102-247(I), *reprinted in* 1992 U.S.C.C.A.N. 2642.....................................

*In the Matter of EnLink Ohio River Valley Pipeline, LLC*, C.P.F. No. 3-2015-5009, Final Order (Jan. 18, 2018)................................................................................37

*Gov't Accountability Office*, GAO-13-168, Pipeline Safety; Better Data and Guidance Needed to Improve Pipeline Operator Incident Response (Jan. 2013)...................................................................................................................9

x

## **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| API | American Petroleum Institute |
| ASV | Automatic shut-off valve |
| Department | United States Department of Transportation and Pipeline and Hazardous Materials Safety Administration |
| Final Rule | *Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards*, 87 Fed. Reg. 20,940 (Apr. 8, 2022) |
| GPA | GPA Midstream Association |
| GPAC | Gas Pipeline Advisory Committee |
| LPAC | Liquid Pipeline Advisory Committee |
| NPRM | Notice of proposed rulemaking |
| Oak Ridge | Oak Ridge National Laboratory |
| Petitioners | American Petroleum Institute and GPA Midstream Association |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| Pipeline Safety Act | 49 U.S.C. §§ 60101, *et seq.* |
| RCV | Remote-control valve |
| RMVs | Rupture-mitigation valves |
| 1968 Act | Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720 |
| 1979 Act | Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989 |

xi

| | |
|---|---|
| 1988 Act | Pipeline Safety Reauthorization Act of 1988, Pub. L. No. 100-561, 102 Stat. 2805 |
| 1992 Act | Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289 |
| 1994 Act | Pub. L. 103–272, (1994), 108 Stat. 1301 |
| 1996 Act | Accountable Pipeline Safety and Partnership Act of 1996 Pub. L. No. 104-304, 110 Stat. 3793 |
| 2011 Act | Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-90 (2012), 125 Stat. 1904 |
| 2020 Act | Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020), 134 Stat. 1181, 2235 |

## INTRODUCTION

More than ten years ago, in the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-90 (2012), 125 Stat. 1904 ("2011 Act"), Congress told the Department to consider requiring the use of certain valve technologies—referred to in this proceeding as "rupture-mitigation valves," or RMVs—on "transmission pipeline facilities."  Transmission lines are a type of pipeline used to transport oil or gas to storage facilities, distribution centers, or, in some cases, directly to end users.  Congress *did not* tell the Department in the 2011 Act to consider requiring RMVs on "gathering pipeline facilities".  Gathering lines are a different type of pipeline used to transport oil or gas from a production facility to a central collection point for further processing or transportation, typically in a transmission line.  Congress has long understood the difference between transmission and gathering lines—and certainly could have told the Department in the 2011 Act to consider requiring RMVs on "gathering pipeline facilities"—but chose not to do so.

Perhaps unsurprisingly then, the Department did not say anything about requiring RMVs on "gathering pipeline facilities" for the next *eight* years—not during the public meeting that the Department held to discuss RMVs, or in the 344-page technical study that the Department commissioned on the use of RMVs, or in the 53-page *Federal Register* notice that the Department issued containing the

proposed RMV regulations, or in the 50-page preliminary regulatory impact analysis and 20-page draft environmental assessment that the Department prepared for the proposed RMV regulations. In fact, the first time the Department ever said anything about requiring RMVs on gathering pipeline facilities was a few days before presenting its proposed regulations to two federal advisory committees for peer review. And after hearing the public comments from GPA, API, and others, both committees issued reports to the Department questioning the appropriateness of that action due to the lack of public notice.

But the Department dismissed all of these concerns and issued final regulations requiring RMVs on certain gathering pipeline facilities anyway. In justifying that decision, the Department explained that it never said that the RMV regulations *would not* apply to gathering lines, and that statement was true, of course—the Department had not said or done anything on the subject for more than eight years. More importantly, the Department also chose not to address another issue that had been raised throughout the rulemaking process—namely, the fact that Congress had never told it to require RMVs on "gathering pipeline facilities" *in the first place*. The Department's decision to stay silent when faced with that concern says more than any response ever could.

So, in the end, this case is really about what Congress *did not tell* the Department to do more than a decade ago; what the Department *did not say* for the

2

next eight years; and what the Department *did not do* in the years that followed. And why all the things that *did not happen* make the RMV regulations for gathering lines unlawful.

## JURISDICTIONAL STATEMENT

On July 1, 2022, Petitioners filed a petition with this Court for judicial review of the Final Rule. They filed the petition within 89 days of April 7, 2022, the date that the Office of the Federal Register made the Final Rule available for public inspection, and April 8, 2022, the date that the Office of the Federal Register published the Final Rule in the *Federal Register*. Accordingly, this Court has jurisdiction to hear the petition, and venue is proper under 49 U.S.C. § 60119(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.     Whether the Department disregarded the clear and unambiguously expressed intent of Congress by adopting regulations in the Final Rule that require the use of automatic or remote-controlled shut-off valves, or equivalent technology, on "gathering pipeline facilities," when the specific rulemaking provision on that subject in 49 U.S.C. § 60102(n)(1) is limited to "transmission pipeline facilities"; the general rulemaking authority in 49 U.S.C. § 60102(a) cannot be used to circumvent the specific requirements in 49 U.S.C. § 60102(n)(1); and the other statutes referenced in the Final Rule do not authorize that action.

3

II.     Whether the Department violated the rulemaking requirements in the Pipeline Safety Act and Administrative Procedure Act by adopting regulations in the Final Rule that require the use of automatic or remote-controlled shut-off valves, or equivalent technology, on certain gathering pipeline facilities, without complying with the risk assessment requirements in 49 U.S.C. § 60102(b)(2)(D)-(E) and (b)(3), the pipeline advisory committee requirements in 49 U.S.C. §§ 60102(b)(2)(G) and (b)(4) and 60115(c), and the reasoned decisionmaking requirements in 49 U.S.C. § 60102(b)(5), or providing an adequate explanation for its disparate treatment of gathering and distribution pipeline facilities.

III.    Whether, given the seriousness of the deficiencies and lack of disruptive consequences, the Court must vacate the regulations in the Final Rule that require the use of automatic or remote-controlled shut-off valves, or equivalent technology, on certain gathering pipeline facilities and remand to the matter to the Department for further action.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are contained in "Addendum A" to this brief.

4

## STATEMENT OF THE CASE

**A.    Factual Background**

**1.    The Department prescribes pipeline safety standards pursuant to authority provided in the Pipeline Safety Act.**

The Department administers the provisions in the Pipeline Safety Act, the federal law that authorizes the nation's safety program for gas, hazardous liquid, and carbon dioxide pipeline facilities.  49 U.S.C. §§ 60101, *et seq.*; 49 C.F.R. § 1.96 (2021).  One of the Department's primary obligations under the Act is "to prescribe minimum safety standards for pipeline transportation and for pipeline facilities."  49 U.S.C.  § 60102(a)(2).   The Department has prescribed those minimum safety standards for gas pipeline facilities in 49 C.F.R. Part 192 and hazardous liquid and carbon dioxide pipeline facilities in 49 C.F.R. Part 195.

This case concerns a safety standard for gathering lines.  A gathering line is a type of pipeline that transports oil or gas from a production facility to a central collection point for further processing or transportation.  Typically, another type of pipeline, known as a transmission line (or, as sometimes described in the historical vernacular, a trunkline), receives the oil or gas from the gathering line at that central collection point.  The transmission line then carries the oil or gas to a storage facility, distribution center, or, in some cases, directly to an end user.  A third type of pipeline, known as a distribution line, delivers gas from a transmission line (or, much less frequently, from a gathering line) directly to consumers.  Distribution lines are not

5

used to deliver oil directly to consumers. PHMSA, Natural Gas Systems, https://primis.phmsa.dot.gov/comm/NaturalGasPipelineSystems.htm?nocache=7521 (last visited Oct. 20, 2022); PHMSA, Petroleum Pipeline Systems, https://primis.phmsa.dot.gov/comm/PetroleumPipelineSystems.htm?nocache=1120 (last visited Oct. 20, 2022).

### 2.    The Department's safety standards for gathering lines are unique.

The Department's safety standards for gathering lines reflect the unique history, operating characteristics, and functions performed by these pipelines. By way of background, in the Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720 (the "1968 Act"), the federal law that originally authorized the nation's gas pipeline safety program, Congress provided the Department with broad authority to regulate the transmission and distribution of gas by pipeline. And the Department subsequently used that broad authority to prescribe comprehensive safety standards for gas transmission and distribution lines. *Establishment of Minimum Standards*, 35 Fed. Reg. 13,248, 13,258-59 (Aug. 19, 1970); *see also Part 190—Interim Minimum Federal Safety Standards for the Transportation of Natural and Other Gas by Pipeline*, 33 Fed. Reg. 16,500, 16,500-16,503 (Nov. 13, 1968). Similarly, in the Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96-129, Title II, 93 Stat. 989, 1003 (the "1979 Act"), Congress delegated the Department broad authority to regulate the movement of hazardous liquid by pipeline. And the

6

Department subsequently used that broad authority to prescribe safety standards for hazardous liquid pipelines.  *Transportation of Liquids by Pipeline*, 46 Fed. Reg. 38,357 (July 27, 1981).

But Congress gave the Department more limited authority to regulate gathering lines in the 1968 and 1979 Acts.  Citing the absence of sufficient data to justify federal regulation, Congress prohibited the Department from exercising jurisdiction over gas or hazardous liquid gathering lines in rural areas.  H.R. Rep. No. 90-1390 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3223, 3234–3235; S. Rep. No. 96-182 (1979), *reprinted in* 1979 U.S.C.C.A.N. 1971, 1988.  Because of that statutory exclusion, the Department's regulations only applied to gathering lines in non-rural areas for many years.  *Establishment of Minimum Standards*, 35 Fed. Reg. 13,248, 13,258–259 (Aug. 19, 1970); *Transportation of Liquids by Pipeline*, 46 Fed. Reg. 38,357, 38,361 (July 27, 1981).  And because most gathering lines were in rural areas, the Department traditionally regulated very few gathering lines.

3.    **The Department satisfied a prior congressional mandate by establishing regulations for gathering lines in the mid-2000s.**

In the Pipeline Safety Act of 1992, Pub. L. No. 102-508, § 109(b), § 208(b), 106 Stat. 3289, 3295, 3303-3304 ("1992 Act"), as recodified by Pub. L. 103–272, (1994), 108 Stat. 1301 ("1994 Act"), and amended by the Accountable Pipeline Safety and Partnership Act of 1996 Pub. L. No. 104-304, § 12, 110 Stat. 3793, 3802

7

("1996 Act") (currently codified at 49 U.S.C. § 60101(b)), Congress modified the original statutory exclusion for rural gathering lines and directed the Department to prescribe new regulations for gathering lines. The Department added the regulations for gas gathering lines to 49 C.F.R. Part 192 in 2006, establishing a two-tiered, risk-based regime of safety standards for regulated Type A gathering lines and Type B gathering lines. *Gas Gathering Line Definition; Alternative Definition for Onshore Lines and New Safety Standards*, 71 Fed. Reg. 13,289 (Mar. 15, 2006). The Department added the regulations for onshore hazardous liquid gathering lines to 49 C.F.R. Part 195 in 2008, also establishing a two-tiered, risk-based regime of safety standards for regulated gathering lines in non-rural and rural areas. *Pipeline Safety: Protecting Unusually Sensitive Areas from Rural Onshore Hazardous Liquid Gathering Lines*, 73 Fed. Reg. 31,634 (June 3, 2008).

As with the Department's original pipeline safety standards, the 2006 and 2008 regulations only applied to certain gathering line segments. To be regulated as a Type A or Type B gathering line under 49 C.F.R. Part 192, a gathering line had to be in a more populated location or pass within a prescribed distance of a building or small, well-defined outside area that met a specified occupancy threshold. For the regulations in 49 C.F.R. Part 195 to apply, a gathering line had to either be in a non-rural area or satisfy a three-part test. Most gathering lines did not satisfy these

8

criteria, and the length of regulated segments varied significantly depending on the

specific circumstances of the area surrounding the pipeline.[1]

###   4.   The Department's mid-2000s gathering line regulations were in effect when Congress passed the 2011 Act.

The Department's 2006 and 2008 regulations for gathering lines were in effect

when Congress enacted the 2011 Act.  Pub. L. 112-90, 125 Stat. 1904; *Hall v. United*

*States*, 566 U.S. 506, 516 (2012) ("We assume that Congress is aware of existing

law when it passes legislation") (*quoting Miles v. Apex Marine Corp.*, 498 U.S. 19,

32 (1990)).  In Section 4 of the 2011 Act, Congress repealed an earlier provision and

added a new rulemaking requirement for the use of automatic or remote-controlled

shut-off valves on certain transmission pipeline facilities.  Pub. L. 112-90 § 4, 125

Stat. at 1907; *see Gov't Accountability Office*, GAO-13-168, Pipeline Safety; Better

Data and Guidance Needed to Improve Pipeline Operator Incident Response at 10-

11 (Jan. 2013) (describing basic differences between manual valves, automatic shut-

---

[1] For example, the Department's data for the 2011 calendar year reporting period indicates that only 7,770.6 miles of Type A gas gathering lines and 5,132.7 miles of Type B onshore gas gathering lines were regulated under 49 C.F.R. Part 192, as compared to 299,730.1 miles of onshore gas transmission lines and more than 2.1 million miles of gas distribution lines.   Pipeline Mileage and Facilities, PHMSA, https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-mileage-and-facilities (follow "2010+ Pipeline Miles and Facilities" link).   The same data indicates that only 2,919.1 miles of hazardous liquid gathering lines were regulated under 49 C.F.R. Part 195 out of a total of 183,574.6 miles of regulated hazardous liquid pipeline facilities.  *Id.*

9

off valves, and remote-controlled valves).  That new rulemaking requirement, as currently codified at 49 U.S.C. § 60102(n)(1), prompted the issuance of the regulations at issue in this case.

### B.    Procedural History

#### 1.    In the 2011 Act, Congress gave the Department specific instructions about requiring the use of rupture-mitigation valves on transmission pipeline facilities.

Section 60102(n)(1) of the Pipeline Safety Act states:

(n) Automatic and Remote-Controlled Shut-off Valves for New *Transmission Pipelines*.—
(1) In general.—Not later than 2 years after the date of enactment of this subsection, and after considering the factors specified in subsection (b)(2), the Secretary, if appropriate, shall require by regulation the use of automatic or remote-controlled shut-off valves, or equivalent technology, where economically, technically, and operationally feasible on *transmission pipeline facilities* constructed or entirely replaced after the date on which the Secretary issues the final rule containing such requirement.

49 U.S.C. § 60102(n)(1) (emphasis added).  Section 60102(b)(2)—the other statutory provision referenced in 49 U.S.C. § 60102(n)(1)—prescribes a list of factors that the Department must consider "[w]hen prescribing any standards" under certain statutory provisions.  *Id.* § 60102(b)(2).  Two of those factors are particularly relevant in this case.

First, the Department must consider "the reasonably identifiable or estimated benefits [and costs] expected to result from implementation or compliance with the

10

standard." 49 U.S.C. § 60102(b)(2)(D)-(E). The Department must conduct a "risk

assessment" to obtain that information, and in doing so must:

> (A) identify the regulatory and nonregulatory options that the Secretary considered in prescribing a proposed standard; (B) identify the costs and benefits associated with the proposed standard; (C) include—(i) an explanation of the reasons for the selection of the proposed standard in lieu of the other options identified; and (ii) with respect to each of those other options, a brief explanation of the reasons that the Secretary did not select the option; and (D) identify technical data or other information upon which the risk assessment information and proposed standard is based.

49 U.S.C. § 60102(b)(3).

Second, the Department must consider "the comments and recommendations

of the Technical Pipeline Safety Standards Committee," otherwise known as the Gas

Pipeline Advisory Committee ("GPAC"), "the Technical Hazardous Liquid Pipeline

Safety Standards Committee," otherwise known as the Liquid Pipeline Advisory

Committee ("LPAC"), "or both, as appropriate." *Id.* § 60102(b)(2)(G). The GPAC

and LPAC are peer review committees comprised of representatives from the

government, industry, and general public. *Id.* § 60115. The Department must

present proposed amendments to the safety standards in 49 C.F.R. Parts 192 and

195, along with the information in the risk assessment information and other

supporting analyses, to the GPAC or LPAC, respectively, for review. 49 U.S.C.

§ 60115(c)(1).

11

After completing that review, the GPAC and LPAC are authorized to provide the Department with a report within 90 days "on the technical feasibility, reasonableness, cost-effectiveness, and practicability of the proposed standard[s][,]" as well as "recommended actions and minority views." *Id.* § 60115(c)(2). The Department must, within 90 days of receiving a report, "provide a written response" to the GPAC or LPAC "concerning all significant peer review comments and recommended alternatives contained in the report." *Id.* § 60104(b)(4)(C). The Department must "publish the reasons" for rejecting any conclusions of the GPAC or LPAC in a rulemaking proceeding. *Id.* § 60115(c).

### 2.    In 2012, the Department obtained information about the use of rupture-mitigation valves on transmission lines.

On February 9, 2012, one month after the enactment of Section 60102(n)(1), the Department published a notice in the *Federal Register* announcing that a public meeting would be held to obtain information about the use of automatic shut-off and remote-controlled valves. *Pipeline Safety: Notice of Public Meetings on Improving Pipeline Leak Detection System Effectiveness and Understanding the Application of Automatic/Remote Control Valves*, 77 Fed. Reg. 6,857 (Feb. 9, 2012). The Department did not mention gathering lines at all in the notice. *Id.* Moreover, when the Department subsequently held the previously announced public meeting on March 28, 2012, none of the regulators, operators, or subject-matter experts invited

12

to participate offered any testimony regarding the use of automatic shut-off or remote-controlled valves on gathering lines.  (JA___ (PHMSA-2013-0255-0132)). In fact, the word "gathering" was only mentioned *twice* during the meeting—once by an industry participant who noted that the pipeline mileage data in his presentation excluded gathering lines (JA___ (*Id.* at 18)), and once more by another industry participant who noted that he had prior experience "in the gathering and processing side of the business."  (JA___ (*Id.* at 42)).

The Department published another notice in the *Federal Register* following the public meeting.  *Pipeline Safety: Public Comment on Leak and Valve Studies Mandated by the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011*, 77 Fed. Reg. 19,414 (Mar. 30, 2012).  In that notice, the Department asked the public to comment on the proposed scope of a technical study to obtain information about the use of automatic shut-off and remote-controlled valves for purposes of addressing the rulemaking mandate in 49 U.S.C. § 60102(n)(1).  *Id.*  While referring to "transmission pipelines," "transmission pipeline facilities," and "transmission pipeline operators," the Department did not mention gathering lines at all.  *Id.*

The Department selected the Oak Ridge National Laboratory ("Oak Ridge") to perform the technical study described in the notice.  (JA___ (PHMSA-2013-0255-0004)).  Consistent with the Department's instructions and the requirements in Section 60102(n)(1), Oak Ridge only considered the technical, operational, and

13

economic feasibility and potential costs and benefits of requiring automatic shut-off and remote-controlled valves on transmission lines in conducting that technical study. (*Id.*). In addition, Oak Ridge did not consider any issues relating to the use of automatic or remote-controlled shut-off valves on gathering lines in preparing a separate report for the Department to address a different provision for gathering lines in the 2011 Act. Review of Existing Federal and State Regulations for Gas and Hazardous Liquid Gathering Lines, ORNL/TM-2013/133 (Sept. 4, 2013), https://www.phmsa.dot.gov/news/review-existing-federal-and-state-regulations-gas-and-hazardous-liquid-gathering-lines-june-0.

### 3. In February 2020, the Department proposed regulations requiring the use of rupture-mitigation valves on certain pipelines.

On February 6, 2020, more than eight years after the enactment of the 2011 Act, the Department published a notice of proposed rulemaking ("NPRM") in the *Federal Register* containing valve installation and minimum rupture detection standards for gas, hazardous liquid, and carbon dioxide pipelines. (JA___ (PHMSA-2013-0255-0005)). To address the rulemaking mandate in Section 60102(n)(1), the Department proposed to add new requirements to 49 C.F.R. § 192.179 for the installation of automatic or remote-controlled shut-off valves or equivalent technology on certain onshore gas transmission lines with nominal pipe sizes of six inches or greater in diameter, as well as related operation and maintenance

14

requirements in 49 C.F.R. §§ 192.615, 192.617, 192.634, and 192.745.  (*Id.*at 7,182 – 7,185).  The Department also proposed to add requirements to 49 C.F.R. § 195.258 for the installation of automatic or remote-controlled shut-off valves or equivalent technology on certain hazardous liquid and carbon dioxide pipelines with nominal pipe sizes of six inches or greater in diameter, as well as related operation and maintenance requirements to 49 C.F.R. §§ 195.402, 195.418, and 195.420.  (*Id.* at 7,187 – 7,189)).

The Department did not mention gathering lines in the NPRM, except in passing reference to the title of another rulemaking proceeding.  (*Id.* at 7,166 (citing *Safety of Gas Transmission and Gathering Pipelines*, 81 Fed. Reg. 20,722 (Apr. 8, 2016))).  Nor did the Department include any information about gathering lines in the Preliminary Regulatory Impact Analysis—the document containing the risk assessment information for the NPRM as required under the Pipeline Safety Act.  (JA___ (PHMSA-2013-0255-0006)).  The Department did not discuss gathering lines in the Draft Environmental Assessment either—the document prepared to address the requirements in the National Environmental Policy Act.  (JA___ (PHMSA-2013-0255-0006)).

15

### 4. In April 2020, GPA and API commented that the proposed regulations would require the use of rupture-mitigation valve on gathering lines.

On April 6, 2020, GPA and API submitted written comments responding to the NPRM. (JA___, ___ (PHMSA-2013-0255-0020; PHMSA-2013-0255-0024)). In discussing the proposed requirements for the use of automatic or remote-controlled shut-off valves, or equivalent technology, GPA observed that the rulemaking provision in Section 60102(n)(1) only applied to "transmission pipeline facilities," but that the NPRM would require the use of automatic or remote-controlled shut-off valves on regulated gathering lines with nominal pipe sizes of six inches or greater as a result of the cross-referencing of certain transmission line requirements in Part 192 and Part 195. (JA___ (PHMSA-2013-0255-0020 at 10 - 12)). GPA opposed any proposal to that effect, stating that "[t]here [was] no indication that Congress intended to require the installation of [such valves] on gathering lines, or that doing so would be economically, technically, and operationally feasible." (*Id.* at 10). GPA also emphasized that, if the proposed requirements applied, "[t]he segmented nature of the Part 192 and Part 195 rules for gathering lines would create significant compliance challenges for operators, both at the time of installation and in the event of subsequent replacements." (*Id.* at 11). Finally, GPA noted that the Department had not produced any data to support that proposal. (*Id.*).

16

API offered many of the same comments in opposing the use of automatic and remote-controlled shut-off valves on regulated hazardous liquid gathering lines with nominal pipe sizes of six inches or greater under Part 195. Like GPA, API noted that Congress limited the rulemaking provision in Section 60102(n)(1) to "transmission pipeline facilities," that there was no data on the costs and benefits or economic, technical, and operational feasibility of requiring automatic and remote-controlled shut-off valves on regulated gathering lines, and that the segmented applicability of Part 195 created significant compliance challenges for gathering line operators. (JA___ (PHMSA-2013-0255-0024 at 3, 8 - 9)). Other commenters joined GPA and API in raising similar concerns. (JA___, ___ (PHMSA-2013-0255-0022; (PHMSA-2013-0255-0031)).

**5.    In mid-July 2020, the Department said for the first time that it intended to require rupture-mitigation valves on gathering lines.**

Shortly after the comment period closed, the Department announced that the GPAC and LPAC would hold a two-day public meeting to review the NPRM in late July 2020. *Pipeline Safety: Meeting of the Gas and Liquid Pipeline Safety Advisory Committees*, 85 Fed. Reg. 37,496 (June 22, 2020). The Department also held a pre-briefing session with the GPAC and LPAC a few days prior to the public meeting. (JA___ (PHMSA-2013-0255-0114; PHMSA-2013-0255-0117)).

17

During the pre-briefing session, the Department advised the GPAC and LPAC, for the first time, that it intended to require the use of automatic or remote-controlled shut-off valves or equivalent technology on regulated gas and hazardous liquid gathering lines but recommended that the GPAC consider providing an exception in Part 192 for Type B gas gathering lines. (*Id.* at 29). The Department did not explain why gathering lines were not referenced at all in the NPRM, Preliminary Regulatory Impact Analysis, or Draft Environmental Assessment. (JA___, ___, ___ (PHMSA-2013-0255-0005; PHMSA-2013-0255-0006; PHMSA-2013-0255-0006)). Nor did the Department provide the GPAC or LPAC with any additional data to consider in evaluating the costs, benefits, or other impacts of requiring automatic or remote-controlled shut-off valves on gathering lines. (JA___, ___ (PHMSA-2013-0255-0114; PHMSA-2013-0255-0117)).

### 6.    In late-July 2020, the Pipeline Advisory Committees questioned the appropriateness of requiring rupture-mitigation valves on gathering lines due to the lack of public notice.

On July 22, 2020, the Department convened the GPAC meeting. As in the pre-briefing session, the Department stated at the outset that it intended to require the use of automatic or remote-controlled shut-off valves or equivalent technology on Type A onshore gas gathering lines, but that an exception should be provided for Type B onshore gas gathering lines. (JA___ (PHMSA-2013-0255-0115 at 56, 66)). GPA objected to that proposal during the public comment period, prompting the

18

Department to change its original position and advise the GPAC that the use of automatic or remote-controlled shut-off valves or equivalent technology should only be required for regulated Type A onshore gas gathering lines with a nominal pipe size of greater than twelve inches.  (JA___ (PHMSA-2013-0255-0069 at 183–185)).

The GPAC members then discussed the NPRM.  During that discussion, an industry representative expressed his concerns with requiring automatic or remote-controlled shut-off valves or equivalent technologies on gathering lines, citing the failure to include any information about that proposal in the NPRM or Preliminary Regulatory Impact Analysis.  (*Id.* at 216–217).  A public representative expressed similar concerns, emphasizing the failure to consider the impact of requiring such valves on "isolated" segments of regulated gathering lines.  (*Id.* at 222).  Ultimately, the GPAC recommended that, in addition to providing an exception for all Type B lines and Type A lines with nominal pipe sizes of twelve inches or less, the Department consider the appropriateness of applying the proposed requirements for the use of automatic or remote-controlled shut-off valves to gathering lines in the current proceeding due to the lack of public notice.  (JA___, ___ (PHMSA-2013-0255-0069 at 239–242, 244–246; PHMSA-2013-0255-0065 at 2)).

On July 23, 2020, the Department convened the LPAC meeting.  The Department stated at the outset that it intended to require the use of automatic or remote-controlled shut-off valves or equivalent technology on all regulated

19

hazardous liquid gathering lines in non-rural areas. Departing slightly from the views it expressed a few days earlier in the pre-briefing session, however, the Department stated that these valves should only be required only for a subset of regulated rural gathering lines that cross certain bodies of water or drinking water resources that qualify as unusually sensitive areas. (JA___ (PHMSA-2013-0255-0109 at 54, 63, 66)). Again, GPA objected to that proposal during the public comment period, and further noted that the public had not been given an adequate opportunity to consider limiting the applicability of the valve requirements to regulated rural gathering lines that cross certain bodies of water, a proposal that had only been made for the first time that day. (JA___ (PHMSA-2013-0255-0093 at 136–138)). API raised similar objections to the Department's proposal during the public comment period. (*Id.* at 138–139).

The LPAC members then discussed the NPRM. During that discussion, an industry representative expressed his opposition to requiring the use of automatic or remote-controlled shut-off valves or equivalent technology on gathering lines, citing the comments provided by GPA and API. (*Id.* at 140-142). A public representative also acknowledged that "the lack of public notice" was "a huge barrier" to including that proposal in the final rule. (*Id.* at 155). Like the GPAC, the LPAC ultimately recommended that the Department consider the appropriateness of applying the

20

proposed requirements to gathering lines in the current proceeding due to the lack of public notice. (*Id.* at 179–181).

In comments submitted after the GPAC and LPAC meetings, GPA stated yet again that it "remain[ed] strongly opposed to applying the rupture mitigation installation requirements to gas gathering lines[,]" noting that "the GPAC [had] unanimously concluded" that "the [Department] did not provide the public with adequate notice of its intent to pursue that action in the NPRM[.]" (JA___ (PHMSA-2013-0255-0039 at 2)). GPA also reiterated that the Department had not included any information about gathering lines in the Preliminary Regulatory Impact Analysis. (*Id.*).

In a separate joint comment letter, GPA and API renewed their opposition to requiring the installation of automatic or remote-controlled shut-off valves or equivalent technology on regulated hazardous liquid gathering lines, particularly given the LPAC's unanimous recommendation regarding the lack of public notice. (JA___ (PHMSA-2013-0255-0038 at 8–11)). GPA voiced its objections to requiring these valves on gathering lines one last time during a subsequent meeting with the Department and the Office of Management and Budget. (JA___ (PHMSA-2013-0255-0042)).

21

### 7. In April 2022, the Department nevertheless issued final regulations requiring the use of rupture-mitigation valves on certain gathering lines.

On April 8, 2022, the Department published the Final Rule. (JA___ (PHMSA-2013-0255-0043)). Effective as of October 5, 2022, the Final Rule amended the regulations in Part 192 to require the use of RMVs on certain Type A onshore gas gathering lines with a nominal pipe size of six inches or greater. (*Id,* at 20,982 – 20,987). The Final Rule also amended the regulations in Part 195 to require the use of RMVs on certain non-rural gathering lines with a nominal pipe size of six inches or greater and certain regulated rural gathering lines with a nominal pipe size of six inches or greater that cross certain inland bodies of water. (*Id.* at 20,987 – 20,992).[2]

In justifying the RMV requirements for gathering lines, the Department stated that nothing in the NPRM indicated that those pipelines would be exempt from the proposed regulations. (*Id.* at 20,948 - 20,949). The Department also stated that Type A onshore gas gathering lines have a risk profile that is comparable to gas transmission lines, and that RMVs would only be required for regulated rural

---

[2] The Final Rule defined an RMV for purposes of these requirements as "an automatic shut-off valve (ASV) or a remote-control valve (RCV) that a pipeline operator uses to minimize the volume of gas [or hazardous liquid or carbon dioxide] released from the pipeline and to mitigate the consequences of a rupture." (JA___ (PHMSA-2013-0255-0043 at 20,982, 20,987)).

22

gathering lines that transport hazardous liquid at certain water crossings, where extra valves have been required for some time. (*Id.* at 20,949).

In identifying the statutory authority for the Final Rule, the Department cited to the general rulemaking authority in Section 60102(a) and the specific rulemaking provision for RMVs in Section 60102(n) of the Pipeline Safety Act. (*Id.* at 20,978). The Department also referred to two other provisions in passing, *i.e.*, the general regulatory authority in the Hazardous Materials Transportation Safety Act, 49 U.S.C. § 5103, and a provision in the Mineral Leasing Act concerning the examination and reporting of potential leaks or safety problems on pipelines and associated facilities on Federal Lands, 30 U.S.C. § 185(w)(3). (*Id.*).

In the Final Regulatory Impact Analysis, the Department used the results of a Government Accountability Office survey and operator-reported incident and consequence data—neither of which differentiated between transmission and gathering lines—to establish the baseline for analyzing the costs, benefits, and other impacts of the Final Rule. (JA___ (PHMSA-2013-0255-0046 at 25–32)). In addition, the Department only considered pipeline projects that did not involve gathering lines in making assumptions about the use of RMVs, and did not consider the economic, technical, and operational feasibility of requiring RMVs on segments of intermittently regulated gathering lines. (*Id.* at 33–35). Finally, the Department relied on the October 2012 Oak Ridge technical study throughout the Final

23

Regulatory Impact Analysis, without ever acknowledging that the study did not consider the use of RMVs on gathering lines at all.  (*Id.* at 54).

### SUMMARY OF ARGUMENT

The Department disregarded the clear and unambiguously expressed intent of Congress by applying the RMV regulations to gathering lines in the Final Rule. Section 60102(n)(1) directed the Department to consider certain factors and, if appropriate, require the use of RMVs on *transmission* pipeline facilities constructed or entirely replaced after the date of the issuance of the Final Rule.  Congress has long treated transmission and gathering lines as separate and distinct types of pipeline facilities under the Pipeline Safety Act, and the Department has recognized that distinction for decades in the pipeline safety regulations.  Accordingly, the conclusion that the rulemaking provision in Section 60102(n)(1) applies only to "transmission pipeline facilities"—and provides the Department with no authority to require RMVs on "gathering pipeline facilities"—is beyond dispute.

The only question that remains is whether the Department can require RMVs on gathering lines by some other means.  To the extent the Department believes that the general rulemaking authority in Section 60102(a) permits that result, the canon of statutory construction that the specific-trumps-the-general leads to the opposite conclusion.  By explicitly referencing the generally applicable rulemaking factors and including additional criteria for consideration, Congress made clear that the

24

Department could not use the general rulemaking authority in Section 60102(a) to circumvent the specific rulemaking requirements in Section 60102(n)(1). A contrary construction would render meaningless the language that Congress chose to include in Section 60102(n)(1) and allow the Department to disregard the specific directives in other rulemaking provisions. Nor do the other statutes referenced by the Department authorize the RMV requirements for gathering lines.

And even if the Department had the authority to prescribe the RMV requirements for gathering lines in the Final Rule, the regulations are unlawful for other reasons. The Department failed to comply with the risk assessment, pipeline advisory committee, and reasoned decisionmaking requirements in the Pipeline Safety Act and did not provide adequate reasons or bases to support its disparate treatment of gathering and distribution lines. The seriousness of these deficiencies and absence of any disruptive consequences warrant vacating the RMV regulations for gathering lines and remanding the matter to the Department for further action.

## STANDING

Petitioners have associational standing under Article III of the U.S. Constitution to seek judicial review of the gathering line regulations in the Final Rule under *Sierra Club v. EPA*, 292 F. 3d 895, 898 (D.C. Cir. 2002).

First, at least one member of GPA or API owns and operates the specific gathering pipelines to which the Final Rule applies. *See* Adeiya Decl.; Minutillo

Decl.; Wilson Decl.; collectively attached hereto as "Addendum B." The Supreme Court has acknowledged that "there is ordinarily little question" that an agency action has caused a plaintiff injury where the plaintiff "is himself an object of the action." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). This Court has also recognized that standing is usually "self-evident" when the plaintiff is a regulated party or an organization representing regulated parties. *Southern Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895–96 (D.C. Cir. 2006).

Second, the interests that Petitioners seek to protect are germane to their purposes. API represents all segments of the natural gas and oil industry and its stated mission is to "speak for the oil and natural gas industry to the public, Congress and the Executive Branch, state governments and the media" and "represent the industry in legal proceedings, participate in coalitions and work in partnership with other associations to achieve our members' public policy goals."[3] GPA represents the midstream sector of the U.S. energy industry and provides a voice for its members in "setting and adopting standards."[4]

Third, the claims asserted and relief requested do not require an individual member of GPA or API to participate. Petitioners are seeking vacatur of the RMV

---

[3] API, https://www.api.org/about (last accessed Oct. 17, 2022).
[4] GPA Midstream Association, https://gpamidstream.org/whoweare (last accessed Oct. 17, 2022).

26

regulations for gathering lines in the Final Rule due to the Department's failure to comply with the requirements in the Pipeline Safety Act and Administrative Procedure Act ("APA"). Petitioners can assert those claims and obtain the relief sought without the participation of an individual member.

Finally, Petitioners have standing to seek judicial review of the gathering line regulations in the Final Rule under Section 60119 of the Pipeline Safety Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). Petitioners' directly regulated members satisfy the zone-of-interest test and can be represented by GPA and API in this proceeding. *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998).

## STANDARD OF REVIEW

The standards of review in Section 706 of the APA apply to judicial review of agency action under the Pipeline Safety Act, 49 U.S.C. § 60119(a)(3). The APA generally requires a reviewing court to "hold unlawful and set aside agency action" that is taken "in excess of statutory jurisdiction, authority, or limitations" and "without observance of procedure required by law," 5 U.S.C. § 706(2)(C)–(D), or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

27

**ARGUMENT**

**I.    The Department Disregarded The Clear And Unambiguously Expressed Intent Of Congress.**

Whether the Department acted within the bounds of its legal authority in adopting the RMV regulations for gathering lines is a question of law. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").[5]  The Department identified two sources of authority in the Pipeline Safety Act for prescribing the regulations in the Final Rule: (1) the specific rulemaking provision in Section 60102(n), and (2) the general rulemaking provision in Section 60102(a).  The Department also referred in passing to: (1) the general regulatory authority in the Hazardous Materials Transportation Safety Act, 49 U.S.C. § 5103; and (2) a provision in the Mineral Leasing Act concerning the examination and reporting of potential leaks or safety problems on pipelines and associated facilities on Federal Lands, 30 U.S.C. § 185(w)(3).  As

---

[5] *See also New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) ("Merely because an agency has rulemaking power does not mean that it has delegated authority to adopt a particular regulation."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (federal agency "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress"); *National Mining Ass'n v. U.S. Dept. of the Interior*, 105 F.3d 691, 694 (D.C. Cir. 1997) (holding that "the general rulemaking provisions of SMCRA do not provide OSM with *carte blanche* authority to promulgate any rules, on any matter," adding "the power to issue regulations is not the power to issue *any* regulations" (citations and quotation marks omitted)).

28

explained below, none of these statutes authorized the Department to adopt the RMV regulations in the Final Rule for gathering lines.

### A.    The Department Cannot Use the Rulemaking Authority in Section 60102(n)(1) to Require Rupture-Mitigation Valves on Gathering Lines.

The Department cannot use the rulemaking authority in Section 60102(n)(1) to require RMVs on gathering lines.  Section 60102(n)(1) provides, in relevant part, that "the [Department], if appropriate, shall require by regulation the use of automatic or remote-controlled shut-off valves or equivalent technology where economically, technically, and operationally feasible on *transmission pipeline facilities* constructed or entirely replaced after the date on which the Secretary issues the final rule containing such requirement."  49 U.S.C. § 60102(n)(1) (emphasis added).  The ordinary tools of statutory interpretation—*i.e.*, text, structure, purpose, and legislative history—apply in determining whether the Department can use the authority in Section 60102(n)(1) to adopt regulations for "gathering pipeline facilities."  *See*, *e.g.*, *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 314 (D.C. Cir. 2022) (explaining that consideration of the degree of deference owed an agency under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is not necessary if a question can be resolved using the ordinary tools of statutory interpretation).

29

### 1. The statutory text and structure confirm that "transmission pipeline facilities" are not "gathering pipelines facilities."

Starting with the text and structure, Congress used the phrase "transmission pipeline facilities" in the operative language of Section 60102(n)(1). The singular of the latter term, "pipeline facility," is defined in Section 60101(a)(18) for purposes of the Pipeline Safety Act as "a gas pipeline facility and a hazardous liquid pipeline facility." 49 U.S.C. § 60101(a)(18).[6] While not separately defined in Section 60101(a), the term "transmission," and the related terms "gathering" and "distribution," are used in defining other terms in Section 60101(a). *Id.* § 60101(a)(21), (a)(22), (b). The related terms "pipeline" or "line" are used in the same way. *Id.* § 60101(a)(3), (a)(5), (a)(21), (a)(22), (b).

When Congress uses the terms "gathering," "transmission," or "distribution" in conjunction with the terms "pipeline facility," "pipeline," or "line" in the Pipeline Safety Act, the clear and unmistakable intent is to clarify that a particular requirement concerns a specific *type* of pipeline facility or pipeline transportation.

---

[6] The definition of "pipeline facility" incorporates several other terms that are also defined in Section 60101(a), including "gas pipeline facility," "hazardous liquid pipeline facility," "transporting gas," "transporting hazardous liquid," "gas," and "hazardous liquid." 49 U.S.C. §§ 60101(a)(2), 60101(a)(3), 60101(a)(4), 60101(a)(5), 60101(a)(21), 60101(a)(22).

30

Various provisions in the Pipeline Safety Act reflect that intent, including the rulemaking requirements in Section 60102.[7]

For example, the term "transmission" is used in conjunction with the term "pipeline" in Section 60102(f) to establish the extent of the Department's authority to prescribe gas pipeline safety standards for the accommodation of instrumented internal inspection devices. 49 U.S.C. § 60102(f). Similarly, the terms "gathering," "transmission," and "distribution" are used in conjunction with the terms "pipeline facilities" and "lines" in Section 60102(q) to establish the extent of the Department's authority to prescribe gas pipeline leak detection and repair standards and to differentiate between the subsidiary requirements for advanced leak detection technologies and practices. *Id.* § 60102(q); *see*, *e.g.*, *Tyler v. Cain*, 533 U.S. 656,

---

[7] *See e.g.*, 49 U.S.C. § 60101(b) (referencing "gathering lines" and "regulated gathering lines" in rulemaking mandate for establishing definitions and safety standards); *id.* § 60102(f) (referencing "gas transmission pipeline" in a rulemaking mandate for the accommodation of inline inspection tools), (k) (excluding "gathering lines" from a rulemaking mandate for low-stress lines), (q) (incorporating separate provisions for "gathering," "transmission," and "distribution" lines in a rulemaking mandate for gas pipeline leak detection and repair requirements), (r) (referencing "distribution" pipelines in a rulemaking mandate for updating emergency response plan requirements), (t) (referencing "distribution" pipelines in a rulemaking mandate for implementing other pipeline safety practices); *id.* § 60110 (referencing "distribution" pipelines in a rulemaking mandate for excess flow valves); *id.* § 60113 (referencing "distribution" in a rulemaking mandate for customer-owned service line notifications); *id.* § 60139 (referencing "gas transmission pipelines" in rulemaking mandate for maximum allowable operating pressure reconfirmation and materials verification).

31

663 (2001) ("We do not … construe the meaning of statutory words in a vacuum. Rather, we interpret the words in their context and with a view to their place in the overall statutory scheme.") (citation and quotation marks omitted).

As in these other rulemaking provisions, Congress used the term "transmission" in conjunction with "pipeline facilities" in Section 60102(n)(1) to establish the extent of the Department's rulemaking authority for RMVs. Congress did not use the terms "gathering" or "distribution" in Section 60102(n)(1) and, therefore, necessarily excluded those types of pipeline facilities from the authority granted in Section 60102(n)(1). *See*, *e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and quotation marks omitted). If Congress had intended otherwise, the terms "gathering" or "distribution" would appear somewhere in the text of Section 60102(n)(1). And if Congress had wanted the Department to decide which types of pipeline facilities should be included, the term "transmission" would not appear at all. *See*, *e.g.*, *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (construction of a statute that renders a term meaningless "runs aground on the so-called surplusage canon—the presumption that each words Congress uses is there for a reason"). In other words, the statutory text and structure confirm that

32

Congress intended to limit the Department's rulemaking authority in Section 60102(n)(1) to "transmission pipeline facilities," and, in so doing, necessarily excluded "gathering pipeline facilities" and "distribution pipeline facilities." *See*, *e.g.*, *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 340 (D.C. Cir. 2020) ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (citation and quotation marks omitted).

> ### 2.    The legislative history supports the conclusion that "transmission pipeline facilities" are not "gathering pipeline facilities."

In addition to the statutory text and structure, the legislative history supports the conclusion that rulemaking authority in Section 60102(n)(1) is limited to "transmission pipeline facilities" and does not include "gathering pipeline facilities." Congress has long treated "transmission" and "gathering" as separate and distinct types of pipeline facilities, beginning with the 1968 Act (§ 2(3), 82 Stat. at 720), and continuing through the latest reauthorization of the Pipeline Safety Act (the Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020), §§ 109, 112, 113, 134 Stat. 1181, 2223, 2228). For example, in the 1992 Act, Congress included separate rulemaking provisions for gas and hazardous gathering lines, §§ 109, 208, and modified an earlier rulemaking provision for the accommodation of instrumented internal inspection devices by adding a new

33

provision for gas and hazardous liquid "transmission facilities," §§ 103, 203. Pub. L. 102-508, 106 Stat. at 3294, 3304, 3291, 3301 (originally codified at 49 U.S.C. App. 1672(g) and 49 U.S.C. App. 2002(k), respectively). Congress also included separate and distinct references to "transmission" and "gathering" in several provisions in the 2011 Act—the very law that added the rulemaking provision in 49 U.S.C. § 60102(n)(1). *See e.g.*, Pub. L. 112-90 § 4, 125 Stat. at 1907 (referencing transmission pipeline facilities in rulemaking mandate for RMVs and high consequence area study), § 5 (referencing transmission lines in the integrity management study), § 21, 125 Stat. at 1917 (requiring study of gathering lines), § 23, 125 Stat. at 1918 (referencing transmission pipelines in the maximum allowable operating pressure and materials verification requirements). These references show that Congress has a long and well-established history of using the terms "transmission" and "gathering" to distinguish the applicability of provisions (or of specific requirements within provisions).

### 3. The Department has recognized that "transmission pipeline facilities" are not "gathering pipeline facilities" in satisfying other rulemaking mandates.

The Department itself has also recognized the distinction between gathering and transmission lines in implementing other rulemaking provisions. For example, in an October 2019 final rule that addressed a rulemaking provision for "gas transmission pipelines" in 49 U.S.C. § 60139, the Department added exceptions for

34

regulated gas gathering lines to the requirements for reconfirming maximum allowable operating pressure and verifying pipeline materials. *Pipeline Safety: Safety of Gas Transmission Pipelines: MAOP Reconfirmation, Expansion of Assessment Requirements, and Other Related Amendments*, 84 Fed. Reg. 52,180, 52,192, 52,210, 52,226 (Oct. 1, 2019). Similarly, in an April 1994 final rule that addressed a rulemaking provision for "natural gas transmission pipelines" in Section 60102(f), previously codified at 49 U.S.C. App. 1672(g), the Department provided an exception for gas gathering lines from the requirement to accommodate the passage of instrumented internal inspection devices. *Passage of Instrumented Internal Inspection Devices*, 59 Fed. Reg. 17,275, 17,280 – 17,282 (Apr. 12, 1994). Notably, the Department did not provide a comparable exception for hazardous liquid gathering lines, as the rulemaking requirement previously codified at 49 U.S.C. App. 2002(k) and currently codified at Section 60102(f) uses the broader term "pipeline facilities". *Id.* Like the text, structure, and legislative history, the Department's implementation of other rulemaking provisions supports the conclusion that "transmission pipeline facilities" are not "gathering pipeline facilities."

35

### 4. The Department has long recognized that transmission lines are not gathering lines in its own regulations.

The Department has long recognized the distinction between "gathering" and "transmission" lines in its own regulations. Mutually exclusive definitions for the terms "gathering line" and "transmission line" have been codified in 49 C.F.R. Part 192 *for more than 50 years*. 49 C.F.R. § 192.3 (generally defining "gathering line" as "a pipeline that transports gas from a current production facility to a transmission line or main" and "transmission line" as "a pipeline, other than a gathering line," that meets certain criteria); *Establishment of Minimum Standards*, 35 Fed. Reg. at 13,258-59; PHMSA Letter of Interpretation to Mr. Glynn Blanton, Tennessee Regulatory Authority, PI-01-002 (Aug. 17, 2001) ("49 C.F.R. § 192.3 explains that a gathering line ends at a transmission line … [and] once designated as a transmission line, no portion of the line may be redesignated as a gathering line even if further commingling of gas occurs downstream."). And, while the term "transmission line" has not traditionally been used in 49 C.F.R. Part 195, a "gathering line" has been defined as a separate and distinct type of hazardous liquid pipeline facility *for more than 35 years*. 49 C.F.R. § 195.2 (generally defining a "gathering line" as "a pipeline 219.1 mm (8 5⁄8 in) or less nominal outside diameter that transports petroleum from a production facility"); *Transportation of Hazardous Liquids; Gathering Lines in Rural Areas*, 51 Fed. Reg. 15,005, 15,007 (Apr. 22,

36

1986); *In the Matter of EnLink Ohio River Valley Pipeline, LLC*, C.P.F. No. 3-2015-5009, Final Order (Jan. 18, 2018).

> **5.    The Final Rule requires the use of rupture-mitigation valves on "gathering pipeline facilities" that are not "transmission pipeline facilities."**

The Final Rule clearly requires the use of RMVs on "gathering pipeline facilities" for purposes of the Pipeline Safety Act.  The amendments to Part 192 and Part 195 require operators of certain Type A onshore gas gathering lines and hazardous liquid gathering lines in non-rural and rural areas to install RMVs and comply with related operations and maintenance requirements. The Department acknowledged in the preamble to the Final Rule that these pipelines are gathering lines under the definitions in Parts 192 and 195—definitions that the Department established to satisfy a prior rulemaking requirement for gathering lines from the 1992 and 1996 Acts (codified at 49 U.S.C. § 60101(b)).  *Gas Gathering Line Definition: Alternative Definition for Onshore Lines and New Safety Standards*, 71 Fed. Reg. at 13,295; *Pipeline Safety: Protecting Unusually Sensitive Areas From Rural Onshore Hazardous Liquid Gathering Lines and Low-Stress Lines*, 73 Fed. Reg. at 31,644–645.

To be clear, the Department applies certain transmission line requirements to regulated gathering lines under Part 192 and Part 195.  But that does not make a regulated gathering line a "transmission pipeline facility" for purposes of Section

37

60102(n)(1).   Gathering and transmission line operators are required to submit different reports, different data, and different information. 49 C.F.R. §§ 191.15-191.17, 191.23-191.29; 49 C.F.R. Part 195, Subpart B.  Gathering and transmission line operators are also subject to different safety standards.  *See e.g.*, *id.* §§ 192.9 (establishing requirements for offshore and regulated onshore gas gathering lines), 195.11 (establishing requirements for regulated rural gathering lines).   The Department's history of providing gathering line operators with exceptions from transmission line requirements, including in recent rulemaking proceedings, provides further confirmation that a gathering line does not become a transmission line simply because some regulations apply to both types of pipelines.  *See e.g.*, *id.* §§ 192.9(b)-(e) (codifying various exceptions to recently promulgated requirements for gas transmission lines), 192.9(h) (authorizing the use of composite materials in Type C gathering lines if certain requirements are met, but not for gas transmission lines).

### 6.    The Department cannot use the rulemaking authority in Section 60102(n)(1) to require rupture-mitigation valves on "gathering pipeline facilities."

In summary, the text, structure, and legislative history—and the Department's own conduct and regulations—all support the conclusion that the rulemaking authority in Section 60102(n)(1) is limited to "transmission pipeline facilities," and that the Department cannot use that authority to adopt RMV regulations for

38

"gathering pipeline facilities." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

### B. The Department Cannot Use its General Rulemaking Authority in Section 60102(a) to Circumvent the Specific Rulemaking Requirements in Section 60102(n)(1).

Having demonstrated that Section 60102(n)(1) does not authorize the RMV requirements for gathering lines in the Final Rule, the only question remaining is whether the Department could adopt those regulations under some other statute. The Department points to the general rulemaking authority in Section 60102(a) of the Pipeline Safety Act as an alternative source of authority for prescribing the regulations in the Final Rule. (JA___ (PHMSA-2013-0255-0043 at 20,978)). To the extent that the Department believes that the RMV requirements for gathering lines can be based on an exercise of that authority, the canon of statutory construction that the specific trumps the general forecloses that result. *See e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–647 (2012); *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1053, 1061–1066 (D.C. Cir. 2018) (collecting cases and observing that "an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority").[8]

---

[8] *See also American Petroleum Inst. v. EPA*, 706 F.3d 474, 479–480 (D.C. Cir. 2013) ("a broad programmatic objective cannot trump specific instructions"); *Michigan*,

39

**1.    Section 60102(n)(1) is a specific rulemaking provision that limits the Department's discretion under the general rulemaking authority in Section 60102(a).**

Section 60102(a) provides the Department with the general authority "to prescribe minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). Section 60102(a) further states, in relevant part, that those minimum safety standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities" and must "include a requirement that all individuals who operate and maintain pipeline facilities shall be qualified to operate and maintain the pipeline facilities." *Id.*; *see id.* § 60102(a)(3) (prescribing additional requirements that apply to the qualifications of pipeline operators).

Section 60102 also contains a series of specific provisions for the issuance of safety standards or regulations to address certain issues or areas of concern. *Id.* § 60102(c)–(f), (h)–(n), (q)–(t). Many of these specific provisions include common elements, *e.g.*, deadlines for taking certain actions, the factors to be considered, the

---

268 F.3d at 1084 ("EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area." (citation and quotation marks omitted)); *Asiana Airlines v. FAA*, 134 F.3d 393, 401–403 (D.C. Cir. 1998) (same); *American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) ("the general grant of rulemaking power to EPA cannot trump specific portions of the CAA").

40

subject matter to be addressed, and the types of pipeline facilities to be covered. More importantly, in each of these specific provisions, Congress directed the Department to take one or more actions that otherwise would be authorized under the general rulemaking provision in Section 60102(a), *i.e.*, prescribing a safety standard or regulation pertaining to a particular aspect of pipeline transportation and pipeline facilities. As such, the sole purpose of the specific provisions is to effect a decision that otherwise would be left to the Department's broader discretion under the general rulemaking provision. H.R. Rep. 102-247(I), *reprinted in* 1992 U.S.C.C.A.N. 2642, 2660 (expressing the Department's "significant concerns" with certain rulemaking provisions later enacted in the 1992 Act, because those provisions "unnecessarily elevate to statutory mandate many issues that the Department is already addressing through existing authority").

Section 60102(n)(1) is one of these specific provisions. It directs the Department to consider certain factors and, by no later than January 3, 2014, if appropriate, to prescribe regulations requiring the use of RMVs "where economically, technically, and operationally feasible on transmission pipeline facilities constructed or entirely replaced after the date on which the [Department] issues the final rule containing such requirement." 49 U.S.C. § 60102(n)(1). In other words, Section 60102(n)(1) prescribes a deadline for taking an action, establishes the factors to be considered, identifies the subject matter to be addressed,

41

and specifies the types of pipeline facilities to be covered. It also directs the Department to take an action that already is authorized under Section 60102(a). Section 60102(n)(1) therefore necessarily is designed to effect a decision that otherwise would be left to the Department's broader discretion under the general rulemaking provision.

>    **2.    The specific-trumps-the-general canon applies in determining the extent of the Department's rulemaking authority under Section 60102(n)(1) and (a).**

The canon of statutory construction that the specific governs the general applies here in determining the extent of the Department's rulemaking authority under Sections 60102(n)(1) and 60102(a). As the U.S. Supreme Court explained in *RadLAX*, that canon carries particular weight when "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." 566 U.S. at 645 (citation omitted). Section 60102(n)(1) falls squarely within the reach of that principle—it is part of a "comprehensive scheme" of rulemaking provisions in Section 60102 and lays out a "specific solution" (consideration of certain factors and, if appropriate, adoption of regulations by a certain deadline) to a "specific problem" (the use of automatic or remote-controlled shut-off valves on certain transmission pipeline facilities).

As the Supreme Court also explained in *RadLAX*, "the canon has full application … to statutes … in which a general authorization and a more limited,

42

specific authorization exist side-by-side[,]" where it serves to "avoid[] … the superfluity of a specific provision that is swallowed by the general one[.]" *Id.* at 645 (citation omitted). Again, Sections 60102(a) and 60102(n)(1) fall squarely within the reach of that rule: These two general and specific rulemaking authorizations "exist side-by-side" and must be interpreted to avoid superfluity—namely, a scenario where the general rulemaking authority in Section 60102(a) "swallows" the more specific rulemaking requirements in Section 60102(n)(1).

Congress instructed the Department in Section 60102(n)(1) to consider certain factors and, if appropriate, issue regulations requiring the use of RMVs on certain new or entirely replaced "transmission pipeline facilities." Those specific instructions would become meaningless if the Department could simply use the general rulemaking authority in Section 60102(a) to apply the same requirements to other types of pipeline facilities, including gathering lines. Indeed, the Department could effectively disregard *every limitation* in Section 60102(n)(1)—and, for that matter, in the other specific rulemaking provisions in Section 60102(c)–(f), (h)–(n), (q)–(t)—if the general rulemaking authority in Section 60102(a) could be exercised in such way. This Court has refused to accept that kind of absurd result in other cases involving the specific-governs-the-general canon of statutory construction. *See*, *e.g.*, *Air Alliance*, 906 F.3d at 1053, 1061–1066 (stating that the EPA "cannot escape Congress's clear intent to specifically limit the agency's authority under [42

43

U.S.C. §] 7607(d)(7)(B) by grasping at its separate, more general authority under

[42 U.S.C. §] 7412(r)(7)[,]" as "[t]hat would almost always allow EPA to avoid the

restrictions of Section 7607(d)(7)(B) by simply insisting it was invoking Section

7412(r)(7)," and noting that "[s]uch an unreasonable interpretation would deprive

[the more specific authority] of virtually all effect") (citations and quotation marks

omitted).

> **3.    The text of Section 60102(n)(1) confirms that the Department cannot use its general rulemaking authority in Section 60102(a) to require rupture-mitigation valves.**

Two features of the statutory text in Section 60102(n)(1) further confirm that

Congress wanted the specific rulemaking requirements to prevail over the general

rulemaking authority in Section 60102(a).  First, Congress instructed the Department

to consider the factors in Section 60102(b) in deciding whether to adopt regulations

requiring the use of RMVs on certain transmission pipeline facilities under Section

60102(n)(1).  The Department is also required to consider the same factors in Section

60102(b) in prescribing safety standards under the general rulemaking authority in

Section 60102(a).  By including an explicit reference to Section 60102(b), Congress

clearly demonstrated that it understood the interplay between the specific and

general rulemaking requirements in Sections 60102(n)(1) and 60102(a).

Second, Congress included an additional instruction in Section 60102(n)(1)

for the Department to consider criteria that go *beyond* the factors in Section

44

60102(b), particularly that RMVs only be required "where economically, technically, and operationally feasible on transmission pipeline facilities constructed or entirely replaced after the date on which the [Department] issues the final rule containing such requirement."   42 U.S.C. § 60102(n)(1).   The requirement to consider criteria that are *not* among the factors prescribed in Section 60102(b)—and which would *not* apply to an exercise of the general rulemaking authority under Section 60101(a)—demonstrates that Congress wanted the Department to use the "specific solution" in Section 60102(n)(1) to solve the "specific problem" of requiring RMVs on certain transmission pipeline facilities.

### 4. The Final Rule shows why Congress did not want the Department to use its general rulemaking authority in Section 60102(a) to require rupture-mitigation valves.

This case shows why Congress did not want the Department to use the general authority in Section 60102(a) to circumvent the specific requirements in Section 60102(n)(1).   The Department prescribed regulations in the Final Rule that require the use of RMVs on gathering lines, without considering where the use of that technology is "economically, technically, and operationally feasible."   The Department also defined the term "entirely replaced" for purposes of the RMV requirements to include partial replacements of two or more miles, in the aggregate, in any contiguous five-mile length of pipeline during a 24-month period, without considering how that definition impacts the replacement of short, intermittently

45

regulated gathering line segments.[9]  These decisions would be subject to less scrutiny if the regulations requiring the use of RMVs on gathering lines can be issued under the general rulemaking provision in Section 60102(a), as the obligation to consider the criteria referenced above only applies to regulations issued under Section 60102(n)(1).  Allowing the Department to apply *less stringent* criteria in requiring RMVs on gathering pipeline facilities—even though gathering lines present *less risk* to public safety and the environment and have long been subject to *less stringent* regulations than transmission lines—is certainly not the outcome that Congress intended in enacting Section 60102(n)(1).

### C. The Department Cannot Use the Hazardous Materials Transportation Safety Act or Mineral Leasing Act to Require Rupture-Mitigation Valves on Gathering Lines.

The two other provisions that the Department referenced in the Final Rule do not authorize the RMV regulations for gathering lines.  The Department is expressly prohibited from applying the general regulatory authority in Section 5103 of the Hazardous Materials Transportation Safety Act to "a pipeline subject to regulation under" the Pipeline Safety Act, 49 U.S.C. § 5126(b)(1).  Moreover, assuming

---

[9] The Final Rule defined "[e]ntirely replaced onshore transmission pipeline segments" and "[e]ntirely replaced onshore hazardous liquid or carbon dioxide pipeline segments" for purposes of certain RMV requirements as "mean[ing] where 2 or more miles of pipe, in the aggregate, have been replaced within any 5 contiguous miles within any 24-month period."  (JA__, __(PHMSA-2013-0255-0043 at 20,982, 20,987)).

46

Congress intended to delegate rulemaking authority to the Department in 30 U.S.C. § 185(w)(3) of the Mineral Leasing Act, the RMV regulations certainly do not "cause the examination of all pipelines and associated facilities on Federal lands and … prompt reporting of any potential leaks or safety problems." *WildEarth Guardians v. Chao*, 454 F. Supp. 3d 944, 947 (D. Mont. 2020).

## II. Even If The Department Had The Authority To Require The Use Of Rupture-Mitigation Valves On Gathering Pipeline Facilities, The Regulations In The Final Rule Are Unlawful For Other Reasons.

Even if the Department had the authority to adopt the RMV regulations for gathering lines in the Final Rule, the regulations are arbitrary, capricious, and otherwise unlawful for at least four separate reasons. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

### A. The Department did not Comply with the Risk Assessment Requirements.

First, the Department did not comply with the risk assessment requirements in the Pipeline Safety Act in prescribing the RMV requirements for gathering lines.

47

49 U.S.C. § 60102(b)(2)(D)–(E), (3)–(5).   Section 60102(b)(3) requires the Department to conduct a risk assessment for each standard that is prescribed under 49 U.S.C. § 60102, and that risk assessment must, in relevant part, "identify the regulatory and nonregulatory options … considered," "the costs and benefits associated with the proposed standard," and the "technical data or other information upon which the risk assessment information and proposed standard is based." *Id.* § 60102(b)(3)(A)–(B), (D).   The risk assessment must also provide "an explanation of the reasons for the selection of the proposed standard[,] … and … a brief explanation of the reasons that the [Department] did not select the [other] options" identified.  *Id.* § 60102(b)(3)(C).

The Department did not mention gathering lines at all in the NPRM or Preliminary Regulatory Impact Analysis—let alone provide the public, GPAC, and LPAC with the risk assessment information needed to support a proposed standard requiring the use of RMVs on gathering lines.   Regardless of whether the Department actually understood that the RMV requirements in the NPRM would apply to gathering lines, proposing a rule without obtaining any of the required risk assessment information, and then presenting that proposal to the GPAC and LPAC for review, is a clear violation of the Pipeline Safety Act. *Owner–Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 202–203 (D.C. Cir. 2007) (concluding that "the FMCSA's failure to disclose the cost benefit analysis methodology in time for

48

comment was prejudicial because the petitioners demonstrated that they would have mounted a credible challenged if provided the opportunity to do so"); *see also* 49 U.S.C. § 60102(b)(5) (applying reasoned decisionmaking requirement to Department's proposal of safety standard).

Nor did the Department include the required risk assessment information in the Final Rule or Final Regulatory Impact Analysis. (JA___ (PHMSA-2013-0255-0046)). The Department relied extensively in the Final Regulatory Impact Analysis on the October 2012 Oak Ridge technical study, which did not consider the use of RMVs on gathering lines at all; on information obtained from proceedings before Federal Energy Regulatory Commission, an agency that does not have jurisdiction over gas gathering lines; and on information obtained from pipeline projects that did not involve gathering lines. (*Id.*). The Department also failed to consider the segmented applicability of Parts 192 and 195 in analyzing the benefits, costs, and feasibility of requiring RMVs on gathering lines, despite the repeated references to that concern in the record. *See discussion infra* at 16-17, 18-21. *See also* Adeiya Decl., B-5 to B-14, B-15 to B-18; Minutillo Decl., B-20 to B-21; Wilson Decl. B-24 to B-25. Failing to consider the benefits, costs, and feasibility of requiring RMVs on short, intermittently regulated segments of gathering lines violates the Department's obligations under the Pipeline Safety Act. *Business Roundtable v. SEC*, 647 F.3d 1144, 1148–1149 (D.C. Cir. 2011) (finding a regulation to be

49

arbitrary and capricious because "the Commission inconsistently and opportunistically framed the costs and benefits of the rule; failed adequately to quantify the certain costs or to explain why those costs could not be quantified; neglected to support its predictive judgments; contradicted itself; and failed to respond to substantial problems raised by commenters").

### B. The Department did not Comply with the Pipeline Advisory Committee Requirements.

Second, the Department did not comply with the requirements in the Pipeline Safety Act for peer review by GPAC and LPAC. The Department did not present any of the required risk assessment information or supporting analyses to the GPAC or LPAC concerning the use of RMVs on gathering lines. As shown in the statements made by several committee members, the failure to provide that information prohibited the GPAC and LPAC from performing the peer review function that Congress envisioned in 49 U.S.C. § 60102(b)(4). The GPAC and LPAC cannot conduct "an evaluation of the merit of the data and methods used" in preparing the risk assessment if the Department never provides that information. *Id.* § 60102(b)(4)(B)(i).

Nor did the Department provide a written response to the GPAC and LPAC within 90 days "concerning all significant peer review comments and recommended alternatives contained in [their] report[s]." *Id.* § 60102(b)(4)(C)(ii). The comments from the GPAC and LPAC members about the failure to include any information

50

about gathering lines in the NPRM and Preliminary Regulatory Impact Analysis certainly qualify as significant, as does the recommendation about the appropriateness of requiring RMVs for gathering lines in this proceeding due to the lack of public notice.  And the Department certainly received these significant peer review comments and recommendations in a timely report, having previously advised the GPAC and LPAC that the written transcript and other materials prepared at the public meeting serve as the report required under the Pipeline Safety Act. (JA___ (PHMSA-2011-0023-0504 at 10–11)).  In failing to provide a timely written response, the Department deprived the GPAC and LPAC of information that Congress determined is essential to the proper functioning of the peer review process.

Finally, the reasons that the Department provided in the Final Rule for rejecting the conclusions of the GPAC and LPAC are inadequate.  The Department did not address the failure to provide the GPAC and LPAC with any of the required risk assessment information, or to mention gathering lines at all in the NPRM, Preliminary Regulatory Impact Analysis, or Draft Environmental Assessment.  Nor did the Department address the adverse impact that these failures had on the ability of the GPAC and LPAC to perform the peer review function mandated by Congress or discuss why it rejected its *own* recommendation to the GPAC that the RMV requirements be limited to Type A onshore gas gathering lines with nominal pipe

51

sizes greater than 12 inches. *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11, 15–16 (D.C. Cir. 2015) (an agency acts arbitrarily if it fails to "engage the arguments raised" and provide a cogent response to serious objections raised by interested parties) (citation omitted).

## C.    The Department did not Comply with the Reasoned Decisionmaking Requirement.

Third, the Department failed to comply with the reasoned decisionmaking requirement in the Pipeline Safety Act. 49 U.S.C. § 60102(b)(5). Section 60102(b)(5) states, in relevant part, that "the [Department] shall propose or issue a standard … only upon a reasoned determination that the benefits, including safety and environmental benefits, of the intended standard justify its costs." *Id.* Having failed to include any information about the benefits or costs of requiring RMVs on gathering lines in the NPRM, Preliminary Regulatory Impact Analysis, or Draft Environmental Assessment, the Department did not make the reasoned determination required by Section 60102(b)(5) in proposing that standard.

The Department also failed to include the information necessary to make a reasoned determination about requiring RMVs on gathering lines in the Final Rule and Final Regulatory Impact Analysis. The Department relied primarily on generalized assertions about the potential risk to public safety in explaining why the RMV requirements should apply to certain regulated gathering lines. (JA___ (PHMSA-2013-0255-0043 at 20,949)). The Department did not acknowledge the

52

failure to consider the technical, operational, and economic feasibility, or potential

costs and benefits, of requiring automatic and remote-controlled shut-off valves on

gathering lines in the March 2012 public meeting or October 2012 Oak Ridge study.

*Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1520 (D.C. Cir.

1984) ("Such self-contradictory, wandering logic does not constitute an adequate

explanation" of agency action).

Nor did the Department analyze its own data to understand the potential

impact of requiring RMVs on short, intermittently regulated gathering line segments.

*See* 49 U.S.C. § 60102(b)(2)(B) (requiring consideration of "the appropriateness of

the standard for the particular type of pipeline transportation or facility"); Adeiya

Decl., B-5 to B-14, B-15 to B-18; Minutillo Decl., B-20 to B-21; Wilson Decl. B-24

to B-25. The Department clearly could not make the reasoned determination that

Section 60102(b)(5) requires without that information. *Public Citizen v. FMCSA*,

374 F.3d 1209, 1216 (D.C. Cir. 2004) ("the rule is arbitrary and capricious because

the agency failed to consider the impact of the rules on the health of drivers, a factor

the agency must consider under its organic statute").

### D.    The Department did not Adequately Support its Disparate Treatment of Gathering and Distribution Lines.

Finally, the Department did not adequately support its disparate treatment of

gathering and distribution lines in applying the RMV requirements. *See*, *e.g.*,

*Lilliputian Sys., Inc. v. PHMSA*, 741 F.3d. 1309, 1313 (D.C. Cir. 2014) ("As a

53

general matter, an agency cannot treat similarly situated entities differently unless it support[s] th[e] disparate treatment with a reasoned explanation and substantial evidence in the record." (citation and quotation marks omitted)).

The Department acknowledged in the Final Rule that its risk-based rationale for applying the RMV requirements to gathering lines extends to "distribution pipeline facilities," but concluded that "such an extension is beyond the scope of the [proposed rule] and would require additional notice and public comment, and thus further delay issuance of this final rule." (JA___(PHMSA-2013-0255-0043 at 20,949)). While its reasoning with respect to distribution lines was certainly correct, the Department failed to recognize that the same scope and notice-and-comment concerns also apply to gathering lines.

Again, the Department did not mention "gathering" or "gathering lines" at all in: (a) the February 2012 *Federal Register* notice announcing the public meeting to solicit information concerning the rulemaking requirements in Section 60102(n)(1), or during the public meeting itself, *Notice of Public Meetings on Improving Pipeline Leak Detection System Effectiveness and Understanding the Application of Automatic/Remote Control Valves*, 77 Fed. Reg. 6,857 (Feb. 9, 2012); (b) the March 2012 *Federal Register* notice soliciting public comment on the scope of the Oak Ridge study *Public Comment on Leak and Valve Studies Mandated by the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011*, 77 Fed. Reg. 19,414

54

(Mar. 30, 2012); (c) the October 2012 study itself, (JA___ (PHMSA-2013-0255-0004)); or (d) the NPRM,  Preliminary Regulatory Impact Analysis, or Draft Environmental Assessment.   (JA___, ____, ___ (PHMSA-2013-0255-0005; PHMSA-2013-0255-0006; PHMSA-2013-0255-0006)).  In fact, the Department did not express an affirmative intent to require RMVs on gathering lines until the July 2020 pre-briefing session with the GPAC and LPAC, *see discussion infra* at 17-18, and the GPAC and LPAC both issued reports to the Department questioning the appropriateness of action *due to the lack of public notice.  See discussion infra* at 18-21.  On this record, there is no basis to support the Department's disparate treatment of gathering and distribution lines in applying the RMV requirements.

**III.     The Rupture-Mitigation Valve Requirements For Gathering Lines In The Final Rule Must Be Vacated And Remanded To The Department For Further Proceedings.**

In deciding whether to vacate an unlawful agency action and remand for further proceedings, this Court considers (1) "the seriousness of the … deficiencies" and (2) "the disruptive consequences" of vacatur.  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–151 (D.C. Cir. 1993) (citation and quotation marks omitted).  Both factors clearly demonstrate that vacatur is the appropriate remedy in this case.

As to the seriousness of the deficiencies, the Department disregarded the clear and unambiguously expressed intent of Congress and violated several other

55

provisions in the Pipeline Safety Act in requiring RMVs on gathering lines in the Final Rule. These are not minor or technical deficiencies—or mere inadequacies in reasoning or explanation—that the Department can remedy on remand. Indeed, the absence of information and data about the use of RMVs on gathering lines is perhaps the most striking feature of the record given the Department's decisions in this proceeding.

Nor are the consequences of vacating the RMV requirements for gathering lines disruptive. Congress only directed the Department to consider requiring RMVs on certain transmission pipeline facilities in Section 60102(n)(1), and Petitioners are not challenging the regulations in the Final Rule that require RMVs on those types of pipeline facilities. Petitioners are only challenging the regulations that require RMVs on certain regulated gathering lines, and those regulations are easily severable from the other requirements in the Final Rule. *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008), *rehearing granted in part*, 550 F.3d 1176 (D.C. Cir. 2008). The Department's intent with respect to severability is apparent from the text, structure, and history of the regulations, which only apply the RMV requirements to certain gathering lines by virtue of cross-referencing the requirements for transmission lines in a limited number of regulations.

Moreover, the consequences of not vacating the RMV requirements are disruptive to Petitioners and other interested stakeholders. Affected gathering line

56

operators will incur costs to comply with regulations that are unlawful, and those costs cannot be recovered from the Department. The public interest will also suffer if unlawful regulations remain in effect. For these reasons, the Court should vacate the RMV requirements that apply to gathering lines in the Final Rule and remand the matter for further proceedings.

## **CONCLUSION**

The Department disregarded the clear and unambiguously expressed intent of Congress and violated the Pipeline Safety Act and APA in requiring RMVs on gathering lines in the Final Rule. Petitioners respectfully request that the Court vacate those requirements and remand the matter for further proceedings. Oral argument is requested.

Respectfully submitted,

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
*Counsel for Petitioners GPA Midstream Association and American Petroleum Institute*

Dated October 21, 2022

57

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,116 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Keith J. Coyle*
Keith J. Coyle, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
*Counsel for Petitioners GPA Midstream Association and American Petroleum Institute*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing "Initial Brief of Petitioners GPA Midstream Association and American Petroleum Institute," was electronically filed through this Court's CM/ECF system, which will send a notice of filing to the counsel registered to receive service through the Court's CM/ECF system via electronic filing.


*/s/ Keith J. Coyle*

Keith J. Coyle, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
*Counsel for Petitioners GPA Midstream
Association and American Petroleum
Institute*


Dated: October 21, 2022