**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 22-1148**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GPA MIDSTREAM ASSOCIATION and AMERICAN PETROLEUM
INSTITUTE,

Petitioners,

v.

U.S. DEPARTMENT OF TRANSPORTATION and PIPELINE AND
HAZARDOUS MATERIALS SAFETY ADMINISTRATION,

Respondents.

On Petition for Review of a Final Rule of the Pipeline and Hazardous
Materials Safety Administration

### INITIAL BRIEF FOR RESPONDENTS

*Of Counsel:*

PAUL M. GEIER
   *Assistant General Counsel*
CHARLES E. ENLOE
   *Senior Trial Attorney*
   *U.S. Department of*
   *Transportation*

ERIN D. HENDRIXSON
AMAL DERIA
NATHAN W. COLE
   *Attorney Advisors*
   *Pipeline and Hazardous*
   *Materials Safety Administration*

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

ABBY C. WRIGHT
ANNA O. MOHAN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7533*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3159*
   *anna.mohan@usdoj.gov*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

The parties to this case are: Petitioners GPA Midstream Association and American Petroleum Institute; and Respondents U.S. Department of Transportation and Pipeline and Hazardous Materials Safety Administration.

There are no Amici at this time.

### B.    Rulings Under Review

Petitioners seek review of the final rule entitled *Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards*, 87 Fed. Reg. 20,940 (Apr. 8, 2022).

### C.    Related Cases

This case has not previously been before this Court. And to the best of undersigned counsel's knowledge, there are no related cases pending in a United States court of appeals or in any local or federal court in the District of Columbia.

*/s/ Anna O. Mohan*
Anna O. Mohan

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION.............................................3

STATEMENT OF ISSUES...........................................................3

PERTINENT STATUTES AND REGULATIONS .....................3

STATEMENT OF THE CASE ....................................................4

     A.    Statutory and Regulatory Background ....................................4

         1.    General Authority to Prescribe Safety Standards
for Pipelines .......................................................................4

         2.    Transmission and Gathering Lines ...............................6

         3.    Authority to Define Gathering Lines Subject to
Regulation ..........................................................................8

         4.    Direction to Require Installation of Rupture-
Mitigation Valves...........................................................12

     B.    The Challenged Rule.............................................................14

     C.    The Petition for Review ........................................................24

SUMMARY OF ARGUMENT ..................................................24

STANDARD OF REVIEW.........................................................27

ARGUMENT ..............................................................................28

I.    PHMSA Is Authorized to Require Rupture-Mitigation Valves
for Gathering Lines .......................................................................28

A.    Section 60102(a) Confers Broad Discretion on PHMSA to Prescribe Pipeline Safety Standards, Including the Standards in the Final Rule ...................................28

B.    Section 60102(n) Does Not Limit PHMSA's Authority to Impose Requirements on Gathering Lines ......................30

II.    PHMSA Complied with the Requisite Procedures in Promulgating the Final Rule ...........................................39

A.    PHMSA Provided Adequate Notice of Its Intent to Apply the Final Rule's Rupture-Mitigation Valve Requirements to Gathering Lines .........................................39

B.    PHMSA Conducted a Thorough Risk Assessment and Explained Its Reasons for Adopting the Final Rule............45

III.    If the Court Believes the Rule Suffers from Flaws, the Appropriate Remedy Is Not to Vacate the Rule in Its Entirety .................................................................................51

CONCLUSION ..................................................................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Adirondack Med. Ctr. v. Sebelius*,
  740 F.3d 692 (D.C. Cir. 2014) ........................................... 32, 35, 36, 37

*Air All. Houston v. Environmental Prot. Agency*,
  906 F.3d 1049 (D.C. Cir. 2018) .......................................... 38

*American Petroleum Inst. v. Environmental Prot. Agency*,
  862 F.3d 50 (D.C. Cir. 2017), *decision modified on reh'g*,
  883 F.3d 918 (D.C. Cir. 2018) ............................................. 51

*Chamber of Commerce v. U.S. Sec. Exch. Comm'n*:
  412 F.3d 133 (D.C. Cir. 2005) ........................................... 48
  443 F.3d 890 (D.C. Cir. 2006) ................................................ 49, 50, 51

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ................................................ 35, 36, 37

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
  467 U.S. 837 (1984) ................................................................ 38

*City & Cty. of San Francisco v. Federal Energy Regulatory Comm'n*,
  24 F.4th 652 (D.C. Cir. 2022) ............................................. 28

*Community Care Found. v. Thompson*,
  318 F.3d 219 (D.C. Cir. 2003) ............................................ 39

*Davis Cty. Solid Waste Mgmt. v. Environmental Prot. Agency*,
  108 F.3d 1454 (D.C. Cir. 1997) .........................................51-52

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
  867 F.3d 564 (5th Cir. 2017) ............................................. 27

*Helicopter Ass'n Int'l v. Federal Aviation Admin.*,
  722 F.3d 430 (D.C. Cir. 2013) ........................................... 35

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*,
  613 F.3d 1112 (D.C. Cir. 2010) .......................................... 43

*Michigan v. Environmental Prot. Agency*,
  576 U.S. 743 (2015) ............................................................. 48

iv

*New Jersey v. Environmental Prot. Agency*,
    517 F.3d 574 (D.C. Cir. 2008) ............................................ 52

*Northeast Md. Waste Disposal Auth. v. Environmental Prot. Agency*,
    358 F.3d 936 (D.C. Cir. 2004) ............................................ 42

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ............................................................ 36

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) ............................................................ 39

**Statutes:**

Administrative Procedure Act,
    5 U.S.C. § 706(2)(A) ........................................................... 27

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 49 ....................................... 34

Natural Gas Pipeline Safety Act of 1968,
    Pub. L. No. 90-481, § 2(3), 82 Stat. 720, 720 ...................... 7

Pipeline Safety Act of 1979,
    Pub. L. No. 96-129, § 202(3), 93 Stat. 989, 1003 ................ 7

Pipeline Safety Act of 1992,
    Pub. L. No. 102-508, §§ 109, 208(b), 106 Stat. 3289, 3294-95, 3303-04
    (codified as amended at 49 U.S.C. § 60101(b)) ................... 8

Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011,
    Pub. L. No. 112-90, 125 Stat. 1904 (2012) ......................... 13
      § 4, 125 Stat. at 1907 (codified at 49 U.S.C. § 60102(n)(1) ............. 13
      § 21, 125 Stat. at 1917 .................................................. 14, 31

49 U.S.C. § 60101 *et seq.* .................................................... 4
    49 U.S.C. § 60101(b) ................................................. 1, 8, 30
    49 U.S.C. § 60101(b)(2) ................................................... 24
    49 U.S.C. § 60101(b)(2)(A)-(B) ........................................ 8
    49 U.S.C. § 60102(a) .......................................... 24, 25, 28

49 U.S.C. § 60102(a)(1) ................................................. 4, 28
49 U.S.C. § 60102(a)(2) ............................................. 1, 4, 28
49 U.S.C. § 60102(a)(2)(A) ...................................... 4, 24, 28
49 U.S.C. § 60102(a)(2)(B) ................................ 4, 24, 28, 30
49 U.S.C. § 60102(b)(2) ..................................................... 5
49 U.S.C. § 60102(b)(2)(B)-(E) ..................................... 38
49 U.S.C. § 60102(b)(2)(D)-(E) ..................................... 45
49 U.S.C. § 60102(b)(2)(F)-(G) ..................................... 39
49 U.S.C. § 60102(b)(3) .......................................... 4-5, 45
49 U.S.C. § 60102(b)(3)(A) ........................................... 46
49 U.S.C. § 60102(b)(3)(C) ........................................... 46
49 U.S.C. § 60102(b)(4) ................................................... 5
49 U.S.C. § 60102(b)(5) ...................................... 6, 22, 45
49 U.S.C. § 60102(c)-(t) ................................................. 30
49 U.S.C. § 60102(k)(1) ................................................. 33
49 U.S.C. § 60102(n)(1) ........................... 1, 15, 30, 33, 35, 37
49 U.S.C. § 60102(r) ...................................................... 34
49 U.S.C. § 60115(c)(2) ................................................... 5
49 U.S.C. § 60119 ........................................................ 27
49 U.S.C. § 60119(a) ...................................................... 3
49 U.S.C. § 60119(a)(3) ................................................ 27

**Regulations:**

49 C.F.R. § 1.97 .......................................................... 1

49 C.F.R. § 190.243 ..................................................... 27

49 C.F.R. § 192.3 ..................................................... 6, 44

49 C.F.R. § 192.5 ........................................................ 10

49 C.F.R. § 192.8(c) ................................................... 10

49 C.F.R. § 192.9 ................................................... 15, 44

49 C.F.R. § 192.9(c) ............................................... 10, 40

49 C.F.R. § 192.9(d) ................................................... 11

49 C.F.R. § 192.9 (1971) ........................................................... 8

49 C.F.R. § 192.179 ................................................. 44

49 C.F.R. § 192.634 ................................................. 44

49 C.F.R. § 195.1 ..................................................... 15

49 C.F.R. § 195.1(a)(4)(i) ................................................. 11, 40

49 CF.R. § 195.1 (1982) ........................................................ 8

49 C.F.R. § 195.11 ................................................... 15

49 C.F.R. § 195.11(a) ...................................................... 11

49 C.F.R. § 195.11(b)(2)(i) .................................................. 40

**Legislative Materials:**

H.R. Rep. No. 90-1390 (1968), *as reprinted in*
   1968 U.S.C.C.A.N. 3223 ........................................................ 7

H.R. Rep. No. 102-247, pt. 1 (1991), *as reprinted in*
   1992 U.S.C.C.A.N. 2642........................................................9

S. Rep. No. 96-182 (1979), *as reprinted in*
   1979 U.S.C.C.A.N. 1971........................................................7

**Other Authorities:**

35 Fed. Reg. 13,248 (Aug. 19, 1970) ...................................... 7

46 Fed. Reg. 38,357 (July 27, 1981) ...................................... 7

*Gas Gathering Line Definition; Alternative Definition for Onshore
   Lines and New Safety Standards*,
   71 Fed. Reg. 13,289 (Mar. 15, 2006) ............................... 9, 10

PHMSA, U.S. Dep't of Transp., *Fact Sheet: Distribution Pipelines*,
https://perma.cc/W8XT-X6SE ............................................................ 44,

PHMSA, U.S. Dep't of Transp., *Fact Sheet: Gathering Pipelines*,
https://perma.cc/XP6P-2SVN ............................................................ 6, 8

PHMSA, U.S. Dep't of Transp., *Fact Sheet: Transmission Pipelines*,
https://perma.cc/6HPF-ZWMG ............................................................ 6

*Pipeline Safety: Meeting of the Gas and Liquid Pipeline Safety
Advisory Committees*,
85 Fed. Reg. 37,496 (June 22, 2020) ............................................. 17-18

*Pipeline Safety: Protecting Unusually Sensitive Areas From
Rural Onshore Hazardous Liquid Gathering Lines and
Low-Stress Lines*,
73 Fed. Reg. 31,634 (June 3, 2008) ................................................. 9, 11

*Pipeline Safety: Requirement of Valve Installation and Minimum
Rupture Detection Standards*,
87 Fed. Reg. 20,940 (Apr. 8, 2022) ............ 2, 12, 13, 20, 21, 22, 23, 29,
38, 41, 42, 43, 44, 47, 49

*Pipeline Safety: Safety of Gas Gathering Pipelines: Extension of
Reporting Requirements, Regulation of Large, High-Pressure
Lines, and Other Related Amendments*,
86 Fed. Reg. 63,266 (Nov. 15, 2021) ................................................. 11

*Pipeline Safety: Safety of Gas Transmission Pipelines*,
76 Fed. Reg. 53,086 (Aug. 25, 2011) ................................................. 14

*Pipeline Safety: Safety of On-Shore Hazardous Liquid Pipelines*,
75 Fed. Reg. 63,774 (Oct. 18, 2010) ............................................. 14-15

*Pipeline Safety: Valve Installation and Minimum Rupture
Detection Standards*,
85 Fed. Reg. 7162 (Feb. 6, 2020) ........................................... 15, 40, 47

# GLOSSARY

| | |
|---|---|
| 2011 Act | Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. No. 112-90, 125 Stat. 1904 (2012) |
| Department | Department of Transportation |
| Final Rule | *Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards*, 87 Fed. Reg. 20,940 (Apr. 8, 2022) |
| JA | Joint Appendix |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| Secretary | Secretary of Transportation |

## INTRODUCTION

In the 1960s and 1970s, Congress authorized the Secretary of Transportation to "prescribe minimum safety standards" for the transportation and storage of gas and hazardous liquids in pipelines. 49 U.S.C. § 60102(a)(2).  In 2011, in response to several pipeline safety incidents, Congress directed the Secretary to adopt, if appropriate, a standard that would require operators to install rupture-mitigation valves, which are valves that can be closed automatically or via remote control allowing operators to quickly stop the flow of hazardous materials in the event of a pipeline rupture.  *See id.* § 60102(n)(1). Congress made this mandate specifically applicable to "transmission pipeline facilities"—that is, pipelines that transport materials long distances.  *See id.*  Congress did not mention in that mandate a different type of pipeline, known as a gathering line, but Congress has long authorized the Secretary to prescribe standards for those pipelines as well.  *See id.* § 60101(b).

In response to Congress's directive, the Pipeline and Hazardous Materials Safety Administration (PHMSA), acting through a delegation from the Secretary, *see* 49 C.F.R. § 1.97, promulgated a rule requiring

operators of transmission lines and certain gathering lines to install rupture-mitigation valves. *See* JA__ [*Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards*, 87 Fed. Reg. 20,940 (Apr. 8, 2022)] (Final Rule). PHMSA explained that it was imposing the requirements on the identified gathering lines because those lines, like transmission lines, pose significant risks to public safety and the environment.

Petitioners now challenge the Final Rule, arguing that PHMSA lacked statutory authority to apply the rule to gathering lines and that the Final Rule is procedurally deficient. Petitioners appear to concede that the Final Rule falls within PHMSA's general rulemaking authority under section 60102(a). And nothing in the text or structure of section 60102(n) suggests that Congress, in directing PHMSA to apply rupture-mitigation valve requirements to one type of pipeline, intended to strip PHMSA of the authority it already had to apply such requirements to other types of pipelines. Because PHMSA also complied with all relevant procedural requirements when it promulgated the Final Rule, this Court should deny the petition for review.

2

## STATEMENT OF JURISDICTION

On July 1, 2022, petitioners filed this petition for review challenging the PHMSA Final Rule, which was posted on the agency's website on March 31, 2022, made available for public inspection on April 7, 2022, and published in the Federal Register on April 8, 2022. This Court has jurisdiction under 49 U.S.C. § 60119(a), which gives the courts of appeals exclusive jurisdiction to review regulations issued by the Secretary of Transportation regarding pipeline transportation and pipeline facilities.

## STATEMENT OF ISSUES

The issues presented are the following:

1.    Whether, in failing to explicitly mention gathering lines in its mandate regarding rupture-mitigation valves, Congress intended to strip PHMSA of its longstanding authority to require installation of those valves on gathering lines.

2.    Whether PHMSA complied with applicable procedural requirements in promulgating the Final Rule.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

3

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

### 1.    General Authority to Prescribe Safety Standards for Pipelines

The federal pipeline safety laws, 49 U.S.C. § 60101 *et seq.*, give the

Secretary of Transportation regulatory and enforcement authority to

take actions to protect the public "against risks to life and property

posed by pipeline transportation and pipeline facilities." *Id.*

§ 60102(a)(1).  The statute directs the Secretary to "prescribe minimum

safety standards for pipeline transportation and for pipeline facilities."

*Id.* § 60102(a)(2).  Those standards can apply "to any or all of the

owners or operators of pipeline facilities."  *Id.* § 60102(a)(2)(A).  And

they "may apply to the design, installation, inspection, emergency plans

and procedures, testing, construction, extension, operation,

replacement, and maintenance of pipeline facilities."  *Id.*

§ 60102(a)(2)(B).

In addition to directing the Secretary to set safety standards,

Congress has imposed various procedural requirements on rulemakings

setting those standards.  The Secretary must conduct a risk assessment

that identifies the costs and benefits of the proposed standard.  *See* 49

4

U.S.C. § 60102(b)(3).  The Secretary must submit the proposed standard

and its risk assessment to the public and to one, or both, of two advisory

committees: the Technical Pipeline Safety Standards Committee, also

known as the Gas Pipeline Advisory Committee, and the Technical

Hazardous Liquid Pipeline Safety Standards Committee, also known as

the Liquid Pipeline Advisory Committee (together, the Advisory

Committees or the Committees).  *See id.* § 60102(b)(4).  Based on review

of those materials and the discussion during the Committees' meetings,

the Committees issue recommendations to PHMSA regarding the

"technical feasibility, reasonableness, cost-effectiveness, and

practicability of the proposed standard."  *Id.* § 60115(c)(2).

Before prescribing a final standard, the Secretary must consider

several factors, including: "relevant available" pipeline safety and

environmental information; "the appropriateness of the standard for the

particular type of pipeline transportation or facility"; "the

reasonableness of the standard"; the "reasonably identifiable or

estimated" costs and benefits of the standard; and any comments and

recommendations received from the public and the Advisory

Committees.  *Id.* § 60102(b)(2).  "Except where otherwise required by

5

statute, the Secretary shall propose or issue a standard … only upon a reasoned determination that the benefits, including safety and environmental benefits, of the intended standard justify its costs." *Id.* § 60102(b)(5).

### 2.    Transmission and Gathering Lines

The Secretary's authority includes the power to set safety standards for several types of pipelines, including two relevant here: transmission lines and gathering lines.  Transmission lines transport materials long distances.  *See* 49 C.F.R. § 192.3 (defining gas transmission line); PHMSA, U.S. Dep't of Transp., *Fact Sheet: Transmission Pipelines*, https://perma.cc/6HPF-ZWMG.  Gathering lines, in contrast, transport materials shorter distances from the production site to a central collection point, such as a processing facility or a transmission line.  *See* 49 C.F.R. § 192.3 (defining gas gathering line); PHMSA, U.S. Dep't of Transp., *Fact Sheet: Gathering Pipelines*, https://perma.cc/XP6P-2SVN.

When Congress authorized federal safety regulation of pipelines in the 1960s and 1970s, gathering lines were largely located in rural areas where they were unlikely to pose a significant threat to persons or

6

property in the event of a rupture. *See* H.R. Rep. No. 90-1390, at 18-19 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 3223, 3234-35; S. Rep. No. 96-182, at 18 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 1971, 1988. Accordingly, Congress initially authorized the Secretary to regulate only those segments of gathering lines that passed through areas designated as nonrural. *See* Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, § 2(3), 82 Stat. 720, 720 (transportation of gas); Pipeline Safety Act of 1979, Pub. L. No. 96-129, § 202(3), 93 Stat. 989, 1003 (transportation of hazardous liquids).

Pursuant to those authorizations, PHMSA promulgated a set of safety standards, codified in title 49 of the Code of Federal Regulations, parts 192 (for gas pipelines) and 195 (for hazardous liquid pipelines). *See* 35 Fed. Reg. 13,248 (Aug. 19, 1970) (gas pipelines); 46 Fed. Reg. 38,357 (July 27, 1981) (hazardous liquid pipelines).[1] PHMSA made clear in these standards that unless specified, each operator of a nonrural gathering line was required to "comply with the requirements

---

[1] PHMSA, its predecessor agencies, and the Department of Transportation, as well as the Secretary of Transportation and the PHMSA Administrator, are referred to collectively as "PHMSA" or "the agency" for purposes of this brief.

7

… applicable to transmission lines." 49 C.F.R. § 192.9 (1971); *see* 49 C.F.R. § 195.1 (1982) (nonrural hazardous liquid gathering lines subject to requirements of this part).

### 3.    Authority to Define Gathering Lines Subject to Regulation

It eventually became clear that the rural-nonrural distinction was not accurately capturing the gathering lines that should be subject to regulation. In particular, some portions of gathering lines that passed close to areas where people worked or lived were not being regulated because they were in nominally "rural" areas. *Fact Sheet: Gathering Pipelines*, *supra*. Accordingly, in the 1990s, Congress authorized the Secretary to regulate any gathering line that he defined as a "regulated gathering line." *See* Pipeline Safety Act of 1992, Pub. L. No. 102-508, §§ 109, 208(b), 106 Stat. 3289, 3294-95, 3303-04 (codified as amended at 49 U.S.C. § 60101(b)). Congress directed the Secretary, in crafting that definition, to consider functional and operational characteristics of gathering lines, including the "location, length of line from the well site, operating pressure, throughput, and the composition of the transported gas or hazardous liquid," as well as the diameter of the pipeline for hazardous liquid lines. 49 U.S.C. § 60101(b)(2)(A)-(B). In short, the

8

Secretary was instructed to "find out whether any gathering lines present a risk to people or the environment, and if so how large a risk and what measures should be taken to mitigate the risk." H.R. Rep. No. 102-247, pt. 1, at 23 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 2642, 2653.

To fulfill Congress's mandate, PHMSA initiated rulemakings to define "regulated gathering lines" for both gas and hazardous liquid pipelines. *See Gas Gathering Line Definition; Alternative Definition for Onshore Lines and New Safety Standards*, 71 Fed. Reg. 13,289 (Mar. 15, 2006); *Pipeline Safety: Protecting Unusually Sensitive Areas from Rural Onshore Hazardous Liquid Gathering Lines and Low-Stress Lines*, 73 Fed. Reg. 31,634 (June 3, 2008). After soliciting comments and reviewing technical data provided by industry representatives, including petitioners, PHMSA ultimately adopted a risk-based approach to defining regulated gathering lines. *See* 71 Fed. Reg. at 13,289-90 (describing comments and surveys submitted by petitioners); 73 Fed. Reg. at 31,635-36.

As to gas gathering lines, PHMSA decided to group pipelines into two "Types" based on operating pressure and proximity to populated

areas.  Type A lines have similar pressure levels as transmission lines
and pass through locations with more than 10 buildings intended for
human occupancy.  *See* 49 C.F.R. § 192.8(c) (defining pipeline Types);
*see also id.* § 192.5 (defining different location Classes based on
proximity to dwellings).  Type B lines operate at lower pressures and
generally must also pass through a populated area.  *See id.* § 192.8(c).
Gathering lines are then subject to different levels of regulation based
on how they are categorized.  Given that Type A pipelines have risk
profiles similar to transmission lines, PHMSA required operators of
those lines—like operators of previously regulated nonrural gas
gathering lines—to "comply with the requirements … applicable to
transmission lines," unless otherwise specified.  *Id.* § 192.9(c); *see* 71
Fed. Reg. at 13,291 ("[H]igh-pressure gathering lines in populated areas
can present the same risk as regulated transmission lines."); *id.* at
13,292 ("Because of the higher stress at which Type A lines operate and
their ability to harm more of the public, we considered Type A lines to
warrant safety requirements equivalent to transmission line[s] ….").
Because Type B lines operate at lower pressures, PHMSA subjected
them to only a subset of the regulations that apply to transmission

10

lines, including those requirements that govern the "design, installation, [and] construction" of new or replaced lines.  49 C.F.R. § 192.9(d).[2]

As to hazardous liquid pipelines, PHMSA maintained, in part, the rural-nonrural area distinction.  Nonrural liquid gathering lines are subject to all of the requirements in part 195 of title 49 of the Code of Federal Regulations.  *See* 49 C.F.R. § 195.1(a)(4)(i).  Rural liquid gathering lines, in contrast, are subject to part 195's requirements only when they are likely to cause the most damage because they have a larger diameter, operate at a higher pressure, and are located near a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release.  *See id.* § 195.11(a) (defining "regulated rural gathering line"); 73 Fed. Reg. at 31,636 (defining regulated rural gathering lines as those "where leaks can cause the most significant damage").

---

[2] PHMSA recently created two additional categories of gas gathering lines:  Type C and Type R.  *See Pipeline Safety: Safety of Gas Gathering Pipelines: Extension of Reporting Requirements, Regulation of Large, High-Pressure Lines, and Other Related Amendments*, 86 Fed. Reg. 63,266, 63,296 (Nov. 15, 2021).  These categories of gathering lines are not subject to the requirements challenged in this proceeding.

### 4.     Direction to Require Installation of Rupture-Mitigation Valves

In addition to granting the Secretary general authority to prescribe safety standards that the agency deems appropriate, Congress has periodically directed the agency to promulgate particular types of standards in response to specific pipeline incidents.

Two such incidents occurred in 2010.  On July 25, a hazardous liquid transmission pipeline ruptured in Marshall, Michigan, "resulting in a release of approximately 800,000 gallons of crude oil into the Kalamazoo River and approximately $1 billion in property and environmental damages."  JA__ [87 Fed. Reg. at 20,940].  The operator was able to prevent further damage by using rupture-mitigation valves—that is, valves that can be closed either by remote control or automatically, without a person located at the valve location.  The rupture-mitigation valves allowed the operator to isolate and shut-off flow to the ruptured segment of the pipeline once the rupture was detected.  *See* JA__ [*id.* at 20,941].  Less than two months later, in San Bruno, California, a gas transmission pipeline ruptured, causing an explosion that killed eight people, sent 51 others to the hospital, destroyed or damaged more than 100 homes, and required the

12

evacuation of more than 300 homes.  *See* JA__ [*id.*].  The delay in closing off the affected segments of the pipeline "allowed the fire to burn unabated and hampered emergency response efforts."  JA__ [*Id.*].

Responding in part to the San Bruno and Marshall incidents, Congress enacted the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011.  *See* Pub. L. No. 112-90, 125 Stat. 1904 (2012) (2011 Act).  The legislation contained several mandates to improve pipeline safety.  As relevant here, Congress directed the Secretary to, "if appropriate, … require by regulation the use of automatic or remote-controlled shut-off valves, or equivalent technology, where economically, technically, and operationally feasible on transmission pipeline facilities constructed or entirely replaced after the date on which the Secretary issues the final rule containing such requirement."  2011 Act § 4, 125 Stat. at 1907 (codified at 49 U.S.C. § 60102(n)(1)).  Congress also instructed PHMSA to "conduct a review of existing Federal and State regulations for gas and hazardous liquid gathering lines" and to prepare a report evaluating whether to apply existing regulations to "gathering lines that are not currently subject to Federal regulation"

and whether "to modify or revoke existing exemptions from Federal regulation" for regulated gathering lines. *Id.* § 21, 125 Stat. at 1917.

## B.    The Challenged Rule

In parallel with Congress's consideration of the 2011 Act and similar legislation, PHMSA initiated a rulemaking process to consider requiring the use of automatic or remote-controlled shut-off valves.

1.    PHMSA began its valve rulemaking by publishing two advanced notices of proposed rulemaking.  With respect to gas pipelines, PHMSA announced that it was "considering whether revised requirements are needed on new construction or existing pipelines concerning mainline valves, including valve spacing and installation of remotely operated or automatically operated valves; … and whether new regulations are needed to govern the safety of gathering lines." JA__ [*Pipeline Safety: Safety of Gas Transmission Pipelines*, 76 Fed. Reg. 53,086, 53,086 (Aug. 25, 2011)].  With respect to hazardous liquid pipelines, PHMSA sought "comment on," among other things, "whether to require the installation of emergency flow restricting devices [a type of remote-controlled valve] … in certain areas."  JA__ [*Pipeline Safety:*

14

*Safety of On-Shore Hazardous Liquid Pipelines*, 75 Fed. Reg. 63,774, 63,774 (Oct. 18, 2010)].

After an initial comment period and two public meetings, PHMSA published a notice of proposed rulemaking, along with a preliminary risk assessment. *See* JA__ [*Pipeline Safety: Valve Installation and Minimum Rupture Detection Standards*, 85 Fed. Reg. 7162 (Feb. 6, 2020)]; JA__ [Preliminary Regulatory Impact Analysis, PHMSA-2013-0255-0006 (Feb. 2020)] (Preliminary Assessment).  PHMSA proposed to revise parts 192 and 195 of the pipeline safety regulations to require operators to install "automatic shut-off valves, remote-control valves, or an equivalent technology" on "newly constructed or entirely replaced" larger-diameter gas and hazardous liquid pipelines, unless they could demonstrate that doing so would not be economically, technologically, or operationally feasible.  JA__ [85 Fed. Reg. at 7178-79].  PHMSA did not propose any amendments to 49 C.F.R. § 192.9, § 195.1, or § 195.11, the regulations that specify the applicability to gathering lines of the safety requirements in parts 192 and 195.

The Preliminary Assessment accompanying the notice evaluated the costs and benefits of the proposed rule.  In assessing costs, PHMSA

15

first estimated the number of rupture-mitigation valves that would need to be installed and the costs of each such valve. *See* JA__ [Preliminary Assessment at 8, 34-38]. To determine the benefits of the proposed rule, PHMSA relied, in part, on a technical study by Oak Ridge National Laboratory, which evaluated the effectiveness of valve closure swiftness in mitigating the consequences of gas transmission and hazardous liquid pipeline releases. *See* JA__ [Preliminary Assessment at 10, 39-45]. That study demonstrated that improving the speed of valve closure can reduce property damage from gas pipeline ruptures that ignite as well as mitigate property and environmental damage from ruptures of hazardous liquid pipelines. *See* JA__ [Preliminary Assessment at 39-45]. PHMSA also cited a study from engineering consultants, Kiefner and Associates, Inc., which examined historical accident and incident data for gas and hazardous liquid transmission and gathering lines. *See* JA__ [Preliminary Assessment at 12-13, 18]; *see also* JA__ [Final Report No. 12-173, Leak Detection Study at 3-53 to 3-73, 3-74 to 3-82, PHMSA-2013-0255-0003 (Dec. 10, 2012)] (Kiefner Study).

Several interested parties, including petitioners, submitted comments on the implications of the proposed rule for gathering lines. Petitioners expressed concern that PHMSA's "proposed rules would apply to certain regulated gathering lines." JA__ [GPA Midstream Association Comment at 10, PHMSA-2013-0255-0020 (Apr. 6, 2020)] (GPA Comment); *see* JA__ [American Petroleum Institute Comment at 8, PHMSA-2013-0255-0026 (Apr. 6, 2020)] (American Petroleum Institute Comment).  They acknowledged that "PHMSA often applies the requirements for transmission pipelines to certain regulated gathering lines."  JA__ [GPA Comment at 11].  But they argued that the 2011 Act's mandate applied only to transmission pipeline facilities and that requiring installation of automated or remote-controlled valves on gathering lines would create "significant compliance challenges for operators" given segments of those lines can be subject to different regulations.  JA__ [GPA Comment at 10-11]; JA__ [American Petroleum Institute Comment at 8].

PHMSA subsequently convened meetings of its Advisory Committees.  *See* JA__ [*Pipeline Safety: Meeting of the Gas and Liquid Pipeline Safety Advisory Committees*, 85 Fed. Reg. 37,496 (June 22,

17

2020)].  In its pre-briefing and final presentations to the Committees,

PHMSA explained that it intended to require the use of rupture-

mitigation valves for larger-diameter Type A gas gathering lines and for

larger-diameter regulated rural and nonrural hazardous liquid

gathering lines, but it expressed openness to considering additional

exemptions to those requirements.  *See* JA__ [Agency Pre-Brief

Presentation at 25, 29-30, PHMSA-2013-0255-0114 (July 14, 2020)];

JA__ [Agency Presentation to Gas Pipeline Advisory Committee at 56,

PHMSA-2013-0255-0115 (July 22, 2020)]; JA__ [Agency Presentation to

Liquid Pipeline Advisory Committee at 54, PHMSA-2013-0255-0109

(July 23, 2020)].  These gathering lines, PHMSA explained, were being

built with increasing frequency and carried "significant public risk"

given their operating pressure, size, and locations.  JA__ [Gas Pipeline

Advisory Committee Transcript at 239-41, PHMSA-2013-0255-0069

(July 22, 2020)] (Gas Pipeline Advisory Committee Transcript)

(discussing gas gathering lines); *see also* JA__ [Liquid Pipeline Advisory

Committee Transcript at 158-59, PHMSA-2013-0255-0089 (July 23,

2020)] (Liquid Pipeline Advisory Committee Transcript) (noting that

the consequences of incidents on regulated hazardous liquid gathering

lines would be similar to incidents on hazardous liquid transmission lines of the same size and pressure).

Members of the public participated at the Advisory Committee meetings, and petitioners reiterated their concerns about the rule's application to gathering lines. *See* JA__ [Gas Pipeline Advisory Committee Transcript at 183-85]; JA__ [Liquid Pipeline Advisory Committee Transcript at 136-38]. The Advisory Committees ultimately concluded that the valve requirements would be "technically feasible, reasonable, cost-effective, and practicable" so long as PHMSA included exemptions for certain lower risk gathering lines. JA__ [Gas Pipeline Advisory Committee Voting Slides at 2, PHMSA-2013-0255-0065 (July 22, 2022)] (Gas Pipeline Advisory Committee Voting Slides); JA__ [Liquid Pipeline Advisory Committee Voting Slides at 3, PHMSA-2013-0255-0094 (July 23, 2022)] (Liquid Pipeline Advisory Committee Voting Slides). The Committees further recommended that PHMSA consider whether a separate rulemaking was necessary to address the question of gathering lines given that PHMSA did not explicitly mention gathering lines in its notice of proposed rulemaking. JA__ [Gas Pipeline

Advisory Committee Voting Slides at 2]; JA__ [Liquid Pipeline Advisory Committee Voting Slides at 3].

Petitioners submitted additional comments following the meetings, again reiterating their position that the valve requirements should not apply to any gathering lines.  *See* JA__ [Joint GPA Midstream, American Petroleum Institute Comment Letter at 8-11, PHMSA-2013-0255-0038 (Sept. 8, 2020)].  Petitioner GPA Midstream also met in January 2022 with PHMSA and Office of Information Regulatory Affairs personnel to reiterate its position.  *See* JA__ [EO 12866 Meeting Summary, PHMSA-2013-0255-0042 (Jan. 28, 2022)].

2.    PHMSA published the final rule in the Federal Register on April 8, 2022 and also issued a final risk assessment.  *See* JA__ [87 Fed. Reg. 20,940]; JA__ [Final Regulatory Impact Analysis, PHMSA-2013-0255-0046 (Mar. 2022)] (Final Assessment).  As to gas gathering lines, PHMSA explained that the Final Rule's rupture-mitigation valve requirements would apply only to certain new or entirely replaced, larger-diameter Type A lines in densely populated areas or with the potential to cause significant damage to people or property.  *See* JA__ [87 Fed. Reg. at 20,942].  Those lines, PHMSA explained, "generally

20

present a higher risk of public safety consequences, similar to gas transmission pipelines" and thus "warrant[] the additional protection that [rupture-mitigation valves] or alternative equivalent technology would provide."  JA__ [*Id.* at 20,949].  PHMSA exempted other Type A lines and all Type B lines (which operate at lower pressures) because they were less likely to significantly impact people or property.  *See* JA__ [*id.*]; *see also* JA__ [*id.* at 20,961].  As to hazardous liquid gathering lines, PHMSA explained that the Final Rule's rupture-mitigation valve requirements would apply to larger-diameter nonrural gathering lines, consistent with PHMSA's approach of applying the same requirements to those lines and transmission lines.  *See* JA__ [*id.* at 20,949, 20,961].  PHMSA also noted that the Final Rule's rupture-mitigation valve requirements would apply only to certain regulated rural gathering lines—specifically, those that cross large bodies of water—explaining that it "ha[d] required extra valves near such water crossings for several decades" and that any release from such gathering lines would have adverse environmental impacts.  JA__ [*Id.* at 20,949].  In short, as to the subset of gathering lines covered by the Final Rule, PHMSA concluded that "the benefits, including safety and

21

environmental benefits, of the intended standard justif[ied] its costs."
49 U.S.C. § 60102(b)(5); *see also* JA__ [87 Fed. Reg. at 20,943].

PHMSA also explained why it was unnecessary to conduct an
additional rulemaking specific to gathering lines.  Section 192.9 of the
pipeline safety regulations, PHMSA observed, "states that operators of
Type A gas gathering pipelines must comply with the requirements of
part 192 applicable to gas transmission pipelines," and "[n]othing in the
[notice of proposed rulemaking] stated or suggested that the regulatory
amendments proposed therein would not apply to new and entirely
replaced gas gathering lines as provided by the plain meaning of
§ 192.9."  JA__ [87 Fed. Reg. at 20,949].  "[S]imilarly to Type A gas
gathering pipelines, regulations proposed for design and construction
standards for hazardous liquid pipelines will apply to regulated rural
hazardous liquid gathering pipelines absent a specific statement that
the regulations do not apply to regulated rural hazardous liquid
gathering pipelines," and part 195 generally applies to all nonrural
hazardous liquid gathering lines.  JA__ [*Id.*]; *see also* JA__ [*id.* at
20,961].  Thus, the notice made clear that PHMSA intended for the
rupture-mitigation valve requirements "to apply to new and entirely

22

replaced regulated gathering pipelines, both for gas and hazardous liquid operators." JA__ [*id.* at 20,948-49].

In the Final Assessment accompanying the Final Rule, PHMSA relied on data sources and methodology that it had identified in the Preliminary Assessment to calculate estimated costs and benefits of the rule, making clear that its analysis included gathering lines. PHMSA acknowledged that compliance costs for gathering line operators could be higher given that different segments of those pipelines can be subject to different rules. But PHMSA estimated that application of the Final Rule's requirements to certain gas and hazardous liquid gathering lines would not significantly increase the cost of the rule given that "no more than 300 miles" or "about 5 percent of the total gas and hazardous liquid line mileage" projected to be built each year would be subject to those requirements. JA__ [Final Assessment at 35 n.36]. PHMSA also evaluated the projected benefits of the rule based on historical incident data on gas and hazardous liquid gathering lines, as well as the same Oak Ridge National Laboratory and Kiefner studies cited in the Preliminary Assessment. JA__ [Final Assessment at 13-14, 19, 23-24, 28-32]. PHMSA explained that installing rupture-mitigation valves on

23

the specified gathering lines would yield similar benefits as installation on transmission lines given that those gathering lines are "similar[] (in terms of design and operating characteristics, and risks to public safety and the environment) as transmission lines."  JA__ [Final Assessment at 34 n.35].

## C.    The Petition for Review

On July 1, 2022, petitioners filed a petition for review in this Court, challenging the Final Rule.

## SUMMARY OF ARGUMENT

**I.**    Congress granted PHMSA broad authority in 49 U.S.C. § 60102(a) to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities."  PHMSA can apply those standards to "any or all" operators of pipeline facilities, including operators of gathering lines that PHMSA determines require regulation.  *Id.* § 60102(a)(2)(A); *see id.* § 60101(b)(2).  And those standards can govern the "design," "installation," "construction," and "replacement" of pipeline facilities.  *Id.* § 60102(a)(2)(B).

Applying its significant expertise in administering the pipeline safety laws, PHMSA determined that it would be appropriate to require

24

operators of transmission lines and certain gathering lines with similar risk profiles to install rupture-mitigation valves on their newly constructed or entirely replaced pipelines. That requirement plainly falls within PHMSA's broad authority under 49 U.S.C. § 60102(a), and petitioners do not contend otherwise.

Petitioners instead urge that a subsequently enacted provision, 49 U.S.C. § 60102(n)(1), strips PHMSA of the authority to apply that requirement to gathering lines. According to petitioners, Congress, in directing PHMSA to require, if appropriate, the use of rupture-mitigation valves "on transmission pipeline facilities," *id.*, implicitly limited PHMSA's ability to apply such a requirement to other types of pipelines. That reference to "transmission pipeline facilities," however, simply shows that Congress intended to *mandate* a valve requirement only for transmission pipeline facilities, preserving the discretion PHMSA already had to decide whether to apply that requirement to the other pipelines it regulates. That reading, unlike petitioners', is consistent with the remainder of the statute, which shows that when Congress intended to restrict PHMSA's ability to impose a rule on gathering lines, it did so expressly. It also reflects the history of the

25

pipeline safety laws in which Congress, in response to specific pipeline incidents, has periodically directed PHMSA to impose particular types of standards, without restricting PHMSA's broader rulemaking authority.

II.    PHMSA also complied with all relevant rulemaking requirements in the pipeline safety laws and the Administrative Procedure Act.  PHMSA provided notice to the public and to its Advisory Committees of its intent to amend parts 192 and 195 of its regulations to require the installation of rupture-mitigation valves on certain newly constructed or entirely replaced pipelines.  Those regulations apply to both transmission lines and to certain gathering lines, and nothing in the notice suggested that gathering lines would be exempt.  Petitioners and the Advisory Committees thus understood the requirements would apply to gathering lines, as their comments and discussions during the rulemaking process reflect.

PHMSA also conducted a thorough risk assessment, weighing the costs and benefits of the Final Rule and reasonably concluding that its benefits justified the costs.  PHMSA examined reasonably available data to evaluate additional compliance costs that gathering line

26

operators might face.  And where data specific to gathering lines was not available, PHMSA reasonably explained why its conclusions would apply to those pipelines as well.

**III.**   Petitioners' challenges thus lack merit.  But even if this Court disagrees, the Court should not vacate the rule in its entirety. Petitioners do not contend that PHMSA lacks the authority to impose these requirements on transmission lines and does not otherwise challenge the application of the rule to those pipelines.  Accordingly, this Court should, at the very least, leave in place that portion of the rule.

## STANDARD OF REVIEW

A rule may be set aside under 49 U.S.C. § 60119 only when "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also* 49 U.S.C. § 60119(a)(3) ("A judicial review of agency action under this section shall apply the standards of review established in section 706 of title 5."); 49 C.F.R. § 190.243 (similar); *see ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017).  "A court must uphold a rule if the agency has examined the relevant considerations

27

and articulated a satisfactory explanation for its action, including a

rational connection between the facts found and the choice made." *City*

*& Cty. of San Francisco v. Federal Energy Regulatory Comm'n*, 24 F.4th

652, 658 (D.C. Cir. 2022) (alterations and quotation marks omitted).

## ARGUMENT

## I.    PHMSA Is Authorized to Require Rupture-Mitigation Valves for Gathering Lines

### A.    Section 60102(a) Confers Broad Discretion on PHMSA to Prescribe Pipeline Safety Standards, Including the Standards in the Final Rule

To "provide adequate protection against risks to life and property

posed by pipeline[s]," 49 U.S.C. § 60102(a)(1), Congress authorized

PHMSA to regulate the transportation via pipeline of gas and

hazardous liquids.  *See id.* § 60102(a).  Specifically, 49 U.S.C.

§ 60102(a)(2) empowers PHMSA to "prescribe minimum safety

standards for pipeline transportation and for pipeline facilities."  Those

standards can "apply to any or all of the owners or operators of pipeline

facilities."  *Id.* § 60102(a)(2)(A).  And they "may apply to the design,

installation, inspection, emergency plans and procedures, testing,

construction, extension, operation, replacement, and maintenance of

pipeline facilities."  *Id.* § 60102(a)(2)(B).

28

The Final Rule falls squarely within that express grant of statutory authority.  *See* JA__ [87 Fed. Reg. at 20,978] (invoking section 60102(a) as authority for Final Rule).  The Final Rule sets minimum safety standards for certain newly constructed or entirely replaced transmission and gathering lines, requiring operators of those lines to install rupture-mitigation valves or alternative equivalent technologies and establishing performance standards for the operation of those valves.  *See* JA__ [*id.* at 20,940].  Together, those requirements advance the statute's stated goals by helping to "prevent or mitigate the public safety and environmental consequences of pipeline ruptures" and to "prevent the catastrophic loss of life, property damage, and environmental harm experienced from [those] ruptures."  JA__ [*Id.*].

The Final Rule is also consistent with the structure and history of the pipeline safety laws.  In the 1960s and 1970s, Congress gave PHMSA broad authority to determine which safety standards are necessary for several types of pipelines—including transmission lines and nonrural gathering lines—and to promulgate rules establishing those standards.  Congress expanded that authority in the 1990s, empowering PHMSA to determine when to subject rural gathering lines

29

to those same standards.  *See* 49 U.S.C. § 60101(b); *supra* pp. 8-9.  Since then, Congress has periodically responded to specific pipeline incidents by directing PHMSA to impose, or evaluate whether to impose, particular types of standards.  *See, e.g.*, 49 U.S.C. § 60102(c)-(t).  That is precisely what Congress did in the 2011 Act when, informed in part by the ruptures in San Bruno, California and Marshall, Michigan, it provided that PHMSA "if appropriate, shall require … the use of automatic or remote-controlled shut-off valves, or equivalent technology … on [newly constructed or entirely replaced] transmission pipeline facilities."  *Id.* § 60102(n)(1).  That specific directive—to require operators to install rupture-mitigation technology in new and replaced pipelines if appropriate—is consistent with PHMSA's general authority to set standards governing the design, installation, and construction of pipeline facilities.  *Id.* § 60102(a)(2)(B).

## B.    Section 60102(n) Does Not Limit PHMSA's Authority to Impose Requirements on Gathering Lines

Petitioners appear to concede that the Final Rule falls within the plain text of PHMSA's general rulemaking authority in section 60102(a).  *See* Opening Br. 42 (observing that section 60102(n)(1)

30

"directs the Department to take an action that already is authorized under Section 60102(a)"). They nevertheless contend that PHMSA exceeded its statutory authority because, in their view, section 60102(n)(1), instead of confirming PHMSA's broad authority, actually imposes a limit on it. Section 60102(n)(1)'s specific reference to "transmission pipeline facilities," they argue, shows that Congress intended to strip PHMSA of its ability to require rupture-mitigation valves for other types of pipeline facilities, including gathering lines. *See* Opening Br. 30-32, 33-36. That interpretation suffers from several flaws.

1.    To start, petitioners' reading of section 60102(n)(1) is inconsistent with other sections of the same statutory enactment and the broader structure of the pipeline safety laws. For example, section 21 of the 2011 Act—enacted at the same time as section 60102(n)(1)—instructs PHMSA to evaluate whether to apply existing regulations to "gathering lines that are not currently subject to Federal regulation" and whether "to modify or revoke existing exemptions from Federal regulation" for regulated gathering lines. 2011 Act § 21, 125 Stat. at 1917. It would be passing strange for Congress to, on the one

31

hand, direct PHMSA to consider whether to apply its existing rules to *more* gathering lines while simultaneously, and obliquely, removing PHMSA's authority to apply a new rule to *any* gathering lines. A more natural reading is that the 2011 Act directed PHMSA to use its broad existing authority to achieve a specific purpose, without affecting PHMSA's discretion to exercise that authority in other ways. The 2011 Act, in other words, "gives support to the idea that Congress intended" in section 60102(n)(1) "to clarify and complement the Secretary's existing authority" to require the use of rupture-mitigation technology on all federally regulated pipelines, "not to extinguish or eliminate" that authority with respect to a subset of pipelines. *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014).

Petitioners' reading also conflicts with the broader structure and history of the pipeline safety laws. As petitioners acknowledge, Congress was aware that the design and construction standards PHMSA promulgates apply to transmission lines as well as to certain gathering lines. *See* Opening Br. 9 (observing that PHMSA's "2006 and 2008 regulations for gathering lines were in effect when Congress enacted the 2011 Act" and citing case law for the proposition that

32

Congress is assumed to be aware of existing law). Accordingly, when Congress intended to limit PHMSA's ability to impose a particular type of requirement on gathering lines, it did so expressly. In section 60102(k), for example, Congress instructed PHMSA to "issue regulations subjecting low-stress hazardous liquid pipelines to the same standards and regulations as other hazardous liquid pipelines." 49 U.S.C. § 60102(k)(1). In the same paragraph, however, Congress made clear that "[t]he regulations issued under this paragraph shall not apply to gathering lines." *Id.*

Congress did not use parallel language in section 60102(n)(1). Instead, Congress mandated that PHMSA require rupture-mitigation valves for transmission lines if appropriate, leaving to PHMSA's discretion whether to consider applying those requirements to gathering lines as well. *See* 49 U.S.C. § 60102(n)(1). And even after PHMSA expressly discussed the applicability of its proposed valve rule to gathering lines at the Advisory Committee meetings, *see supra* pp. 17-19, Congress instructed PHMSA to expedite issuance of the final rule, without suggesting there were limits on PHMSA's authority. *See*

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 720.

Petitioners' argument, moreover, would have troubling implications for pipeline safety and agency safety regulation more broadly. As explained, Congress granted PHMSA broad rulemaking authority in the 1960s and 1970s. Since that time, Congress has issued a series of mandates instructing PHMSA to impose particular standards in response to specific pipeline incidents. *See supra* p. 12. Those mandates often explicitly reference the specific type of pipeline involved in the incident, without mentioning others. *See, e.g.*, 49 U.S.C. § 60102(r) (mandating certain emergency response procedures for gas distribution systems). Neither PHMSA nor any court of which PHMSA is aware has ever understood those specific references to limit the agency's general authority to set similar standards for other types of pipelines. And there is no evidence that Congress—in repeatedly directing PHMSA to impose more stringent standards in response to particular incidents—has at the same time implicitly cut back on PHMSA's general rulemaking authority. To hold otherwise would restrict Congress's ability to direct agencies to confront particularly

important problems, for fear of unduly restricting the agency's more general authority. This Court has rejected similar efforts in the context of other statutory schemes. *See, e.g.*, *Helicopter Ass'n Int'l v. Federal Aviation Admin.*, 722 F.3d 430, 433-34 (D.C. Cir. 2013) (observing that statutory references to discrete areas in noise-related provisions did not limit the agency's general authority to prescribe air traffic regulations to protect individuals on the ground, including by limiting impact of aircraft noise on residential communities).

2.    For similar reasons, petitioners' reliance on the surplusage (Opening Br. 32-33, 42-43) and specific-governs-the-general (Opening Br. 39-43) canons of construction is misplaced.

The surplusage canon, which "is neither inviolable nor insurmountable," particularly "when agency authority is at stake," *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 724 (D.C. Cir. 2022) (quoting *Adirondack*, 740 F.3d at 699), does not assist petitioners because there is no superfluity here. Section 60102(n) specifically mandates that PHMSA "shall require" the use of remote-controlled or automatic shut-off valve technology on transmission lines if it determines that such a rule is appropriate. 49 U.S.C. § 60102(n)(1).

35

Section 60102(a)'s "broad grant of authority," in turn, "fills a space that

the specific provision[] do[es] not occupy" by giving PHMSA the

discretion to determine whether to impose a similar rule with respect to

other pipeline facilities, including gathering lines. *Adirondack Med.*

*Ctr.*, 740 F.3d at 699. In short, "each provision does meaningful,

independent work, despite the possibility for partial overlap." *Changji*

*Esquel Textile Co.*, 40 F.4th at 724.

Similarly, as the cases petitioners cite acknowledge, "the

general/specific canon is not an absolute rule." *RadLAX Gateway Hotel,*

*LLC v. Amalgamated Bank*, 566 U.S. 639, 646-47 (2012). In particular,

"this canon does not apply unless the competing provisions are

'irreconcilably conflicting.'" *Changji Esquel Textile Co.*, 40 F.4th at 724

(quoting *Adirondack Med. Ctr.*, 740 F.3d at 698). And sections 60102(a)

and 60102(n) do not irreconcilably conflict on the question whether

PHMSA may impose rupture-mitigation valve requirements on

gathering lines. Section 60102(n)(1) "is silent on the issue," referring

only to transmission lines, and "the broad grant of authority in [section

60102(a)] allows it." *Id.* A conflict arises only if section 60102(n) is

construed to prohibit by negative implication the imposition of a

36

rupture-mitigation valve requirement on gathering lines.  But that
negative implication or *expressio unius* canon "is a feeble helper in an
administrative setting, where Congress is presumed to have left to
reasonable agency discretion questions that it has not directly
resolved."  *Id.* at 723 (quoting *Adirondack Med. Ctr.*, 740 F.3d at 697).
And it is a particularly "poor indicator of Congress' intent" when, as
here, it is "countervailed by a broad grant of authority contained within
the same statutory scheme."  *Adirondack Med. Ctr.*, 740 F.3d at 697.

Petitioners unsuccessfully attempt to generate a conflict between
sections 60102(a) and 60102(n) by arguing that section 60102(n)'s
procedural requirements are somehow different, or more rigorous, than
the general rulemaking requirements reflected in section 60102(b)(2).
*See* Opening Br. 43-46.  But as petitioners elsewhere recognize (at 44),
section 60102(n)(1) explicitly cross-references section 60102(b)(2)'s
rulemaking requirements, directing PHMSA to regulate the use of
rupture-mitigation valves "after considering the factors specified in
subsection (b)(2)."  49 U.S.C. § 60102(n)(1).  Section 60102(n)(1)'s
reference to standards that are "economically, technically, and
operationally feasible," *id.*, similarly reflects the requirements of section

60102(b)(2), which instructs PHMSA to consider, among other things, the costs and benefits of any proposed standard, as well as "the reasonableness of the standard" and "the appropriateness of the standard for the particular type of pipeline transportation or facility." *Id.* § 60102(b)(2)(B)-(E). The rulemaking requirements in sections 60102(b) and 60102(n) are perfectly consistent, unlike the provisions at issue in petitioners' cases. *See, e.g.*, *Air All. Houston v. Environmental Prot. Agency*, 906 F.3d 1049, 1060-62 (D.C. Cir. 2018) (concluding that general rulemaking authority could not trump specific provision where specific provision contained three-month statutory limit that general provision did not).

    3.    As explained above, section 60102(a)(1) plainly authorizes PHMSA to prescribe the standards in this case, and section 60102(n) does not strip the agency of that authority. But even assuming there were ambiguity with respect to the relationship between these provisions, PHMSA's interpretation, which resulted from notice and comment rulemaking, is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984). *See* JA__ [87 Fed. Reg. at 20,978] (explaining PHMSA's view that the Final Rule

is authorized under section 60102(a) and "implements a statutory

mandate at 49 U.S.C. § 60102(n)").  Deference, moreover, is "even more

warranted" when the agency's interpretation concerns a "complex and

highly technical regulatory program," like PHMSA's pipeline safety

program.  *Community Care Found. v. Thompson*, 318 F.3d 219, 225

(D.C. Cir. 2003) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S.

504, 512 (1994)).  Thus, even if the Court were to find ambiguity in the

language of these provisions, PHMSA's reasonable interpretation of the

language is entitled to deference.[3]

## II.  PHMSA Complied with the Requisite Procedures in Promulgating the Final Rule

### A.  PHMSA Provided Adequate Notice of Its Intent to Apply the Final Rule's Rupture-Mitigation Valve Requirements to Gathering Lines

PHMSA provided the public and its Advisory Committees with

adequate notice of, and opportunity to comment on, its proposal to apply

the rupture-mitigation valve requirements to gathering lines.  PHMSA

then thoroughly considered and responded to those comments in the

Final Rule.  *See* 49 U.S.C. § 60102(b)(2)(F)-(G) (describing requirement

---

[3] PHMSA is not relying on the Hazardous Materials Transportation Safety Act or the Mineral Leasing Act to support its rule regarding gathering lines.

to consider comments and information received from the public and from Advisory Committees).

PHMSA issued a notice of proposed rulemaking informing the public that it proposed to amend parts 192 and 195 of the pipeline safety regulations to prescribe standards governing the installation, operation, and spacing of rupture-mitigation valves.  *See* JA__ [85 Fed. Reg. 7162].  The pipeline safety regulations have long made clear that—unless PHMSA explicitly provides otherwise—the design and construction requirements in parts 192 and 195 apply automatically to new and replaced transmission lines and certain categories of gathering lines that pose similar risks to public safety and the environment.  *See, e.g.*, 49 C.F.R. § 192.9(c) (providing that operators of Type A gas gathering lines must comply with the requirements of part 192 applicable to transmission lines, except for enumerated exceptions); *id.* § 195.1(a)(4)(i) (noting that part 195 applies generally to nonrural hazardous liquid gathering lines); *id.* § 195.11(b)(2)(i) (providing that operators of certain new or replaced regulated rural hazardous liquid pipelines must be designed, installed, and constructed in compliance with part 195).  And, as PHMSA explained, "[n]othing in the [notice of

proposed rulemaking] stated or suggested that the regulatory amendments" to the valve requirements "would not apply" to those gathering lines. JA__ [87 Fed. Reg. at 20,949]; *see also* JA__ [*id.*] (explaining that "regulations proposed for design and construction standards for hazardous liquid pipelines will apply to regulated rural hazardous liquid gathering pipelines absent a specific statement" to the contrary).

Members of the public were thus on notice that the rupture-mitigation valve requirements would apply to certain gathering lines, even though the notice of proposed rulemaking did not specifically reference them. *Contra* Opening Br. 48, 50. Indeed, the application of the requirements to gathering lines was a central focus of petitioners' comments on the proposed rule. They acknowledged that PHMSA's "rules would apply to certain regulated gathering lines," and argued that such an application exceeded PHMSA's statutory authority for the same reasons articulated above. *See* JA__ [GPA Midstream Comment at 10]. And, as petitioners observe, other commenters echoed those same arguments. *See* Opening Br. 17. The fact that "[n]umerous commenters—including … [p]etitioners here—filed comments that were

41

critical of the" proposed application of the rule to gathering lines

demonstrates that PHMSA provided adequate notice and opportunity to

comment on that proposal. *Northeast Md. Waste Disposal Auth. v.*

*Environmental Prot. Agency*, 358 F.3d 936, 952 (D.C. Cir. 2004).

The Advisory Committees also extensively discussed the rule's

application to gathering lines in their meetings and ultimately agreed

that the rule would be "technically feasible, reasonable, cost-effective,

and practicable" if PHMSA provided exemptions for gathering lines that

present less of a risk to public safety.  JA__ [Gas Pipeline Advisory

Committee Voting Slides at 2]; JA__ [Liquid Pipeline Advisory

Committee Voting Slides at 3].  As petitioners note, the Committees

also recommended that PHMSA consider whether to promulgate rules

related to gathering lines in a separate proceeding.  *See* Opening Br. 50-

51.  PHMSA explained in the Final Rule that it "considered" that

recommendation, JA__ [87 Fed. Reg. at 20,960], but ultimately agreed

with some of the Committee members that a separate proceeding was

unnecessary, *see* JA__ [Gas Pipeline Advisory Committee Transcript at

217-18] (Chairman Danner stating that he was "not convinced" that

"more process [on gathering lines] is required").  PHMSA explained that

the pipeline safety regulations establish that operators of certain gathering lines must comply with the requirements applicable to transmission lines, and "[n]othing in the [notice of proposed rulemaking] stated or suggested that the regulatory amendments … would not apply" to those pipelines.  JA__ [87 Fed. Reg. at 20,949]; *see* JA__ [*id.* at 20,959-61] (acknowledging that the Committees "recommended that PHMSA consider the appropriateness of applying this rulemaking, or a separate rulemaking, to gathering lines" and describing response).[4]

That same logic shows why PHMSA did not act arbitrarily in applying the rupture-mitigation valve requirements to certain gas gathering lines, but not gas distribution lines.  *See* JA__ [87 Fed. Reg.

---

[4] Petitioners are incorrect to the extent they suggest that PHMSA was required to prepare an additional "written response" to the Committees' recommendations.  *Contra* Opening Br. 50-51.  PHMSA is unaware of any instance in which it has prepared a response separate from discussion of the Committees' recommendations within its final rule.  Nor have the Committees ever objected to this practice.  In any event, even if the statute could be read as requiring PHMSA to respond separately from the final rule, any failure to do so would be harmless. *See Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("[I]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." (quotation marks omitted)).

at 20,949] (observing that "there could be safety and environmental benefits from extending elements of this final rule to gas distribution pipelines" but declining to do so). *Contra* Opening Br. 53-55. A distribution line is a pipeline, other than a transmission or gathering line, that is used to transport natural gas to a consumer and that generally is smaller in diameter and operates at a reduced pressure. *See* 49 C.F.R. § 192.3 (defining distribution line); PHMSA, U.S. Dep't of Transp., *Fact Sheet: Distribution Pipelines*, https://perma.cc/W8XT-X6SE. Both the notice of proposed rulemaking and the Final Rule located their new rupture-mitigation valve requirements within provisions (49 C.F.R. §§ 192.179 and 192.634) that are applicable by their terms to gas transmission lines and also applicable to certain gathering lines pursuant to preexisting cross-references at 49 C.F.R. § 192.9. No such cross-references within PHMSA regulations provide for application of those requirements to gas distribution lines. Thus, as PHMSA explained, to require distribution line operators to install rupture-mitigation valves was "beyond the scope of the [proposed rule]" and would have "require[d] additional notice and public comment." JA__ [87 Fed. Reg. at 20,949].

44

### B.   PHMSA Conducted a Thorough Risk Assessment and Explained Its Reasons for Adopting the Final Rule

PHMSA also conducted a thorough risk assessment of its proposed standards and explained that the benefits of the Final Rule justified its costs. *See* 49 U.S.C. § 60102(b)(2)(D)-(E), (3) (describing requirement to conduct risk assessment); *id.* § 60102(b)(5) (requiring reasoned determination that benefits of standard justify its costs).

In its risk assessment, PHMSA first estimated the total number of rupture-mitigation valves that would need to be installed based on annual report data on newly constructed pipelines—including gas and hazardous liquid gathering lines—and the maximum spacing allowed for valves in the pipeline safety regulations. *See* JA__ [Preliminary Assessment at 8, 23, 29-31]; JA__ [Final Assessment at 8, 25, 36-40]. PHMSA then estimated the costs of installing each new valve based on data from operators and vendors on the purchase and installation costs of the new components, as well as costs associated with updating operating programs. *See* JA__ [Preliminary Assessment at 8, 31-37]; JA__ [Final Assessment at 8-9, 40-46].

On the benefits side, PHMSA noted the difficulty of quantifying the benefits of the rule in terms of avoided incidents and accidents. *See* JA__ [Preliminary Assessment at 39]; JA__ [Final Assessment at 48]. But PHMSA nonetheless cited a technical study by Oak Ridge National Laboratory, which evaluated the effect of valve closure speed on the consequences of gas transmission and hazardous liquid pipeline releases. That study demonstrated that faster valve closure can mitigate property and environmental damage from gas and hazardous liquid pipeline ruptures. *See* JA__ [Preliminary Assessment at 39-45]; JA__ [Final Assessment at 48-53]. Finally, PHMSA identified other options it considered—including applying the requirements to a different subset of pipelines—and explained why it did not select them. *See* JA__ [Preliminary Assessment at 46-47]; JA__ [Final Assessment at 55]; *see also* 49 U.S.C. § 60102(b)(3)(A), (C) (requiring agency to identify options considered and explain why it selected the standard it did).

Petitioners fault PHMSA for purportedly relying in its analysis on data related only to transmission lines. *See* Opening Br. 48-50, 52-53. But PHMSA examined incident data on both "transmission lines and the smaller mileage of regulated gas gathering lines" in assessing the

46

consequences of ruptures, including the potential for injuries and

fatalities; costs due to property damage; facility repair and replacement;

emergency response; and environmental damage.  JA__ [Final

Assessment at 28-29, 50-53]; *see also* JA__ [Final Assessment at 30-32]

(examining similar data for hazardous liquid lines).  PHMSA also

relied, in both the notice of proposed rulemaking and the Final Rule, on

the Kiefner Study, which examined data on gas and hazardous liquid

transmission lines and gathering lines and concluded that shortened

response times in response to pipeline incidents would significantly

reduce their severity.  *See* JA__ [85 Fed. Reg. at 7167-68] (notice); JA__

[87 Fed. Reg. at 20,940, 20,941 & n.9] (Final Rule); *see also* JA__

[Kiefner Study at 3-62, 3-63, 3-81, 3-82].  And although other data

PHMSA cited was from transmission line operators, PHMSA explained

why conclusions from that data would apply equally to the covered

gathering lines:  Those gathering lines are "similar[] (in terms of design

and operating characteristics, and risks to public safety and the

environment) [to] transmission lines."  JA__ [Final Assessment at 34

n.35]; *see also* JA__ [87 Fed. Reg. at 20,972] (clarifying that the Final

Rule applies to certain gathering lines "as these pipelines typically have

47

risk profiles similar to transmission pipelines"). That "general analysis based on informed conjecture" was more than adequate to satisfy reasoned decision-making requirements. *Chamber of Commerce v. U.S. Sec. Exch. Comm'n*, 412 F.3d 133, 142 (D.C. Cir. 2005) (quotation marks omitted).

Nor did PHMSA ignore an element of the problem by failing to address the costs to operators of installing valves on regulated segments of gathering lines. *Contra* Opening Br. 49, 52-53. PHMSA acknowledged that "gathering operators subject to the final rule may incorporate [rupture-mitigation valves] less frequently in their new/replacement pipelines" and thus face increased "compliance costs." JA__ [Final Assessment at 35 n.36]. But PHMSA reasonably concluded that the overall increase in costs would be minimal—only "0.9 million [dollars] per year"—given that "no more than 300 miles" of gathering lines or "about 5 percent of the total gas and hazardous liquid line mileage" projected to be built each year would be subject to the Final Rule's rupture-mitigation valve requirements. JA__ [Final Assessment at 35 n.36]; *see Michigan v. Environmental Prot. Agency*, 576 U.S. 743, 759 (2015) (observing that agencies generally have discretion "to decide

48

(as always, within the limits of reasonable interpretation) how to

account for cost").  PHMSA, moreover, explained why that cost was

justified:  If indeed "Type A gas gathering and hazardous liquid line

operators exhibit lower baseline compliance levels," as PHMSA had

assumed when contemplating increased compliance costs, then "the

benefits of the rulemaking would be higher."  JA__ [Final Assessment

at 35 n.36].  And PHMSA authorized operators to install alternative

technology (such as manual valves) or to delay compliance timelines if

they can demonstrate that installation of rupture-mitigation valves as

contemplated by the Final Rule "would be economically, technically, or

operationally infeasible."  JA__ [87 Fed. Reg. at 20,956].

Contrary to petitioners' suggestion, it is not problematic that

PHMSA's final assessment of costs was more comprehensive than the

preliminary assessment submitted for review to the Advisory

Committees and the public.  *Contra* Opening Br. 50-51.  Agencies

frequently supplement their preliminary analyses with information

gathered through the notice-and-comment process.  *See Chamber of

Commerce v. U.S. Sec. Exch. Comm'n*, 443 F.3d 890, 900 (D.C. Cir.

2006).  The key question is whether "at least the most critical factual

49

material that is used to support the agency's position on review ... [has]
been made public in the proceeding and exposed to refutation." *Id.*
(alterations in original) (quotation marks omitted).

That standard was satisfied here. In its Preliminary Assessment,
PHMSA cited the data it relied on, including publicly available reports
on pipeline incidents, reports from operators on new pipeline
construction and existing valves installed, reports from equipment
vendors on the costs of new valve technology, and technical studies
describing the benefits of faster valve closure. *See* JA__ [Preliminary
Assessment at 29-44]. PHMSA also described in detail its methodology
for calculating the costs of the proposed rule, including how it estimated
the number of valves that would need to be installed and the costs of
installing each valve. *See* JA__ [Preliminary Assessment at 29-37].
PHMSA then used the same data sources and the same methodology in
its Final Assessment—it simply expanded its analysis to emphasize that
it considered historical PHMSA incident data for gas and hazardous
liquid gathering pipelines and to ensure that it accounted specifically
for the approximately 300 miles of new gathering lines estimated to be
built each year that would be covered by the rule's rupture-mitigation

50

valve requirements.  *See* JA__ [Final Assessment at 36-46].  "[F]urther

notice and comment are not required" when, as here "additional fact

gathering merely … check[s] or confirm[s] prior assessments without

changing methodology, … confirm[s] or corroborat[es] data in the

rulemaking record, or … internally generat[es] information using a

methodology disclosed in the rulemaking record."  *Chamber of

Commerce*, 443 F.3d at 900 (citations omitted).

## III.  If the Court Believes the Rule Suffers from Flaws, the Appropriate Remedy Is Not to Vacate the Rule in Its Entirety

For all the reasons explained above, petitioners' challenges lack

merit.  But if this Court were to disagree, the Court should not vacate

the rule in its entirety.  Instead, the Court should sever the portion of

the rule applicable to transmission lines and vacate the rule only as

applied to gathering lines.  *See American Petroleum Inst. v.

Environmental Prot. Agency*, 862 F.3d 50, 71 (D.C. Cir. 2017) (per

curiam), *decision modified on reh'g*, 883 F.3d 918 (D.C. Cir. 2018) (per

curiam).  Petitioners do not challenge the transmission-line portion of

the rule, and that portion of the rule "operate[s] entirely independently"

of the rule's application to certain gathering lines.  *Id.* (quoting *Davis

*Cty. Solid Waste Mgmt. v. Environmental Prot. Agency*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (per curiam)).  As petitioners acknowledge (Opening Br. 56), there also is no doubt that PHMSA "would have adopted the severed portion on its own" given that Congress explicitly directed PHMSA to require the installation of rupture-mitigation valves on transmission lines if it determined that such a requirement was appropriate.  *New Jersey v. Environmental Prot. Agency*, 517 F.3d 574, 584 (D.C. Cir. 2008) (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

*Of Counsel:*

PAUL M. GEIER
  *Assistant General Counsel*
CHARLES E. ENLOE
  *Senior Trial Attorney*
  *U.S. Department of*
*Transportation*


ERIN D. HENDRIXSON
AMAL DERIA
NATHAN W. COLE
  *Attorney Advisors*
  *Pipeline and Hazardous Materials*
  *Safety Administration*

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
ABBY C. WRIGHT

 */s/ Anna O. Mohan*
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3159*
  *anna.mohan@usdoj.gov*


December 2022

53

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,403 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Anna O. Mohan*
Anna O. Mohan

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Anna O. Mohan*
Anna O. Mohan

**ADDENDUM**

# TABLE OF CONTENTS

49 U.S.C. § 60101................................................................................ A1

49 U.S.C. § 60102................................................................................ A5

49 C.F.R. § 192.9................................................................................ A25

49 C.F.R. § 195.1................................................................................ A32

49 C.F.R. § 195.11.............................................................................. A35

**49 U.S.C. § 60101**

**§ 60101. Definitions**

(a) General.—In this chapter—

    (1) "existing liquefied natural gas facility"—

    (A) means a liquefied natural gas facility for which an application to approve the site, construction, or operation of the facility was filed before March 1, 1978, with—

      (i) the Federal Energy Regulatory Commission (or any predecessor); or

      (ii) the appropriate State or local authority, if the facility is not subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.); but

    (B) does not include a facility on which construction is begun after November 29, 1979, without the approval;

    (2) "gas" means natural gas, flammable gas, or toxic or corrosive gas;

    (3) "gas pipeline facility" includes a pipeline, a right of way, a facility, a building, or equipment used in transporting gas or treating gas during its transportation;

    (4) "hazardous liquid" means—

    (A) petroleum or a petroleum product;

    (B) nonpetroleum fuel, including biofuel, that is flammable, toxic, or corrosive or would be harmful to the environment if released in significant quantities; and

    (C) a substance the Secretary of Transportation decides may pose an unreasonable risk to life or property when transported by a hazardous liquid pipeline facility in a liquid state (except for liquefied natural gas);

    (5) "hazardous liquid pipeline facility" includes a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in transporting hazardous liquid;

    (6) "interstate gas pipeline facility" means a gas pipeline facility—

A1

(A) used to transport gas; and

(B) subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.);

(7) "interstate hazardous liquid pipeline facility" means a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce;

(8) "interstate or foreign commerce"—

(A) related to gas, means commerce—

(i) between a place in a State and a place outside that State; or

(ii) that affects any commerce described in subclause (A)(i) of this clause; and

(B) related to hazardous liquid, means commerce between—

(i) a place in a State and a place outside that State; or

(ii) places in the same State through a place outside the State;

(9) "intrastate gas pipeline facility" means a gas pipeline facility and transportation of gas within a State not subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.);

(10) "intrastate hazardous liquid pipeline facility" means a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility;

(11) "liquefied natural gas" means natural gas in a liquid or semisolid state;

(12) "liquefied natural gas accident" means a release, burning, or explosion of liquefied natural gas from any cause, except a release, burning, or explosion that, under regulations prescribed by the Secretary, does not pose a threat to public health or safety, property, or the environment;

(13) "liquefied natural gas conversion" means conversion of natural gas into liquefied natural gas or conversion of liquefied natural gas into natural gas;

(14) "liquefied natural gas pipeline facility"—

A2

(A) means a gas pipeline facility used for transporting or storing liquefied natural gas, or for liquefied natural gas conversion, in interstate or foreign commerce; but

(B) does not include any part of a structure or equipment located in navigable waters (as defined in section 3 of the Federal Power Act (16 U.S.C. 796));

(15) "municipality" means a political subdivision of a State;

(16) "new liquefied natural gas pipeline facility" means a liquefied natural gas pipeline facility except an existing liquefied natural gas pipeline facility;

(17) "person", in addition to its meaning under section 1 of title 1 (except as to societies), includes a State, a municipality, and a trustee, receiver, assignee, or personal representative of a person;

(18) "pipeline facility" means a gas pipeline facility and a hazardous liquid pipeline facility;

(19) "pipeline transportation" means transporting gas and transporting hazardous liquid;

(20) "State" means a State of the United States, the District of Columbia, and Puerto Rico;

(21) "transporting gas"—

(A) means—

(i) the gathering, transmission, or distribution of gas by pipeline, or the storage of gas, in interstate or foreign commerce; and

(ii) the movement of gas through regulated gathering lines; but

(B) does not include gathering gas (except through regulated gathering lines) in a rural area outside a populated area designated by the Secretary as a nonrural area;

(22) "transporting hazardous liquid"—

(A) means—

(i) the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous

A3

liquid by pipeline, in or affecting interstate or foreign commerce; and

(ii) the movement of hazardous liquid through regulated gathering lines; but

(B) does not include moving hazardous liquid through—

(i) gathering lines (except regulated gathering lines) in a rural area;

(ii) onshore production, refining, or manufacturing facilities; or

(iii) storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities;

(23) "risk management" means the systematic application, by the owner or operator of a pipeline facility, of management policies, procedures, finite resources, and practices to the tasks of identifying, analyzing, assessing, reducing, and controlling risk in order to protect employees, the general public, the environment, and pipeline facilities;

(24) "risk management plan" means a management plan utilized by a gas or hazardous liquid pipeline facility owner or operator that encompasses risk management;

(25) "Secretary" means the Secretary of Transportation; and

(26) "underground natural gas storage facility" means a gas pipeline facility that stores natural gas in an underground facility, including—

(A) a depleted hydrocarbon reservoir;

(B) an aquifer reservoir; or

(C) a solution-mined salt cavern reservoir.

(b) Gathering Lines.—

(1)

(A) Not later than October 24, 1994, the Secretary shall prescribe standards defining the term "gathering line".

(B) In defining "gathering line" for gas, the Secretary—

A4

(i) shall consider functional and operational characteristics of the lines to be included in the definition; and

(ii) is not bound by a classification the Commission establishes under the Natural Gas Act (15 U.S.C. 717 et seq.).

(2)

(A) Not later than October 24, 1995, the Secretary, if appropriate, shall prescribe standards defining the term "regulated gathering line". In defining the term, the Secretary shall consider factors such as location, length of line from the well site, operating pressure, throughput, and the composition of the transported gas or hazardous liquid, as appropriate, in deciding on the types of lines that functionally are gathering but should be regulated under this chapter because of specific physical characteristics.

(B)

(i) The Secretary also shall consider diameter when defining "regulated gathering line" for hazardous liquid.

(ii) The definition of "regulated gathering line" for hazardous liquid may not include a crude oil gathering line that has a nominal diameter of not more than 6 inches, is operated at low pressure, and is located in a rural area that is not unusually sensitive to environmental damage.

**49 U.S.C. § 60102**

**§ 60102. Purpose and general authority**

(a) Purpose and Minimum Safety Standards.—

(1) Purpose.—

The purpose of this chapter is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation.

(2) Minimum safety standards.—The Secretary shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities. The standards—

(A) apply to any or all of the owners or operators of pipeline facilities;

(B) may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities; and

(C) shall include a requirement that all individuals who operate and maintain pipeline facilities shall be qualified to operate and maintain the pipeline facilities.

(3) Qualifications of pipeline operators.—

The qualifications applicable to an individual who operates and maintains a pipeline facility shall address the ability to recognize and react appropriately to abnormal operating conditions that may indicate a dangerous situation or a condition exceeding design limits. The operator of a pipeline facility shall ensure that employees who operate and maintain the facility are qualified to operate and maintain the pipeline facilities.

(b) Practicability and Safety Needs Standards.—

(1) In general.—A standard prescribed under subsection (a) shall be—

(A) practicable; and

(B) designed to meet the need for—

(i) gas pipeline safety, or safely transporting hazardous liquids, as appropriate; and

(ii) protecting the environment.

(2) Factors for consideration.—When prescribing any standard under this section or section 60101(b), 60103, 60108, 60109, 60110, or 60113, the Secretary shall consider—

(A) relevant available—

(i) gas pipeline safety information;

(ii) hazardous liquid pipeline safety information; and

(iii) environmental information;

(B) the appropriateness of the standard for the particular type of pipeline transportation or facility;

(C) the reasonableness of the standard;

(D) based on a risk assessment, the reasonably identifiable or estimated benefits expected to result from implementation or compliance with the standard;

(E) based on a risk assessment, the reasonably identifiable or estimated costs expected to result from implementation or compliance with the standard;

(F) comments and information received from the public; and

(G) the comments and recommendations of the Technical Pipeline Safety Standards Committee, the Technical Hazardous Liquid Pipeline Safety Standards Committee, or both, as appropriate.

(3) Risk assessment.—In conducting a risk assessment referred to in subparagraphs (D) and (E) of paragraph (2), the Secretary shall—

(A) identify the regulatory and nonregulatory options that the Secretary considered in prescribing a proposed standard;

(B) identify the costs and benefits associated with the proposed standard;

(C) include—

A7

(i) an explanation of the reasons for the selection of the proposed standard in lieu of the other options identified; and

(ii) with respect to each of those other options, a brief explanation of the reasons that the Secretary did not select the option; and

(D) identify technical data or other information upon which the risk assessment information and proposed standard is based.

(4) Review.—

(A) In general.—The Secretary shall—

(i) submit any risk assessment information prepared under paragraph (3) of this subsection to the Technical Pipeline Safety Standards Committee, the Technical Hazardous Liquid Pipeline Safety Standards Committee, or both, as appropriate; and

(ii) make that risk assessment information available to the general public.

(B) Peer review panels.—The committees referred to in subparagraph (A) shall serve as peer review panels to review risk assessment information prepared under this section. Not later than 90 days after receiving risk assessment information for review pursuant to subparagraph (A), each committee that receives that risk assessment information shall prepare and submit to the Secretary a report that includes—

(i) an evaluation of the merit of the data and methods used; and

(ii) any recommended options relating to that risk assessment information and the associated standard that the committee determines to be appropriate.

(C) Review by secretary.—Not later than 90 days after receiving a report submitted by a committee under subparagraph (B), the Secretary—

(i) shall review the report;

(ii) shall provide a written response to the committee that is the author of the report concerning all significant peer review comments and recommended alternatives contained in the report; and

(iii) may revise the risk assessment and the proposed standard before promulgating the final standard.

(5) Secretarial decisionmaking.—

Except where otherwise required by statute, the Secretary shall propose or issue a standard under this chapter only upon a reasoned determination that the benefits, including safety and environmental benefits, of the intended standard justify its costs.

(6) Exceptions from application.—The requirements of subparagraphs (D) and (E) of paragraph (2) do not apply when—

(A) the standard is the product of a negotiated rulemaking, or other rulemaking including the adoption of industry standards that receives no significant adverse comment within 60 days of notice in the Federal Register;

(B) based on a recommendation (in which three-fourths of the members voting concur) by the Technical Pipeline Safety Standards Committee, the Technical Hazardous Liquid Pipeline Safety Standards Committee, or both, as applicable, the Secretary waives the requirements; or

(C) the Secretary finds, pursuant to section 553(b)(3)(B) of title 5, United States Code, that notice and public procedure are not required.

(7) Report.—Not later than March 31, 2000, the Secretary shall transmit to the Congress a report that—

(A) describes the implementation of the risk assessment requirements of this section, including the extent to which those requirements have affected regulatory decisionmaking and pipeline safety; and

(B) includes any recommendations that the Secretary determines would make the risk assessment process conducted pursuant to the requirements under this chapter a more effective means of assessing the benefits and costs associated with alternative regulatory and nonregulatory options in prescribing standards under the Federal pipeline safety regulatory program under this chapter.

A9

(c) Public Safety Program Requirements.—

(1) The Secretary shall include in the standards prescribed under subsection (a) of this section a requirement that an operator of a gas pipeline facility participate in a public safety program that—

(A) notifies an operator of proposed demolition, excavation, tunneling, or construction near or affecting the facility;

(B) requires an operator to identify a pipeline facility that may be affected by the proposed demolition, excavation, tunneling, or construction, to prevent damaging the facility; and

(C) the Secretary decides will protect a facility adequately against a hazard caused by demolition, excavation, tunneling, or construction.

(2) To the extent a public safety program referred to in paragraph (1) of this subsection is not available, the Secretary shall prescribe standards requiring an operator to take action the Secretary prescribes to provide services comparable to services that would be available under a public safety program.

(3) The Secretary may include in the standards prescribed under subsection (a) of this section a requirement that an operator of a hazardous liquid pipeline facility participate in a public safety program meeting the requirements of paragraph (1) of this subsection or maintain and carry out a damage prevention program that provides services comparable to services that would be available under a public safety program.

(4) Promoting public awareness.—

(A) Not later than one year after the date of enactment of the Accountable Pipeline Safety and Accountability Act of 1996,[1] and annually thereafter, the owner or operator of each interstate gas pipeline facility shall provide to the governing body of each municipality in which the interstate gas pipeline facility is located, a map identifying the location of such facility.

(B)

(i) Not later than June 1, 1998, the Secretary shall survey and assess the public education programs under section 60116 and

A10

the public safety programs under section 60102(c) and determine their effectiveness and applicability as components of a model program. In particular, the survey shall include the methods by which operators notify residents of the location of the facility and its right of way, public information regarding existing One-Call programs, and appropriate procedures to be followed by residents of affected municipalities in the event of accidents involving interstate gas pipeline facilities.

(ii) Not later than one year after the survey and assessment are completed, the Secretary shall institute a rulemaking to determine the most effective public safety and education program components and promulgate if appropriate, standards implementing those components on a nationwide basis. In the event that the Secretary finds that promulgation of such standards are not appropriate, the Secretary shall report to Congress the reasons for that finding.

(d) Facility Operation Information Standards.—The Secretary shall prescribe minimum standards requiring an operator of a pipeline facility subject to this chapter to maintain, to the extent practicable, information related to operating the facility as required by the standards prescribed under this chapter and, when requested, to make the information available to the Secretary and an appropriate State official as determined by the Secretary. The information shall include—

(1) the business name, address, and telephone number, including an operations emergency telephone number, of the operator;

(2) accurate maps and a supplementary geographic description, including an identification of areas described in regulations prescribed under section 60109 of this title, that show the location in the State of—

(A) major gas pipeline facilities of the operator, including transmission lines and significant distribution lines; and

(B) major hazardous liquid pipeline facilities of the operator;

(3) a description of—

(A) the characteristics of the operator's pipelines in the State; and

(B) products transported through the operator's pipelines in the State;

(4) the manual that governs operating and maintaining pipeline facilities in the State;

(5) an emergency response plan describing the operator's procedures for responding to and containing releases, including—

(A) identifying specific action the operator will take on discovering a release;

(B) liaison procedures with State and local authorities for emergency response; and

(C) communication and alert procedures for immediately notifying State and local officials at the time of a release; and

(6) other information the Secretary considers useful to inform a State of the presence of pipeline facilities and operations in the State.

(e) Pipe Inventory Standards.—The Secretary shall prescribe minimum standards requiring an operator of a pipeline facility subject to this chapter to maintain for the Secretary, to the extent practicable, an inventory with appropriate information about the types of pipe used for the transportation of gas or hazardous liquid, as appropriate, in the operator's system and additional information, including the material's history and the leak history of the pipe. The inventory—

(1) for a gas pipeline facility, shall include an identification of each facility passing through an area described in regulations prescribed under section 60109 of this title but shall exclude equipment used with the compression of gas; and

(2) for a hazardous liquid pipeline facility, shall include an identification of each facility and gathering line passing through an area described in regulations prescribed under section 60109 of this title, whether the facility or gathering line otherwise is subject to this chapter, but shall exclude equipment associated only with the pipeline pumps or storage facilities.

(f) Standards as Accommodating "Smart Pigs".—

A12

(1) Minimum safety standards.—The Secretary shall prescribe minimum safety standards requiring that—

(A) the design and construction of new natural gas transmission pipeline or hazardous liquid pipeline facilities, and

(B) when the replacement of existing natural gas transmission pipeline or hazardous liquid pipeline facilities or equipment is required, the replacement of such existing facilities be carried out, to the extent practicable, in a manner so as to accommodate the passage through such natural gas transmission pipeline or hazardous liquid pipeline facilities of instrumented internal inspection devices (commonly referred to as "smart pigs"). The Secretary may extend such standards to require existing natural gas transmission pipeline or hazardous liquid pipeline facilities, whose basic construction would accommodate an instrumented internal inspection device to be modified to permit the inspection of such facilities with instrumented internal inspection devices.

(2) Periodic inspections.—

Not later than October 24, 1995, the Secretary shall prescribe, if necessary, additional standards requiring the periodic inspection of each pipeline the operator of the pipeline identifies under section 60109 of this title. The standards shall include any circumstances under which an inspection shall be conducted with an instrumented internal inspection device and, if the device is not required, use of an inspection method that is at least as effective as using the device in providing for the safety of the pipeline.

(g) Effective Dates.—

A standard prescribed under this section and section 60110 of this title is effective on the 30th day after the Secretary prescribes the standard. However, the Secretary for good cause may prescribe a different effective date when required because of the time reasonably necessary to comply with the standard. The different date must be specified in the regulation prescribing the standard.

(h) Safety Condition Reports.—

A13

(1) The Secretary shall prescribe regulations requiring each operator of a pipeline facility (except a master meter) to submit to the Secretary a written report on any—

(A) condition that is a hazard to life, property, or the environment; and

(B) safety-related condition that causes or has caused a significant change or restriction in the operation of a pipeline facility.

(2) Submission of report.—As soon as practicable, but not later than 5 business days, after a representative of a person to whom this section applies first establishes that a condition described in paragraph (1) exists, the operator shall submit the report required under that paragraph to—

(A) the Secretary;

(B) the appropriate State authority or, where no appropriate State authority exists, to the Governor of a State where the subject of the Safety Related Condition report occurred; and

(C) the appropriate Tribe where the subject of the Safety Related Condition report occurred.

(3) Submission of report to other entities.—Upon request, a State authority or a Governor that receives a report submitted under this subsection may submit the report to any relevant emergency response or planning entity, including any—

(A) State emergency response commission established pursuant to section 301 of the Emergency Planning and Community Right-To-Know Act of 1986 (42 U.S.C. 11001);

(B) Tribal emergency response commission or emergency planning committee (as defined in part 355 of title 40, Code of Federal Regulations (or a successor regulation));

(C) local emergency planning committee established pursuant to section 301 of the Emergency Planning and Community Right-To-Know Act of 1986 (42 U.S.C. 11001); or

(D) other public agency responsible for emergency response.

(i) Carbon Dioxide Regulation.—

(1) Transportation in liquid state.—

The Secretary shall regulate carbon dioxide transported by a hazardous liquid pipeline facility. The Secretary shall prescribe standards related to hazardous liquid to ensure the safe transportation of carbon dioxide by such a facility.

(2) Transportation in gaseous state.—

(A) Minimum safety standards.—

The Secretary shall prescribe minimum safety standards for the transportation of carbon dioxide by pipeline in a gaseous state.

(B) Considerations.—

In establishing the standards, the Secretary shall consider whether applying the minimum safety standards in part 195 of title 49, Code of Federal Regulations, as in effect on the date of enactment of this paragraph, for the transportation of carbon dioxide in a liquid state to the transportation of carbon dioxide in a gaseous state would ensure safety.

(3) Limitation on statutory construction.—

Nothing in this subsection authorizes the Secretary to regulate piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation, or treatment of carbon dioxide or the preparation of carbon dioxide for transportation by pipeline at production, refining, or manufacturing facilities.

(j) Emergency Flow Restricting Devices.—

(1) Not later than October 24, 1994, the Secretary shall survey and assess the effectiveness of emergency flow restricting devices (including remotely controlled valves and check valves) and other procedures, systems, and equipment used to detect and locate hazardous liquid pipeline ruptures and minimize product releases from hazardous liquid pipeline facilities.

(2) Not later than 2 years after the survey and assessment are completed, the Secretary shall prescribe standards on the circumstances under which an operator of a hazardous liquid pipeline facility must use an emergency flow restricting device or

other procedure, system, or equipment described in paragraph (1) of this subsection on the facility.

(k) Low-Stress Hazardous Liquid Pipelines.—

(1) Minimum standards.—

Not later than December 31, 2007, the Secretary shall issue regulations subjecting low-stress hazardous liquid pipelines to the same standards and regulations as other hazardous liquid pipelines, except as provided in paragraph (3). The implementation of the applicable standards and regulatory requirements may be phased in. The regulations issued under this paragraph shall not apply to gathering lines.

(2) General prohibition against low internal stress exception.—

Except as provided in paragraph (3), the Secretary may not provide an exception to the requirements of this chapter for a hazardous liquid pipeline because the pipeline operates at low internal stress.

(3) Limited exceptions.—The Secretary shall provide or continue in force exceptions to this subsection for low-stress hazardous liquid pipelines that—

(A) are subject to safety regulations of the United States Coast Guard; or

(B) serve refining, manufacturing, or truck, rail, or vessel terminal facilities if the pipeline is less than 1 mile long (measured outside the facility grounds) and does not cross an offshore area or a waterway currently used for commercial navigation,

until regulations issued under paragraph (1) become effective. After such regulations become effective, the Secretary may retain or remove those exceptions as appropriate.

(4) Relationship to other laws.—

Nothing in this subsection shall be construed to prohibit or otherwise affect the applicability of any other statutory or regulatory exemption to any hazardous liquid pipeline.

(5) Definition.—

A16

For purposes of this subsection, the term "low-stress hazardous liquid pipeline" means a hazardous liquid pipeline that is operated in its entirety at a stress level of 20 percent or less of the specified minimum yield strength of the line pipe.

(6) Effective date.—

The requirements of this subsection shall not take effect as to low-stress hazardous liquid pipeline operators before the effective date of the rules promulgated by the Secretary under this subsection.

(l) Updating Standards.—

The Secretary shall, to the extent appropriate and practicable, update incorporated industry standards that have been adopted as part of the Federal pipeline safety regulatory program under this chapter.

(m) Inspections by Direct Assessment.—

Not later than 1 year after the date of the enactment of this subsection, the Secretary shall issue regulations prescribing standards for inspection of a pipeline facility by direct assessment.

(n) Automatic and Remote-Controlled Shut-off Valves for New Transmission Pipelines.—

(1) In general.—

Not later than 2 years after the date of enactment of this subsection, and after considering the factors specified in subsection (b)(2), the Secretary, if appropriate, shall require by regulation the use of automatic or remote-controlled shut-off valves, or equivalent technology, where economically, technically, and operationally feasible on transmission pipeline facilities constructed or entirely replaced after the date on which the Secretary issues the final rule containing such requirement.

(2) High-consequence area study.—

(A) Study.—

The Comptroller General of the United States shall conduct a study on the ability of transmission pipeline facility operators to respond to a hazardous liquid or gas release from a pipeline segment located in a high-consequence area.

A17

(B) Considerations.—

In conducting the study, the Comptroller General shall consider the swiftness of leak detection and pipeline shutdown capabilities, the location of the nearest response personnel, and the costs, risks, and benefits of installing automatic and remote-controlled shut-off valves.

(C) Report.—

Not later than 1 year after the date of enactment of this subsection, the Comptroller General shall submit to the Committee on Transportation and Infrastructure and the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report on the results of the study.

(o) Transportation-Related Oil Flow Lines.—

(1) Data collection.—

The Secretary may collect geospatial or technical data on transportation-related oil flow lines, including unregulated transportation-related oil flow lines.

(2) Transportation-related oil flow line defined.—

In this subsection, the term "transportation-related oil flow line" means a pipeline transporting oil off of the grounds of the well where it originated and across areas not owned by the producer, regardless of the extent to which the oil has been processed, if at all.

(3) Limitation.—

Nothing in this subsection authorizes the Secretary to prescribe standards for the movement of oil through production, refining, or manufacturing facilities or through oil production flow lines located on the grounds of wells.

(p) Limitation on Incorporation of Documents by Reference.—

Beginning 3 years after the date of enactment of this subsection, the Secretary may not issue a regulation pursuant to this chapter that incorporates by reference any documents or portions thereof unless the

A18

documents or portions thereof are made available to the public, free of charge.

(q) Gas Pipeline Leak Detection and Repair.—

(1) In general.—Not later than 1 year after the date of enactment of this subsection, the Secretary shall promulgate final regulations that require operators of regulated gathering lines (as defined pursuant to subsection (b) of section 60101 for purposes of subsection (a)(21) of that section) in a Class 2 location, Class 3 location, or Class 4 location, as determined under section 192.5 of title 49, Code of Federal Regulations, operators of new and existing gas transmission pipeline facilities, and operators of new and existing gas distribution pipeline facilities to conduct leak detection and repair programs—

(A) to meet the need for gas pipeline safety, as determined by the Secretary; and

(B) to protect the environment.

(2) Leak detection and repair programs.—

(A) Minimum performance standards.—The final regulations promulgated under paragraph (1) shall include, for the leak detection and repair programs described in that paragraph, minimum performance standards that reflect the capabilities of commercially available advanced technologies that, with respect to each pipeline covered by the programs, are appropriate for—

(i) the type of pipeline;

(ii) the location of the pipeline;

(iii) the material of which the pipeline is constructed; and

(iv) the materials transported by the pipeline.

(B) Requirement.—The leak detection and repair programs described in paragraph (1) shall be able to identify, locate, and categorize all leaks that—

(i) are hazardous to human safety or the environment; or

(ii) have the potential to become explosive or otherwise hazardous to human safety.

A19

(3) Advanced leak detection technologies and practices.—

(A) In general.—The final regulations promulgated under paragraph (1) shall—

(i) require the use of advanced leak detection technologies and practices described in subparagraph (B);

(ii) identify any scenarios where operators may use leak detection practices that depend on human senses; and

(iii) include a schedule for repairing or replacing each leaking pipe, except a pipe with a leak so small that it poses no potential hazard, with appropriate deadlines.

(B) Advanced leak detection technologies and practices described.—The advanced leak detection technologies and practices referred to in subparagraph (A)(i) include—

(i) for new and existing gas distribution pipeline facilities, technologies and practices to detect pipeline leaks—

(I) through continuous monitoring on or along the pipeline; or

(II) through periodic surveys with handheld equipment, equipment mounted on mobile platforms, or other means using commercially available technology;

(ii) for new and existing gas transmission pipeline facilities, technologies and practices to detect pipeline leaks through—

(I) equipment that is capable of continuous monitoring; or

(II) periodic surveys with handheld equipment, equipment mounted on mobile platforms, or other means using commercially available technology; and

(iii) for regulated gathering lines in Class 2 locations, Class 3 locations, or Class 4 locations, technologies and practices to detect pipeline leaks through—

(I) equipment that is capable of continuous monitoring; or

(II) periodic surveys with handheld equipment, equipment mounted on mobile platforms, or other means using commercially available technology.

A20

(4) Rules of construction.—

(A) Surveys and timelines.—In promulgating regulations under this subsection, the Secretary—

(i) may not reduce the frequency of surveys required under any other provision of this chapter or stipulated by regulation as of the date of enactment of this subsection; and

(ii) may not extend the duration of any timelines for the repair or remediation of leaks that are stipulated by regulation as of the date of enactment of this subsection.

(B) Application.—

The limitations in this paragraph do not restrict the Secretary's ability to modify any regulations through proceedings separate from or subsequent to the final regulations required under paragraph (1).

(C) Existing authority.—

Nothing in this subsection may be construed to alter the authority of the Secretary to regulate gathering lines as defined pursuant to section 60101.

(r) Emergency Response Plans.—Not later than 2 years after the date of enactment of this subsection, the Secretary shall update regulations to ensure that each emergency response plan developed by an operator of a distribution system under subsection (d)(5), includes written procedures for—

(1) establishing communication with first responders and other relevant public officials, as soon as practicable, beginning from the time of confirmed discovery, as determined by the Secretary, by the operator of a gas pipeline emergency involving a release of gas from a distribution system of that operator that results in—

(A) a fire related to an unintended release of gas;

(B) an explosion;

(C) 1 or more fatalities; or

(D) the unscheduled release of gas and shutdown of gas service to a significant number of customers, as determined by the Secretary;

(2) establishing general public communication through an appropriate channel—

(A) as soon as practicable, as determined by the Secretary, after a gas pipeline emergency described in paragraph (1); and

(B) that provides information regarding—

(i) the emergency described in subparagraph (A); and

(ii) the status of public safety; and

(3) the development and implementation of a voluntary, opt-in system that would allow operators of distribution systems to rapidly communicate with customers in the event of an emergency.

(s) Operations and Maintenance Manuals.—Not later than 2 years after the date of enactment of this subsection, the Secretary shall update regulations to ensure that each procedural manual for operations, maintenance, and emergencies developed by an operator of a distribution pipeline under subsection (d)(4), includes written procedures for—

(1) responding to overpressurization indications, including specific actions and an order of operations for immediately reducing pressure in or shutting down portions of the gas distribution system, if necessary; and

(2) a detailed procedure for the management of the change process, which shall—

(A) be applied to significant technology, equipment, procedural, and organizational changes to the distribution system; and

(B) ensure that relevant qualified personnel, such as an engineer with a professional engineer licensure, subject matter expert, or other employee who possesses the necessary knowledge, experience, and skills regarding natural gas distribution systems, review and certify construction plans for accuracy, completeness, and correctness.

A22

(t) Other Pipeline Safety Practices.—

(1) Records.—Not later than 2 years after the date of enactment of this subsection, the Secretary shall promulgate regulations to require an operator of a distribution system—

(A) to identify and manage traceable, reliable, and complete records, including maps and other drawings, critical to ensuring proper pressure controls for a gas distribution system, and updating these records as needed, while collecting and identifying other records necessary for risk analysis on an opportunistic basis; and

(B) to ensure that the records required under subparagraph (A) are—

(i) accessible to all personnel responsible for performing or overseeing relevant construction or engineering work; and

(ii) submitted to, or made available for inspection by, the Secretary or the relevant State authority with a certification in effect under section 60105.

(2) Presence of qualified employees.—

(A) In general.—

Not later than 180 days after the date of enactment of this subsection, the Secretary shall promulgate regulations to require that not less than 1 agent of an operator of a distribution system who is qualified to perform relevant covered tasks, as determined by the Secretary, shall monitor gas pressure at the district regulator station or at an alternative site with equipment capable of ensuring proper pressure controls and have the capability to promptly shut down the flow of gas or control over pressurization at a district regulator station during any construction project that has the potential to cause a hazardous overpressurization at that station, including tie-ins and abandonment of distribution lines and mains, based on an evaluation, conducted by the operator, of threats that could result in unsafe operation.

(B) Exclusion.—

A23

In promulgating regulations under subparagraph (A), the Secretary shall ensure that those regulations do not apply to a district regulating station that has a monitoring system and the capability for remote or automatic shutoff.

(3) District regulator stations.—

(A) In general.—Not later than 1 year after the date of enactment of this subsection, the Secretary shall promulgate regulations to require that each operator of a distribution system assesses and upgrades, as appropriate, each district regulator station of the operator to ensure that—

(i) the risk of the gas pressure in the distribution system exceeding, by a common mode of failure, the maximum allowable operating pressure (as described in section 192.623 of title 49, Code of Federal Regulations (or a successor regulation)) allowed under Federal law (including regulations) is minimized;

(ii) the gas pressure of a low-pressure distribution system is monitored, particularly at or near the location of critical pressure-control equipment;

(iii) the regulator station has secondary or backup pressure-relieving or overpressure-protection safety technology, such as a relief valve or automatic shutoff valve, or other pressure-limiting devices appropriate for the configuration and siting of the station and, in the case of a regulator station that employs the primary and monitor regulator design, the operator shall eliminate the common mode of failure or provide backup protection capable of either shutting the flow of gas, relieving gas to the atmosphere to fully protect the distribution system from overpressurization events, or there must be technology in place to eliminate a common mode of failure; and

(iv) if the Secretary determines that it is not operationally possible for an operator to implement the requirements under clause (iii), the Secretary shall require such operator to identify actions in their plan that minimize the risk of an overpressurization event.

**49 C.F.R. § 192.9**

**§ 192.9. What requirements apply to gathering pipelines?**

(a) Requirements. An operator of a gathering line must follow the safety requirements of this part as prescribed by this section.

(b) Offshore lines. An operator of an offshore gathering line must comply with requirements of this part applicable to transmission lines, except the requirements in §§ 192.150, 192.285(e), 192.493, 192.506, 192.607, 192.619(e), 192.624, 192.710, 192.712, and in subpart O of this part.

(c) Type A lines. An operator of a Type A regulated onshore gathering line must comply with the requirements of this part applicable to transmission lines, except the requirements in §§ 192.150, 192.285(e), 192.493, 192.506, 192.607, 192.619(e), 192.624, 192.710, 192.712, and in subpart O of this part. However, operators of Type A regulated onshore gathering lines in a Class 2 location may demonstrate compliance with subpart N by describing the processes it uses to determine the qualification of persons performing operations and maintenance tasks.

(d) Type B lines. An operator of a Type B regulated onshore gathering line must comply with the following requirements:

(1) If a line is new, replaced, relocated, or otherwise changed, the design, installation, construction, initial inspection, and initial testing must be in accordance with requirements of this part applicable to transmission lines. Compliance with §§ 192.67, 192.127, 192.179(e), 192.179(f), 192.205, 192.227(c), 192.285(e), 192.506, 192.634, and 192.636 is not required.

(2) If the pipeline is metallic, control corrosion according to requirements of subpart I of this part applicable to transmission lines except the requirements in § 192.493;

(3) If the pipeline contains plastic pipe or components, the operator must comply with all applicable requirements of this part for plastic pipe components;

(4) Carry out a damage prevention program under § 192.614;

(5) Establish a public education program under § 192.616;

A25

(6) Establish the MAOP of the line under § 192.619(a), (b), and (c);

(7) Install and maintain line markers according to the requirements for transmission lines in § 192.707; and

(8) Conduct leakage surveys in accordance with the requirements for transmission lines in § 192.706, using leak-detection equipment, and promptly repair hazardous leaks in accordance with § 192.703(c).

(e) Type C lines. The requirements for Type C gathering lines are as follows.

(1) An operator of a Type C onshore gathering line with an outside diameter greater than or equal to 8.625 inches must comply with the following requirements:

(i) Except as provided in paragraph (h) of this section for pipe and components made with composite materials, the design, installation, construction, initial inspection, and initial testing of a new, replaced, relocated, or otherwise changed Type C gathering line, must be done in accordance with the requirements in subparts B though G and J of this part applicable to transmission lines. Compliance with §§ 192.67, 192.127, 192.179(e), 192.179(f), 192.205, 192.227(c), 192.285(e), 192.506, 192.634, and 192.636 is not required;

(ii) If the pipeline is metallic, control corrosion according to requirements of subpart I of this part applicable to transmission lines except for § 192.493;

(iii) Carry out a damage prevention program under § 192.614;

(iv) Develop and implement procedures for emergency plans in accordance with § 192.615;

(v) Develop and implement a written public awareness program in accordance with § 192.616;

(vi) Install and maintain line markers according to the requirements for transmission lines in § 192.707; and

(vii) Conduct leakage surveys in accordance with the requirements for transmission lines in § 192.706 using leak-detection

A26

equipment, and promptly repair hazardous leaks in accordance with § 192.703(c).

(2) An operator of a Type C onshore gathering line with an outside diameter greater than 12.75 inches must comply with the requirements in paragraph (e)(1) of this section and the following:

(i) If the pipeline contains plastic pipe, the operator must comply with all applicable requirements of this part for plastic pipe or components. This does not include pipe and components made of composite materials that incorporate plastic in the design; and

(ii) Establish the MAOP of the pipeline under § 192.619(a) or (c) and maintain records used to establish the MAOP for the life of the pipeline.

(f) Exceptions.

(1) Compliance with paragraphs (e)(1)(ii), (v), (vi), and (vii) and (e)(2)(i) and (ii) of this section is not required for pipeline segments that are 16 inches or less in outside diameter if one of the following criteria are met:

(i) Method 1. The segment is not located within a potential impact circle containing a building intended for human occupancy or other impacted site. The potential impact circle must be calculated as specified in § 192.903, except that a factor of 0.73 must be used instead of 0.69. The MAOP used in this calculation must be determined and documented in accordance with paragraph (e)(2)(ii) of this section.

(ii) Method 2. The segment is not located within a class location unit (see § 192.5) containing a building intended for human occupancy or other impacted site.

(2) Paragraph (e)(1)(i) of this section is not applicable to pipeline segments 40 feet or shorter in length that are replaced, relocated, or changed on a pipeline existing on or before May 16, 2022.

(3) For purposes of this section, the term "building intended for human occupancy or other impacted site" means any of the following:

A27

(i) Any building that may be occupied by humans, including homes, office buildings factories, outside recreation areas, plant facilities, etc.;

(ii) A small, well-defined outside area (such as a playground, recreation area, outdoor theater, or other place of public assembly) that is occupied by 20 or more persons on at least 5 days a week for 10 weeks in any 12–month period (the days and weeks need not be consecutive); or

(iii) Any portion of the paved surface, including shoulders, of a designated interstate, other freeway, or expressway, as well as any other principal arterial roadway with 4 or more lanes.

(g) Compliance deadlines. An operator of a regulated onshore gathering line must comply with the following deadlines, as applicable.

(1) An operator of a new, replaced, relocated, or otherwise changed line must be in compliance with the applicable requirements of this section by the date the line goes into service, unless an exception in § 192.13 applies.

(2) If a Type A or Type B regulated onshore gathering pipeline existing on April 14, 2006, was not previously subject to this part, an operator has until the date stated in the second column to comply with the applicable requirement for the pipeline listed in the first column, unless the Administrator finds a later deadline is justified in a particular case:

| Requirement | Compliance Deadline |
|---|---|
| (i) Control corrosion according to requirements for transmission lines in subpart I of this part | April 15, 2009. |
| (ii) Carry out a damage prevention program under § 192.614 | October 15, 2007. |
| (iii) Establish MAOP under § 192.619 | October 15, 2007. |
| (iv) Install and maintain line markers under § 192.707 | April 15, 2008. |

A28

| (v) Establish a public education program under § 192.616 | April 15, 2008. |
| (vi) Other provisions of this part as required by paragraph (c) of this section for Type A lines | April 15, 2009. |

(3) If, after April 14, 2006, a change in class location or increase in dwelling density causes an onshore gathering pipeline to become a Type A or Type B regulated onshore gathering line, the operator has 1 year for Type B lines and 2 years for Type A lines after the pipeline becomes a regulated onshore gathering pipeline to comply with this section.

(4) If a Type C gathering pipeline existing on or before May 16, 2022, was not previously subject to this part, an operator must comply with the applicable requirements of this section, except for paragraph (h) of this section, on or before:

(i) May 16, 2023; or

(ii) An alternative deadline approved by PHMSA. The operator must notify PHMSA and State or local pipeline safety authorities, as applicable, no later than 90 days in advance of the deadline in paragraph (b)(1) of this section. The notification must be made in accordance with § 192.18 and must include a description of the affected facilities and operating environment, the proposed alternative deadline for each affected requirement, the justification for each alternative compliance deadline, and actions the operator will take to ensure the safety of affected facilities.

(5) If, after May 16, 2022, a change in class location, an increase in dwelling density, or an increase in MAOP causes a pipeline to become a Type C gathering pipeline, or causes a Type C gathering pipeline to become subject to additional Type C requirements (see paragraph (f) of this section), the operator has 1 year after the pipeline becomes subject to the additional requirements to comply with this section.

A29

(h) Composite materials. Pipe and components made with composite materials not otherwise authorized for use under this part may be used on Type C gathering pipelines if the following requirements are met:

(1) Steel and plastic pipe and components must meet the installation, construction, initial inspection, and initial testing requirements in subparts B though G and J of this part applicable to transmission lines.

(2) Operators must notify PHMSA in accordance with § 192.18 at least 90 days prior to installing new or replacement pipe or components made of composite materials otherwise not authorized for use under this part in a Type C gathering pipeline. The notifications required by this section must include a detailed description of the pipeline facilities in which pipe or components made of composite materials would be used, including:

(i) The beginning and end points (stationing by footage and mileage with latitude and longitude coordinates) of the pipeline segment containing composite pipeline material and the counties and States in which it is located;

(ii) A general description of the right-of-way including high consequence areas, as defined in § 192.905;

(iii) Relevant pipeline design and construction information including the year of installation, the specific composite material, diameter, wall thickness, and any manufacturing and construction specifications for the pipeline;

(iv) Relevant operating information, including MAOP, leak and failure history, and the most recent pressure test (identification of the actual pipe tested, minimum and maximum test pressure, duration of test, any leaks and any test logs and charts) or assessment results;

(v) An explanation of the circumstances that the operator believes make the use of composite pipeline material appropriate and how the design, construction, operations, and maintenance will mitigate safety and environmental risks;

A30

(vi) An explanation of procedures and tests that will be conducted periodically over the life of the composite pipeline material to document that its strength is being maintained;

(vii) Operations and maintenance procedures that will be applied to the alternative materials. These include procedures that will be used to evaluate and remediate anomalies and how the operator will determine safe operating pressures for composite pipe when defects are found;

(viii) An explanation of how the use of composite pipeline material would be in the public interest; and

(ix) A certification signed by a vice president (or equivalent or higher officer) of the operator's company that operation of the applicant's pipeline using composite pipeline material would be consistent with pipeline safety.

(3) Repairs or replacements using materials authorized under this part do not require notification under this section.

A31

**49 C.F.R. § 195.1**

**§ 195.1. Which pipelines are covered by this Part?**

(a) Covered. Except for the pipelines listed in paragraph (b) of this Section, this Part applies to pipeline facilities and the transportation of hazardous liquids or carbon dioxide associated with those facilities in or affecting interstate or foreign commerce, including pipeline facilities on the Outer Continental Shelf (OCS). Covered pipelines include, but are not limited to:

(1) Any pipeline that transports a highly volatile liquid;

(2) Any pipeline segment that crosses a waterway currently used for commercial navigation;

(3) Except for a gathering line not covered by paragraph (a)(4) of this Section, any pipeline located in a rural or non-rural area of any diameter regardless of operating pressure;

(4) Any of the following onshore gathering lines used for transportation of petroleum:

(i) A pipeline located in a non-rural area;

(ii) A regulated rural gathering line as provided in § 195.11; or

(iii) A pipeline located in an inlet of the Gulf of Mexico as provided in § 195.413.

(5) For purposes of the reporting requirements in subpart B of this part, any gathering line not already covered under paragraphs (a)(1), (2), (3) or (4) of this section.

(b) Excepted. This Part does not apply to any of the following:

(1) Transportation of a hazardous liquid transported in a gaseous state;

(2) Except for the reporting requirements of subpart B of this part, see § 195.13, transportation of a hazardous liquid through a pipeline by gravity.

(3) Transportation of a hazardous liquid through any of the following low-stress pipelines:

A32

(i) A pipeline subject to safety regulations of the U.S. Coast Guard; or

(ii) A pipeline that serves refining, manufacturing, or truck, rail, or vessel terminal facilities, if the pipeline is less than one mile long (measured outside facility grounds) and does not cross an offshore area or a waterway currently used for commercial navigation;

(4) Except for the reporting requirements of subpart B of this part, see § 195.15, transportation of petroleum through an onshore rural gathering line that does not meet the definition of a "regulated rural gathering line" as provided in § 195.11. This exception does not apply to gathering lines in the inlets of the Gulf of Mexico subject to § 195.413.

(5) Transportation of hazardous liquid or carbon dioxide in an offshore pipeline in state waters where the pipeline is located upstream from the outlet flange of the following farthest downstream facility: The facility where hydrocarbons or carbon dioxide are produced or the facility where produced hydrocarbons or carbon dioxide are first separated, dehydrated, or otherwise processed;

(6) Transportation of hazardous liquid or carbon dioxide in a pipeline on the OCS where the pipeline is located upstream of the point at which operating responsibility transfers from a producing operator to a transporting operator;

(7) A pipeline segment upstream (generally seaward) of the last valve on the last production facility on the OCS where a pipeline on the OCS is producer-operated and crosses into state waters without first connecting to a transporting operator's facility on the OCS. Safety equipment protecting PHMSA–regulated pipeline segments is not excluded. A producing operator of a segment falling within this exception may petition the Administrator, under § 190.9 of this chapter, for approval to operate under PHMSA regulations governing pipeline design, construction, operation, and maintenance;

(8) Transportation of hazardous liquid or carbon dioxide through onshore production (including flow lines), refining, or manufacturing

facilities or storage or in-plant piping systems associated with such facilities;

(9) Transportation of hazardous liquid or carbon dioxide:

(i) By vessel, aircraft, tank truck, tank car, or other non-pipeline mode of transportation; or

(ii) Through facilities located on the grounds of a materials transportation terminal if the facilities are used exclusively to transfer hazardous liquid or carbon dioxide between non-pipeline modes of transportation or between a non-pipeline mode and a pipeline. These facilities do not include any device and associated piping that are necessary to control pressure in the pipeline under § 195.406(b); or

(10) Transportation of carbon dioxide downstream from the applicable following point:

(i) The inlet of a compressor used in the injection of carbon dioxide for oil recovery operations, or the point where recycled carbon dioxide enters the injection system, whichever is farther upstream; or

(ii) The connection of the first branch pipeline in the production field where the pipeline transports carbon dioxide to an injection well or to a header or manifold from which a pipeline branches to an injection well.

(c) Breakout tanks. Breakout tanks subject to this Part must comply with requirements that apply specifically to breakout tanks and, to the extent applicable, with requirements that apply to pipeline systems and pipeline facilities. If a conflict exists between a requirement that applies specifically to breakout tanks and a requirement that applies to pipeline systems or pipeline facilities, the requirement that applies specifically to breakout tanks prevails. Anhydrous ammonia breakout tanks need not comply with §§ 195.132(b), 195.205(b), 195.242(c) and (d), 195.264(b) and (e), 195.307, 195.428(c) and (d), and 195.432(b) and (c).

A34

**49 C.F.R. § 195.11**

## § 195.1. What is a regulated rural gathering line and what requirements apply?

Each operator of a regulated rural gathering line, as defined in paragraph (a) of this section, must comply with the safety requirements described in paragraph (b) of this section.

(a) Definition. As used in this section, a regulated rural gathering line means an onshore gathering line in a rural area that meets all of the following criteria—

(1) Has a nominal diameter from 6 ⅝ inches (168 mm) to 8 ⅝ inches (219.1 mm);

(2) Is located in or within one-quarter mile (.40 km) of an unusually sensitive area as defined in § 195.6; and

(3) Operates at a maximum pressure established under § 195.406 corresponding to—

(i) A stress level greater than 20–percent of the specified minimum yield strength of the line pipe; or

(ii) If the stress level is unknown or the pipeline is not constructed with steel pipe, a pressure of more than 125 psi (861 kPa) gage.

(b) Safety requirements. Each operator must prepare, follow, and maintain written procedures to carry out the requirements of this section. Except for the requirements in paragraphs (b)(2), (b)(3), (b)(9) and (b)(10) of this section, the safety requirements apply to all materials of construction.

(1) Identify all segments of pipeline meeting the criteria in paragraph (a) of this section before April 3, 2009.

(2) For steel pipelines contracted, replaced, relocated, or otherwise changed after July 3, 2009:

(i) Design, install, construct, initially inspect, and initially test the pipeline in compliance with this part, unless the pipeline is converted under § 195.5.

(ii) Except for pipelines subject to § 195.260(e), such pipelines are not subject to the rupture-mitigation valve (RMV) and alternative

A35

equivalent technology requirements in §§ 195.258(c) and (d), 195.418, and 195.419.

(3) For non-steel pipelines constructed after July 3, 2009, notify the Administrator according to § 195.8.

(4) Beginning no later than January 3, 2009, comply with the reporting requirements in subpart B of this part.

(5) Establish the maximum operating pressure of the pipeline according to § 195.406 before transportation begins, or if the pipeline exists on July 3, 2008, before July 3, 2009.

(6) Install line markers according to § 195.410 before transportation begins, or if the pipeline exists on July 3, 2008, before July 3, 2009. Continue to maintain line markers in compliance with § 195.410.

(7) Establish a continuing public education program in compliance with § 195.440 before transportation begins, or if the pipeline exists on July 3, 2008, before January 3, 2010. Continue to carry out such program in compliance with § 195.440.

(8) Establish a damage prevention program in compliance with § 195.442 before transportation begins, or if the pipeline exists on July 3, 2008, before July 3, 2009. Continue to carry out such program in compliance with § 195.442.

(9) For steel pipelines, comply with subpart H of this part, except corrosion control is not required for pipelines existing on July 3, 2008 before July 3, 2011.

(10) For steel pipelines, establish and follow a comprehensive and effective program to continuously identify operating conditions that could contribute to internal corrosion. The program must include measures to prevent and mitigate internal corrosion, such as cleaning the pipeline and using inhibitors. This program must be established before transportation begins or if the pipeline exists on July 3, 2008, before July 3, 2009.

(11) To comply with the Operator Qualification program requirements in subpart G of this part, have a written description of the processes used to carry out the requirements in § 195.505 to determine the qualification of persons performing operations and

A36

maintenance tasks. These processes must be established before transportation begins or if the pipeline exists on July 3, 2008, before July 3, 2009.

(c) New unusually sensitive areas. If, after July 3, 2008, a new unusually sensitive area is identified and a segment of pipeline becomes regulated as a result, except for the requirements of paragraphs (b)(9) and (b)(10) of this section, the operator must implement the requirements in paragraphs (b)(2) through (b)(11) of this section for the affected segment within 6 months of identification. For steel pipelines, comply with the deadlines in paragraph (b)(9) and (b)(10).

(d) Record Retention. An operator must maintain records demonstrating compliance with each requirement according to the following schedule.

(1) An operator must maintain the segment identification records required in paragraph (b)(1) of this section and the records required to comply with (b)(10) of this section, for the life of the pipe.

(2) An operator must maintain the records necessary to demonstrate compliance with each requirement in paragraphs (b)(2) through (b)(9), and (b)(11) of this section according to the record retention requirements of the referenced section or subpart.

A37